**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | |
|---|---|
| The United States of America and the States of North Carolina, California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, New Jersey, New York, Tennessee, Texas, Virginia and Wisconsin, *ex rel*. Scarlett Lutz, Kayla Webster, Dr. Michael Mayes and Chris Reidel,<br><br>Plaintiffs,<br><br>vs.<br><br>Berkeley Heartlab, Inc., BlueWave Healthcare Consultants, Inc., Latonya Mallory, Floyd Calhoun Dent, III and Robert Bradford Johnson,<br><br>Defendants. | **CA No.**: **9:14-cv-00230-RMG** (Consolidated with 9:11-cv-1593-RMG and 9:15-cv-2485-RMG ) |

**United States' Application for Prejudgment Remedies
Against Defendants BlueWave Healthcare Consultants, Inc.,
<u>Floyd Calhoun Dent, III, and Robert Bradford Johnson</u>**

# TABLE OF CONTENTS

INTRODUCTION AND LEGAL BACKGROUND .............................................................- 1 -

    A. The Federal Debt Collection Procedures Act .......................................................- 1 -

    B. The Debt Owed to the United States Pursuant to the False Claims Act .......................- 3 -

    C. The Anti-Kickback Statute ................................................................................- 5 -

        1. The Employee Safe Harbor ...........................................................................- 7 -

        2. The Personal Services Safe Harbor ................................................................- 8 -

        3. The HHS OIG Rule-Making Process ............................................................- 9-

        4. OIG Advisory Opinions ............................................................................- 11 -

        5. Case Law ...............................................................................................- 13 -

ARGUMENT ......................................................................................................- 15 -

    A. Prejudgment relief is warranted because the United States has established the probable validity of its claim of debt in the amount of at least $58 million for Johnson and Dent individually and $240 million for BlueWave ..............................................................- 15 -

    B. The BlueWave Defendants have concealed and disposed of property with the effect of hindering or delaying recovery by the United States. ...................................................- 21 -

    C. The amount of the debt owing to the United States .....................................................- 25 -

    D. Prejudgment remedies sought .................................................................................- 27 -

        1. Writs of Attachment ......................................................................................- 27 -

            a.   Writs of Attachment – Personal Property ......................................................- 30 -

            b.   Writs of Attachment – Real Property ...........................................................- 31 -

                1.  Writs of Attachment – Real Property – Defendant Johnson ............- 31 -

                2.  Writs of Attachment – Real Property – Defendant Dent .................- 36 -

        2. Writ of Garnishment .......................................................................................- 39 -

    E. Defendant Dent made eleven fraudulent transfers of real property. ...........................- 40 -

    F. Financial Discovery .............................................................................................- 42 -

CONCLUSION ....................................................................................................- 42 -

# TABLE OF AUTHORITIES

Cases

Ab-Tech Constr., Inc. v. United States,
   31 Fed. Cl. 429 (Ct. Fed. Cl. 1994) ..................................................- 4 -

Audio Invs. v. Robertson,
   203 F. Supp. 2d 555 (D.S.C. 2004) ................................................- 41 -

Berkeley Heartlab, Inc., v. Health Diagnostics Laboratory, Inc.,
   No. 3:10-cv-00030-REP (E.D. Va. Nov. 2, 2011)..……….....………………………… - 16 -

Bluewave Healthcare Consultants, Inc. v. Health Diagnostics Laboratory, Inc.,
   No. 5:15-cv-0030-HGD (N.D. Ala. Jan. 9, 2015).…………………………………………… - 20 -

Bluewave Healthcare Consultants, Inc. v. Health Diagnostics Laboratory, Inc.,
   No. 5:15-cv-00884-MHH (N.D. Ala. June 3, 2015)……………………….……………….- 7 -

Cantrell v. N.Y. Univ.,
   326 F. Supp. 2d 468 (S.D.N.Y. 2004) ............................................- 26 -

Ex.-Im. Bank of the U.S. v. Asia Pulp & Paper Co.,
   609 F.3d 111 (2d Cir. 2010)……………………………………….………- 28 -, - 29 -

Health Diagnostics Laboratory, Inc. v. BlueWave Healthcare Consultants, Inc.,
   No. 3:15-cv-0030-REP (E.D. Va. Jan. 13, 2015)…………………………………….- 7 -, - 20 -

Holman v. United States,
   505 F.3d 1060 (10th Cir. 2007) ...................................................- 30 -

Joint Technology, Inc. v. Weaver,
   567 Fed. Appx. 585 (10th Cir. 2014) ............................................- 14 -

Joint Technology, Inc. v. Weaver,
   No. CV-11-846, 2013 WL 257075 (W.D. Okla. Jan. 23, 2013) .............- 13 -, - 14 -

Mama's Enters., LLC v. United States,
   883 F. Supp. 2d 1128 (N.D. Ala. 2012) ........................................- 29 -

May v. A Parcel of Land,
   458 F. Supp. 2d 1324 (S.D. Ala. 2006) .........................................- 30 -

Med. Dev. Network, Inc. v. Prof'l Respiratory Care/Home Med. Equip. Servs., Inc.,
   673 So. 2d 565 (Fla. Dist. Ct. App. 1996)......................................- 14 -

NLRB v. E.D.P. Med. Comp. Sys., Inc.,
   6 F.3d 951 (2d Cir. 1993) ..........................................................- 2 -

Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.,
   926 F. Supp. 835 (E.D. Ark. 1996) ..............................................- 14 -

Spotts v. United States,
   429 F.3d 248 (6th Cir. 2005)......................................................- 30 -

U.S. ex rel. Doe v. DeGregorio,
   510 F. Supp. 2d 877 (M.D. Fla. 2007) .....................................- 3 -, - 15 -

U.S. ex rel. Drakeford v. Tuomey,
   976 F. Supp. 2d 776 (D.S.C. 2013) ..............................................- 4 -

U.S. ex rel. Freedman v. Soarez-Hoyos,
   2012 WL 4344199 (M.D. Fla. 2012) .............................................- 4 -

U.S. ex rel. Harrison v. Westinghouse Savannah River Co.,
   352 F.3d 908 (4th Cir. 2003)......................................................- 4 -

United States v. Alexander,
  No. 6:08-cv-03760-GRA, 2010 U.S. Dist. LEXIS 40108 (D.S.C. Apr. 22, 2010)... - 29 -, - 30 -
United States v. Craft,
  535 U.S. 274 (2002) .................................................................................................... - 30 -
United States v. Fed. Res. Corp.,
  No. 1:11-cv-00127, 2015 U.S. Dist. LEXIS 138489 (D. Idaho Oct. 9, 2015).................... - 28 -
United States v. First Choice Armor & Equip., Inc.,
  808 F. Supp. 2d 68 (D.D.C. 2011) ................................................................................- 3 -
United States v. Kollintzas,
  501 F.3d 796 (7th Cir. 2007)........................................................................................ - 29 -
United States v. Meux,
  597 F.3d 835 (7th Cir. 2010)........................................................................................ - 28 -
United States v. Rogan,
  517 F.3d 449 (7th Cir. 2008)........................................................................................- 4 -
United States v. Teeven,
  862 F. Supp. 1200 (D. Del. 1992) ...................................................................- 15 -, - 22 -
United States v. United Techs. Corp.,
  626 F.3d 313 (6th Cir. 2010)…………………………….…………………………….. - 26 -
United States v. United Techs. Corp.,
  No. 3:99-cv-093, 2008 U.S. Dist LEXIS 61199 (W.D. Ohio Aug. 1, 2008)…………........- 26 -
United States v. Vito,
  No. 99-0630-RV-S, 2000 U.S. Dist. LEXIS 11258 (S.D. Ala. July 13, 2000)…………   - 29 -
West Allis Mem'l Hosp., Inc. v. Bowen,
  852 F.2d 251 (7th Cir. 1988)........................................................................................- 7 -
Zimmer, Inc. v. NuTech Med., Inc.,
  54 F. Supp. 2d 850 (N.D. Ind. 1999)…….…………………………………………………..- 14 -

Statutes
26 U.S.C. § 3121(d)(2) ....................................................................................- 8 -, - 9 -
28 U.S.C. § 2461 note....................................................................................................- 26 -
28 U.S.C. § 3001...........................................................................................................- 1 -
28 U.S.C. § 3001(a)(1)…………………………………………………………………….….- 1 -
28 U.S.C. § 3001(a)(2)…………………………………………………………………….…..- 2 -
28 U.S.C. § 3002(3)(B)…………………………………………………………………….…..- 2 -
28 U.S.C. § 3006 ...........................................................................................................- 15 -
28 U.S.C. § 3010(a) ......................................................................................................- 27 -
28 U.S.C. § 3014(a) ......................................................................................................- 27 -
28 U.S.C. § 3015...........................................................................................................- 42 -
28 U.S.C. § 3101……………………………………………………………………..- 1 -, - 2 -
28 U.S.C. § 3101(b)……………………………………………………………………….... - 22 -
28 U.S.C. § 3101(b)(1)(B) ............................................................................................ - 21 -
28 U.S.C. § 3101(b)(1)(C)………………………………………………………………….... - 22 -
28 U.S.C. § 3101(c)(1)..................................................................................................- 15 -
28 U.S.C. § 3101(c)(2)..................................................................................................- 39 -
28 U.S.C. § 3101(c)(2)(A).............................................................................................- 15 -
28 U.S.C. § 3101(d)………………………………………………………………………...- 2 -
28 U.S.C. § 3102...........................................................................................................- 1 -

28 U.S.C. § 3102(a)(1)……………………………………………- 27 -, - 28 -, - 31 -, - 36 -
28 U.S.C. § 3102(b)…………………………………………………………- 1 -, - 28 -
28 U.S.C. § 3102(c)(3)(E)………………………………………………………… - 28 -
28 U.S.C. § 3102(d)(1)…………………………………………………………… -28 -
28 U.S.C. § 3102(f)…………………………………………………………….- 28 -
28 U.S.C. § 3104……………………………………………………………- 2 -, - 39 -
28 U.S.C. § 3104(a)……………………………………………………… …… - 39 -
28 U.S.C. § 3105(a)……………………………………………………………- 2 -
28 U.S.C. § 3304(b)(1)……………………………………………………… - 40 -
28 U.S.C. § 3304(b)(2)……………………………………………………… - 41 -
28 U.S.C. § 3306(a)………………………………………………………… - 41 -
31 U.S.C. § 3729……………………………………………………………- 1 -, - 2 -
31 U.S.C. § 3729(a)………………………………………………………… - 26 -
31 U.S.C. § 3729(a)(1)(A)……………………………………………………- 3 -
31 U.S.C. § 3731(b)(1)……………………………………………………… - 26 -
31 U.S.C. § 3731(c)………………………………………………………… - 26 -
42 U.S.C. § 1320a-7b(b)…………………………………………………- 3 -, -11 -
42 U.S.C. § 1320a-7b(b)(B)……………………………………………- 5 -, - 6 -
42 U.S.C. § 1320a-7b(b)(1)………………………………………- 4 -, - 8 -
42 U.S.C. § 1320a-7b(b)(1)(A)……………………………………………… -1 -
42 U.S.C. § 1320a-7b(b)(1)(B)………………………………….... - 5 -, - 6 -
42 U.S.C. § 1320a-7b(b)(2)(B)……………………………………………- 5 -
42 U.S.C. § 1320a-7b(b)(3)(B)……………………………………… - 6 -, - 7 -
42 U.S.C. § 1320a-7d(b)(2)……………………………………………..-. 11 -
42 U.S.C. § 1320a-7b(g)………………………………………………..… - 3 -

Regulations

28 C.F.R. § 85.3(a)(9)………………………………………………… - 26 -
42 C.F.R. § 1001.952(i)……………………………………………………....- 7 -
42 C.F.R. § 1001.952(d)………………………………………………- 7 -, - 8 -

Other Authorities

123 Cong. Rec. 30,280…………………………………………………… - 10 -
155 Cong. Rec. S10854 …………………………………………………..…- 3 -
H. Conf. Rep. No. 673 95th Cong. 1st Sess. 41……………………………… - 11 -
HHS OIG Advisory Op. No. 10-23…………………………………… - 13 -
HHS OIG Advisory Op. No. 98-1……………………………………-13 -, - 14 -
HHS OIG Advisory Op. No. 98-10……………………………………… - 15 -
54 Fed. Reg. 3088, 3093 ……………………………………………- 9 -, - 12 -
56 Fed. Reg. 35952, 35981 …………………………………….…. - 10 -, - 12 -
Pub. L. 100-93……………………………………………………………...- 7 -
Pub. L. No. 111-148 …………………………………………………....- 3 -

BlueWave Healthcare Consultants, Inc. ("BlueWave"), and its sole co-owners and officers, Robert Bradford Johnson ("Johnson") and Floyd Calhoun Dent III ("Dent") (collectively, the "BlueWave Defendants"), have obtained over $240 million dollars that they were not entitled to, in violation of the False Claims Act, 31 U.S.C. § 3729, et seq. They contracted for commission-based payments from two client laboratories, Health Diagnostics Laboratory ("HDL") and Singulex, Inc. ("Singulex"), in exchange for promoting laboratory tests that were reimbursed by Federal health care programs, in violation of the Anti-Kickback Statute ("AKS"), 42 U.C.S. § 1320a-7b(b)(1)(A). In addition, the BlueWave Defendants arranged for illegal kickbacks in the form of process and handling fees to be paid to physicians who ordered the laboratory tests and the routine waiver of the co-pays and deductibles owed by TRICARE patients as well as caused the submission of false claims for medically unnecessary tests.

This is an application for relief under the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. § 3001, et seq. The United States is entitled to prejudgment remedies under Subchapters B and D of the FDCPA. As detailed more fully below, the United States is seeking limited prejudgment remedies against the BlueWave Defendants, namely liens (or writs of attachment) on certain real estate, boats, and an airplane to preserve the Government's interest in those properties as well as a writ of garnishment for funds in three bank accounts. BlueWave has no assets other than a bank account with less than $2 million, and therefore prejudgment relief is essential.

## INTRODUCTION AND LEGAL BACKGROUND

### A. The Federal Debt Collection Procedures Act

The FDCPA provides the exclusive civil procedures for the United States "to recover a judgment on a debt[,]" 28 U.S.C. § 3001(a)(1), and to seek prejudgment remedies.

28 U.S.C. § 3001(a)(2). The FDCPA authorizes district courts to secure a debtor's property through several different means, see 28 U.S.C. § 3101, including attachment, 28 U.S.C. § 3102, and garnishment, 28 U.S.C. § 3104, of real and personal property. The purpose of these prejudgment remedies is to establish "security to satisfy such judgment, and interest and costs, as the United States may recover on such claim" for a debt. 28 U.S.C. §§ 3102(b), 3105(a).

The United States is entitled to prejudgment remedies where it establishes: (1) the probable validity of the claim for a debt; (2) the amount of the debt claimed; (3) that the debtor has or is about to assign, dispose, remove, conceal, ill-treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States; and (4) that the requirements for the prejudgment remedies sought have been satisfied. 28 U.S.C. § 3101. Because of the quickness with which the debtor may dispose of property, the Court may issue the prejudgment relief requested, without waiting for a response from the debtor, so long as the United States has made its required showing. NLRB v. E.D.P. Med. Comp. Sys., Inc., 6 F.3d 951, 955-56 (2d Cir. 1993). The writs must be accompanied by a notice of prejudgment remedies signed by the Clerk of Court. 28 U.S.C. § 3101(d). (Proposed Clerk's notices are attached to this Application, and Word versions will also be emailed to Chambers.) The notices inform the debtors that they are entitled to a hearing within five days after the Clerk of Court receives the request, if the debtor wishes that the hearing take place that quickly. Id.

The United States has brought this action under the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq. and common law. Amounts claimed as owing to the United States under the FCA and common law are considered a "debt" that is subject to the FDCPA. The FDCPA defines a "debt" to the United States as, among other things, an amount owing to the United States on the account of a "fine, assessment, penalty, restitution, damages," or "any other

source of indebtedness." 28 U.S.C. § 3002(3)(B). Courts have previously held that claims under the FCA, and associated common law claims, constitute a "debt" for purposes of the FDCPA, and have granted prejudgment remedies in such cases. <u>U.S. ex rel. Doe v. DeGregorio</u>, 510 F. Supp. 2d 877, 884 (M.D. Fla. 2007) ("Treble damages under the False Claims Act . . . constitutes 'debt'" under the FDCPA); <u>see also</u> <u>United States v. First Choice Armor & Equip.</u>, 808 F. Supp. 2d 68, 79 (D.D.C. 2011) ("[B]y alleging that the defendants submitted false claims and made false statements under the FCA, the government sufficiently alleges the existence of a debt under the FDCPA.").

**B.       The Debt Owed to the United States Pursuant to the False Claims Act**

The United States' Complaint asserts three counts under the FCA, all three of which include AKS violations, as well as two common law counts. The AKS prohibits any individual or entity from soliciting, receiving, offering, or paying any remuneration to induce or reward any person for referring, recommending or arranging for the purchase of any item or service for which payment may be made under a Federal health care program. 42 U.S.C. § 1320a-7b(b). In March 2010, as part of the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, 124 Stat. 119 (Mar. 23, 2010), the AKS was amended to provide expressly that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g) (as amended by § 6402 of PPACA). According to the legislative history of the PPACA, this amendment to the AKS was intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for purposes of civil action under the False Claims Act . . . ." 155 Cong. Rec. S10854 (daily ed. Dec. 21, 2010).

As to damages, the FCA, 31 U.S.C. § 3729(a)(1)(A) (2010), provides that a person is

liable to the United States Government for three times the amount of damages which the Government sustains because of the act of that person plus a civil penalty for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  The Government's damages are equal to the full amount that Medicare paid on the false claims that were tainted by the kickback arrangement, because those claims were not eligible for payment.  In other words, compliance with the AKS is a precondition to payment by Medicare and, as such, Medicare should not have paid anything on the claims submitted by the BlueWave Defendants' client laboratories that resulted from the kickback arrangement.  See United States v. Rogan, 517 F.3d 449 (7th Cir. 2008); see also U.S. ex rel. Drakeford v. Tuomey, 976 F. Supp. 2d 776 , 778 (D.S.C. 2013) (affirming jury's finding that entire amount of Medicare reimbursement was government's loss for violations of Stark Statute and rejecting application of U.S. ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 923 (4th Cir. 2003)); U.S. ex rel. Freedman v. Soarez-Hoyos, 2012 WL 4344199, at *5 (M.D. Fla. 2012) (holding that "the amount of the Government's damages resulting from the payment of such claims [tainted by AKS violations] equals the full amount that Medicare paid").[1]

---

[1]  The government acknowledges that there are FCA cases measuring damages differently.  See, e.g., Ab-Tech Constr., Inc. v. United States, 31 Fed. Cl. 429, 434 (Ct. Fed. Cl. 1994) (stating that government's damages for false claims relating to construction of automated data processing facility were zero, because government received exactly what it paid for, despite false statements that were made); Harrison, 352 F.3d at 923 (concluding that government did not incur any damages from FCA violation based on contractor's false statements regarding its conflict of interest, because the value of work performed equaled the amount that the government paid).  Importantly, those cases arise outside of the Medicare context and they do not involve violations of the AKS.  Moreover, unlike Harrison, the government here did incur damages as a result of the BlueWave Defendants' conduct where the conduct induced claims for medically unnecessary tests.  While the government strongly opposes application of any alternate view of damages here, it is of no consequence for purposes of the instant FDCPA action.  Even assuming arguendo the most conservative damages estimate for purposes of this action – that is, the amount of the

- 4 -

## C.        The Anti-Kickback Statute

As set forth in the Complaint and as detailed infra, the United States alleges, inter alia, that the BlueWave Defendants entered into Sales Agreements which, by virtue of their compensation scheme, fall directly within the class of relationships prohibited by the AKS, 42 U.S.C. § 1320a-7b(b)(1).  This FDCPA Application focuses on the Sales Agreements because those Agreements and the ensuing performance under those Agreements was blatantly unlawful as explained herein, forming the predicate for the instant action.

The AKS makes it unlawful to knowingly and willfully "solicit or receive" any remuneration "in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good . . . or item for which payment may be made in whole or in part under a federal health care program."  42 U.S.C. § 1320a-7b(b)(1)(B).  The other side of the same kickback – providing the remuneration – is likewise prohibited.  See 42 U.S.C. § 1320a-7b(b)(2)(B) (making it unlawful to knowingly and willfully "offer or pay" any remuneration "to any person to induce such person . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good . . . or item for which payment may be made in whole or in part under a federal health care program").

The United States Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") is tasked with protecting the integrity of Medicare, Medicaid, and other HHS programs, and has offered interpretive guidance concerning marketing activities in the context of the AKS.  The OIG has explained that the AKS "is extremely broad.  The types of remuneration covered specifically include kickbacks, bribes, and rebates . . . .  In addition,

---

kickback itself – damages to the United States are still nearly $60 million per individual and $240 million for BlueWave (and that is before the trebling permitted under the FCA).  Thus, the instant action is warranted.

prohibited conduct includes not only remuneration intended to induce referrals of patients, but remuneration also intended to induce the purchasing, leasing, ordering, or arranging for any good, facility, service, or item paid for by Medicare or State health care programs." General Comments, OIG, Notice of Final Rule, AKS Provisions of Medicare and State Health Care Programs, 56 Fed. Reg. 35,952 (July 29, 1991).

Under the terms of the Sales Agreements at issue herein, the BlueWave Defendants contracted to receive remuneration from client laboratories, HDL and Singulex, in return for "arranging for" or "recommending" the ordering of HDL and Singulex laboratory tests. (HDL and Singulex tests are products that are paid for in full or in part by Federal health care programs within the meaning of 42 U.S.C. § 1320a-7b(b)(1)(B) to the extent such tests are performed on Federal health care beneficiaries.) Pursuant to the HDL Sales Agreement, HDL appointed BlueWave "as its independent contractor to perform certain sales services for" HDL, "including the sale of various laboratory tests and services of [HDL] to physicians and medical groups." See Ex. 1 at ¶ 1.[2] More specifically, BlueWave agreed to "use its best efforts to maximize" specific sales goals. Id. at ¶ 2. HDL paid BlueWave a monthly base fee, plus a "commission equal to . . . [varying percentage] of the revenue collected by HDL from sales" in BlueWave's territory, thus varying with the volume and value of the referrals. Id. at ¶ 4. The HDL Sales Agreement specifically stated that "[BlueWave] shall act as and be deemed to be an independent contractor for all purposes of this Agreement." Id. at ¶ 10. Between January 2010 and January 2015, BlueWave and HDL performed under the HDL Sales Agreement, and, by January 2015,

---

[2]   The BlueWave Defendants filed an Answer, ECF No. 92, which the United States recently consented for them to amend, Consent Motion to Amend, ECF No. 138, based upon the United States' Motion to Strike Defendants' Affirmative Defenses, ECF No. 108. The BlueWave Defendants have admitted many of the allegations described above. See Answer ¶¶ 21, 25, 96, 98-99, 101-04, 106-08, 115, 122, 135-38.

BlueWave served as a large, independent sales and marketing force for HDL. Ex. 2 at ¶ 12 (<u>BlueWave v. HDL</u>, No. 5:15-cv-00884-MHH, Complaint (N.D. Ala. June 3, 2015) ("<u>BlueWave v. HDL II</u>") (BlueWave's Amended Complaint in a lawsuit it filed against HDL); Ex. 3 at ¶¶ 2, 15, 17 (<u>HDL v. BlueWave</u>, No. 3:15-cv-030-REP, Complaint (E.D. Va. Jan. 13, 2015) ("<u>HDL v. BlueWave</u>"). The BlueWave Defendants executed and performed under a similar sales agreement with Singulex. Ex. 4. The Agreements plainly fall within the purview of the prohibition against such remuneration outlined in the AKS at 42 U.S.C. § 1320a-7b(b)(1)(B).

The BlueWave Defendants cannot avail themselves of the two potential safety valves from the AKS' blanket prohibition on transactions like those found in the Sales Agreements: (1) the employee exception under 42 U.S.C. § 1320a-7b(b)(3)(B), as interpreted by regulation at 42 C.F.R. § 1001.952(i) (the "Employee Safe Harbor"); and (2) the personal services safe harbor found in 42 C.F.R. § 1001.952(d) (the "Personal Services Safe Harbor"). As described below, neither applies to the Sales Agreements. Moreover, these carve outs and their regulatory history provide further confirmation that the Sales Agreements not only fall outside the class of relationships, but reflect the type of arrangement specifically identified as potentially abusive.

### 1. The Employee Safe Harbor

Given the breadth of the AKS, the Secretary of HHS was directed, in Pub. L. 100-93, § 14, 101 Stat. 688, 697 (1987), "to promulgate regulations specifying payment practices that shall not be treated as a criminal offense." The Secretary did so, promulgating what are commonly known as the Medicare "safe harbor" regulations, which are "entitled to the same judicial enforcement accorded Congressional legislation." <u>West Allis Mem'l Hosp., Inc. v. Bowen</u>, 852 F.2d 251, 255-56 n. 4 (7th Cir. 1988). The applicable safe harbor regulations in effect at the time the Sales Agreements were executed (and which are currently in effect) do not

afford any protection for these Agreements.

Subsection (b)(3)(B) of the AKS provides that the illegal remuneration provisions "shall not apply to . . . any amount paid by an employer to an employee (who has a *bona fide* employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3)(B). An "employee" is "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." 26 U.S.C. § 3121(d)(2); <u>see</u> 42 C.F.R. § 1001.952(i) ("employee . . . has the same meaning" as the Internal Revenue Code's definition of "employee").

The Sales Agreements explicitly state that the nature of the relationship between the BlueWave Defendants and the client laboratories, HDL and Singulex, is *not* that of employer-employee but rather of an independent contractor. Ex. 1 at ¶ 10 ("[BlueWave] shall act as and be deemed to be an independent contractor for all purposes of this Agreement."). As such, the Employee Safe Harbor does not apply.

### 2. The Personal Services Safe Harbor

A second, potentially-applicable safe harbor is equally unavailing. Section 1001.952(d) of Title 42 of the Code of Federal Regulations sets forth a six-factor test to determine if contracts, such as the Sales Agreements, fall outside the class of those prohibited by § 1320a-7b(b)(1). Section 1001.952(d) provides, among other things, that:

> As used in [42 U.S.C. § 1320a-7b(b)(1)], "remuneration" does not include any payment made by a principal to an agent as compensation for the services of the agent, as long as the following six standards are met:
>
> (5) The *aggregate compensation* paid to the agent over the term of the agreement *is set in advance*, is consistent with fair market value in arms-length transactions and *is not determined in a manner that takes into account the volume or value of any referrals* or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare ....

42 C.F.R. § 1001.952(d) (emphasis added).

The Sales Agreements plainly fail this test in that the BlueWave Defendants' compensation from BlueWave's client laboratories was directly tied to the number of sales generated on behalf of HDL and Singulex. That is, (1) there was no aggregate compensation provided for under the Sales Agreements, (2) the compensation was not set in advance, and (3) the compensation paid to the BlueWave Defendants was tied to the volume and value of referrals to client laboratories. Therefore, the Personal Services Safe Harbor does not apply.

### 3. The HHS OIG Rule-Making Process

HHS OIG specifically considered the inclusion of marketing agreements with independent contractors when promulgating the safe harbors, and specifically rejected safe harbor protections for such agreements. In formulating the safe harbors, HHS OIG issued its proposed rule on January 23, 1989, following its notice of intent to develop regulations issued nearly two years earlier. Medicare and Medicaid Programs; Fraud and Abuse OIG Anti-Kickback Provisions, 54 Fed. Reg. 3088 (Jan. 23, 1989) (to be codified at 42 C.F.R. pt. 1001). In its proposed rule describing the Employee Safe Harbor, the OIG stated:

> This statutory exemption permits an employer to pay an employee in whatever manner he or she chooses for having that employee assist in the solicitation of Medicare or State health care program business. The proposed exemption follows the statute in that it applies only to *bona fide* employee-employer relationships. We have decided to adopt the definition of employee from the Internal Revenue Service set forth in 26 U.S.C. 3121(d)(2).

> In response to the October 21, 1987 request for comments, many commenters suggested that we broaden the exemption to apply to independent contractors paid on a commission basis. We have declined to adopt this approach because *we are aware of many examples of abusive practices by sales personnel who are paid as independent contractors and who are not under appropriate supervision.* We believe that if individuals and entities desire to pay a salesperson on the basis of the amount of business they

> generate, then to be exempt from civil or criminal prosecution, they should make these salespersons employees where they can and should exert appropriate supervision for the individual's acts.

Id. (emphasis added). HHS OIG states that it is specifically not carving out independent contractors because those kinds of relationships are more likely to engender abusive practices, in part because such individuals are not supervised in the same manner as employees.

Approximately two years later, in 1991, HHS OIG issued the final rule on the AKS safe harbors. Medicare and State Health Care Programs: Fraud and Abuse; OIG AKS Provisions, 56 Fed. Reg. 35952 (July 29, 1991) (codified at 42 C.F.R. pt. 1001). Therein, HHS OIG expressed its concern about arrangements such as the Sales Agreements in the context of discussing both the Personal Services and the Employee Safe Harbors. First, in considering the Personal Services Safe Harbor, HHS OIG stated:

> Comment: Four commenters sought specific protection for commission sales arrangements between health care providers and independent contractors.
> Response: We see no reason, nor has any commenter claimed to have provided one, for treating commission sales agreements differently under these regulations from other types of contracts for personal services performed by independent contractors. Therefore, *commission sales agreements must meet the conditions of the safe harbor provisions governing personal services and management contracts.*

Id. Within the same rulemaking, HHS OIG went on to explain that such Agreements may be abusive and are not protected under the Employee Safe Harbor.

> Comment: Many commenters urged the OIG to extend this exception to apply to independent contractors paid on a commission basis. Two commenters asserted that the legislative history of the statute makes clear that Congress intended to include independent contractors in the employee exception. In support of this contention, they quoted remarks made by Representative Rostenkowski when the House was considering the Medicare-Medicaid Anti-Fraud and Abuse Amendments of 1977. (123 Cong. Rec. 30,280 (1977)).

Response: We continue to reject this approach because of *the existence of widespread abusive practices by salespersons who are independent contractors* and, therefore, who are not under appropriate supervision and control. Although two commenters asserted that they could achieve appropriate supervision and control of independent contractors by including restrictive terms in the contract, we cannot expand this provision to cover such relationships unless we can predict with reasonable certainty that they will not be abusive. We are confident that the employer-employee relationship is unlikely to be abusive, in part because the employer is generally fully liable for the actions of its employees and is therefore more motivated to supervise and control them.

Furthermore, we believe that Representative Rostenkowski's remarks do not reflect congressional intent in this case. His comments related to the House version of the employee exception that was rejected by the Conference Committee. Instead, Congress passed the Senate version, which expressly limited the exception to *bona fide* employment relationships (See H.Conf.Rep. No. 673, 95th Cong., 1st Sess. 41 (1977)). Consequently, *we find no support for the position that Congress intended to cover independent contractors under this exception*.

Id. (emphasis added). Accordingly, HHS OIG – consistent with the language of the statute – was expressly concerned about sales agreements such as those entered into here and made a deliberate choice to exclude them from the protection of the AKS safe harbors. The Sales Agreements are illegal and are not saved by the safe harbor regulations.

### 4. OIG Advisory Opinions

HHS OIG has consistently reiterated its position since the adoption of the final safe harbors in 1991. HHS OIG has rejected protection for commission-based sales agreements with independent contractors in its advisory opinions. Pursuant to 42 U.S.C. § 1320a-7d(b), the Secretary of HHS, in consultation with the Attorney General, is authorized to issue advisory opinions on specific topics, including what constitutes prohibited remuneration under § 1320a-7b(b), and whether any activity or proposed activity could result in imposition of sanctions or

exclusion from participation in Federal health care programs.  <u>See</u> 42 U.S.C. § 1320a-7d(b)(2).

First, in HHS OIG Advisory Opinion No. 99-3, posted March 23, 1999, the OIG stated that:

> [T]he Sales agents are in the business of recommending or arranging for the purchase of the items or services they offer for sale on behalf of their principals, typically manufacturers, or other sellers (collectively, "Sellers"). Accordingly, any compensation arrangement between a Seller and an independent sales agent for the purpose of selling health care items or services that are directly or indirectly reimbursable by a Federal health care program potentially implicates the anti-kickback statute, irrespective of the methodology used to compensate the agent.  Moreover, because such agents are independent contractors, they are less accountable to the Seller than an employee.  *See* 56 Fed. Reg. 35952, 35981 (July 29, 1991); 54 Fed. Reg. 3088, 3093 (Jan. 23, 1989). For these reasons, *this Office has a longstanding concern with independent sales agency arrangements.*

<u>Id.</u> (emphasis added).    In  Advisory  Opinion  99-3,  OIG  goes  on  to  identify  "several characteristics of arrangements . . . that appear to be associated with an increased potential for program abuse."  Specifically cited by HHS OIG were "compensation based on percentage of sales," "direct contact between the sales agent and physicians in a position to order items or services that are then paid for by a Federal health care program," and the "marketing of items or services that are separately reimbursable by a Federal health care program . . . ."  <u>Id.</u>   These characteristics each apply to the Sales Agreements: the BlueWave sales representatives are paid on a commission basis, there is direct contact with physicians by the BlueWave contractors, and the laboratory tests are reimbursed separately by Federal health care programs.  OIG's concern regarding "potential for program abuse" is borne out by these Sales Agreements, where independent contractors solicited and received kickbacks from client labs in exchange for arranging for referrals, and peddled a massive kickback scheme to physicians (in the form of payment of process and handling fees) resulting in the submission of claims to Federal health

care programs for medically unnecessary laboratory tests.  See Compl. ¶¶ 153-71., ECF No. 75

In 2010, the OIG issued a similar opinion, again rejecting such an arrangement.  The OIG stated:

> Marketing fees paid on the basis of successful orders for items or services are inherently subject to abuse because they are linked to business generated by the marketer.  Because the Requestor receives a fee each time its marketing efforts are successful, the Requestor's financial incentive to arrange for or recommend the Hospital's sleep testing facility is heightened.  The more test orders the Requestor's marketing efforts generate, the more fees the Requestor receives.

HHS OIG Advisory Op. No. 10-23 (posted Nov. 4, 2010).

Here, the more test orders that the BlueWave Defendants generated, the more fees the BlueWave Defendants received.  See also HHS OIG Advisory Op. No. 98-1 (posted Mar. 25, 1998) (rejecting marketing arrangement with commission-based payments, noting significant financial incentives increasing risk of abusive marketing and billing practices, opportunity to unduly influence referral source, and no safeguards against fraud or abuse); cf. HHS OIG Advisory Op. No. 98-10 (posted Sept. 8, 1998) (extending protection to the marketing arrangement because, inter alia, sales agents had no direct contact with physicians and manufacturer was not separately reimbursed by Federal health care programs).  In sum, the long-standing position of HHS has been that agreements such as the Sales Agreements at issue herein are inherently subject to abuse.

### 5.  Case Law

Finally, several courts have held that contracts similar to the Sales Agreements are unlawful under the AKS.  In Joint Technology, Inc. v. Weaver, No. CV-11-846, 2013 WL 257075, at *1  (W.D. Okla.  Jan. 23, 2013), the plaintiff, a durable medical equipment supplier, hired defendant "as an independent [sales] agent to solicit referral business from various medical

providers and health clinics." The durable medical equipment supplier argued at summary judgment that the defendant sales representative was, in fact, an employee (and not a contractor), which factual dispute the court resolved against the supplier, finding that the sales representative was not an employee. Id. at *2. The Court in turn held that the agreement between the supplier and the sales representative was void under the AKS, "because the Agreement provided for [the supplier] to pay [the sales representative] commission based upon the volume of his sales and because Medicare and Medicaid paid an average of 20% of [the supplier's] total billings. In other words, [the supplier] paid [the sales representative] to solicit Medicare or Medicaid referrals." Id. at *3. The district court's decision was affirmed by the Tenth Circuit, which held that the parties' agreement violated the AKS. Joint Tech., Inc. v. Weaver, 567 Fed. Appx. 585 (10th Cir. 2014). See also Zimmer, Inc. v. NuTech Med., Inc., 54 F. Supp. 2d 850 (N.D. Ind. 1999) (granting plaintiff manufacturer's motion for summary judgment against defendant, who marketed and distributed products, noting Advisory Opinion 98-1 – which had been submitted to HHS OIG by the parties – finding that the agreement violated the AKS and was therefore illegal and unenforceable); Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc., 926 F. Supp. 835, 837-44 (E.D. Ark. 1996) (granting defendant medical supplier's motion for summary judgment against plaintiff marking company, finding that the commission-based sales arrangement is prohibited by the AKS and is not "saved by the 'safe harbor' regulations"); Med. Dev. Network, Inc. v. Prof'l Respiratory Care, 673 So. 2d 565 (Fla. Dist. Ct. App. 1996) (holding that commission-based sales agreement between durable medical equipment supplier and marketing company was "void and unenforceable as a matter of law," citing AKS).

In sum, courts as well as HHS OIG have repeatedly found commission-based sales agreements with independent contractors to violate the AKS. HHS OIG made a conscious

choice to exclude such agreements from the AKS' safe harbors due to the potential for program abuse. Finally, the plain language of the AKS precludes such arrangements. The Sales Agreements are unlawful.

## **ARGUMENT**

**A. Prejudgment relief is warranted because the United States has established the probable validity of its claim of debt in the amount of at least $58 million for Johnson and Dent individually and $240 million for BlueWave.**

Where, as here, prejudgment relief is sought, the FDCPA states that the government "shall include an affidavit establishing with particularity to the court's satisfaction facts supporting the probable validity of the claim for a debt and the right of the United States to recover what is demanded in the application." 28 U.S.C. § 3101(c)(1). This affidavit, which may be made on information and belief, 28 U.S.C. § 3006, shall also state "specifically the amount of the debt claimed by the United States and any interest or costs attributable to such debt." 28 U.S.C. § 3101(c)(2)(A). The court may consider the "totality of the circumstances" when evaluating whether the government has established the probable validity of its claims. DeGregorio, 510 F. Supp. 2d at 885 (citing United States v. Teeven, 862 F. Supp. 1200, 1218 n.24 (D. Del. 1992)). The United States is supporting this Application through the declaration of Su Kim, Special Agent, HHS OIG, and the affidavit of Kendrick Bailey, Investigator, U.S. Department of Justice, Civil Division; through the BlueWave Defendants filings and testimony in other, related litigation; and through numerous documents produced by the BlueWave Defendants.

Prejudgment relief is warranted in view of the strength of the United States' FCA case. The evidence is strong that the BlueWave Defendants violated the AKS by entering into and performing under the Sales Agreements, arranging for kickbacks to physicians, and arranging for

- 15 -

medically unnecessary testing.

Johnson and Dent incorporated BlueWave in the State of Alabama on January 4, 2010, and it was formed to act as the formal sales and marketing entity that would contract with HDL. Ex. 5; Ex. 6 at ¶ 8. Johnson and Dent jointly co-own BlueWave; each has equal shares. Ex. 7 (Trial Tr. 853:21-22)[3]; Ex. 8 at ¶ 7.[4] BlueWave's business address is 307 Commercial Street, S.E., Hanceville, Alabama, which consists of a 14,000 square foot lot containing a single family residence and a garage. Ex. 5; Ex. 9 (appraised value of the property is $65,000 as of November 2015). BlueWave owns no real property and owns *de minimis* personal property in the form of office furniture and equipment. Ex. 8 at ¶ 20. On September 21, 2012, Defendant Johnson sold the property located at 307 Commercial Street, S.E., to Royal Blue Medical, Inc. ("Royal Blue") for $42,800. Ex. 9. Defendant Johnson incorporated Royal Blue in July 2007. Ex. 10. The following corporate entities associated with Defendant Johnson also operate out of the 307 Commercial Street, S.E., address: Royal Blue, BlueWave, Blue Eagle Farming, LLC ("Blue Eagle Farming"), H J Farming, LLC ("H J Farming"), Eagle Ray Investments, LLC ("Eagle Ray Investments"), Cobalt Healthcare Consultants, Inc. ("Cobalt"), and Blue Smash Investments, LLC ("Blue Smash Investments"). Exs. 5, 10-15.

The only commercial activity performed by BlueWave was done pursuant to the Sales Agreements it entered into with HDL and Singulex. Ex. 8 at ¶¶ 17-18. The Sales Agreements were terminated in 2015 and 2014, respectively. Id. at ¶ 17; Ex. 2 at ¶ 19. In April 2010,

---

[3] Exhibit 7 includes excerpts from the trial testimony of Defendant Johnson; the entire transcript is available on the docket. See Berkeley HeartLab, Inc. v. HDL, No. 3:10-cv-00030-REP, ECF No. 274 (E.D. Va. Nov. 2, 2011).

[4] Although Exhibit 8 is being submitted under seal to avoid public disclosure of all financial information disclosed to the United States, this public filing will make references to certain limited financial information from Exhibit 8.

Latonya Mallory (a named Defendant in the instant action and former CEO and co-founder of HDL) on behalf of HDL, and Johnson and Dent, on behalf of BlueWave, executed a Sales Agreement, which was dated January 4, 2010 (the same date as BlueWave's incorporation), wherein BlueWave would serve as HDL's exclusive outside sales force in certain enumerated states: Alabama, South Carolina, Mississippi, Tennessee, Georgia, Florida, North Carolina, Louisiana and Texas. Ex. 1 at ¶ 1. The HDL Sales Agreement provided that, if BlueWave met certain sales goals, BlueWave would "have a right of first refusal to expand the Territory into other states in which [HDL] plans to do business." Id. Pursuant to that Sales Agreement, HDL appointed BlueWave "as its independent contractor to perform certain sales services for" HDL, "including the sale of various laboratory tests and services of [HDL] to physicians and medical groups." Id. More specifically, BlueWave agreed to "use its best efforts to maximize" specific sales goals. Id. at ¶ 2. In return, HDL agreed, inter alia, to pay physicians between $18-$21 in process and handling fees and to provide zero balance billing for Medicare and Medicaid. Id. at ¶ 3. The HDL Sales Agreement stated that:

> [BlueWave] shall act as and be deemed to be an independent contractor for all purposes of this Agreement and shall not act, nor shall [BlueWave] be deemed to be, an agent, employee or servant of [HDL]. This Agreement is not intended to be one of hiring under the provisions of any workers' compensation or any other law, and shall not be so construed. [BlueWave] has sole responsibility for making any payment for local, state, federal or international tax purposes.

Id. at ¶ 10. Also pursuant to the HDL Sales Agreement, HDL paid BlueWave a monthly base fee, plus a "commission equal to. . . 13.8% of the revenue collected by HDL from sales" in BlueWave's territory. Id. at ¶ 4. After September 30, 2011, BlueWave was to be paid an "Increased Commission" that was "equal to . . . 19.8% of the revenue collected by [HDL] from sales" in the same territory. Id. The Agreement also conveyed shares in HDL to Johnson and

Dent as individuals.  Id.  Between January 2010 and January 2015, BlueWave and HDL performed under the Agreement, and, by January 2015, BlueWave served as a large, independent sales and marketing force to HDL.  Ex. 2 at ¶ 12; Ex. 3 at ¶¶ 2, 15, 17.

On June 1, 2010, BlueWave, Johnson, and Dent executed a similar Sales Agreement with Singulex.  Ex. 4.  This agreement named BlueWave as Singulex's outside sales force.  Id. at ¶ 1.  Pursuant to the Singulex Agreement, BlueWave was paid a monthly commission of 24% of Singulex's revenue collected from sales generated by BlueWave as BlueWave's fee for arranging for or recommending to doctors that they refer patients' blood testing to Singulex.  Ex. 4 at ¶ 5.

BlueWave has principally had three employees:  Johnson is the President; Dent is the Vice President; and there has been an office administrator (who was terminated in November 2013).  Ex. 7 (Trial Tr. 927:22 – 928:4); Ex. 8 at ¶ 16.  BlueWave made the decision to operate using corporate entities or independent contractors when obtaining representation for the various sale territories outlined in the Sales Agreements.  Ex. 7 (Trial Tr. 927:22 – 928:4); Ex. 3 at ¶ 17.  BlueWave has, at various points in time, contracted with over 30 individuals who operated as independent contractors to fulfill its obligations under the Sales Agreements.  Ex. 6 at ¶ 22.

Defendant Dent himself signed an independent contractor agreement with BlueWave effective April 1, 2011, in which BlueWave named Dent's marketing company, HisWay of South Carolina, Inc., as its representative in South Carolina, parts of North Carolina, and Augusta, Georgia, to market and sell HDL and Singulex tests ("the HisWay Agreement").  Ex. 16.  Pursuant to the HisWay Agreement, BlueWave paid HisWay a quarterly commission of 6% of revenues collected from sales HisWay generated for HDL and 10% of revenues collected from sales HisWay generated for Singulex.  Id. at ¶ 4.  Similarly, Defendant Johnson signed an

independent contractor agreement effective April 1, 2011, in which BlueWave named Johnson's marketing company Royal Blue as its representative in Alabama, Mississippi, Tennessee, part of Georgia, and the Florida panhandle to market and sell HDL and Singulex tests ("the Royal Blue Agreement"). Ex. 17. Pursuant to the Royal Blue Agreement, BlueWave paid Royal Blue a quarterly commission of 2% of revenues collected from sales Royal Blue generated for HDL and 3.33% of revenues collected from sales Royal Blue generated for Singulex. Id. at ¶ 4. The Sales Agreements as well as the agreements between BlueWave and its sales force were structured such that the more tests physicians ordered for their patients, the more money the BlueWave Defendants as well as the sales representatives earned. See Ex. 2 at ¶ 7; Ex. 6 at ¶ 13.

BlueWave sales representatives, including Defendants Johnson and Dent, marketed the HDL and Singulex laboratory tests pursuant to their agreements with BlueWave. Ex. 2 at ¶ 12; Ex. 6 at ¶ 16. For instance, Defendant Johnson spent 85-90 percent of his time on direct sales for BlueWave. Ex. 7 (Trial Tr. 854:19-22, 855:1); see also id. (Trial Tr. 935:1-2 (Defendant Johnson testified: "My job is to find accounts, target accounts, isolate accounts, work with the reps, see where I can open accounts at.")). BlueWave sales representatives, including Defendants Johnson and Dent, went to physicians' offices and tried to convince them to order HDL and Singulex laboratory tests. Ex. 6 at ¶ 28, 7 (Trial Tr. 954:11-14; 955:6-10). BlueWave sales representatives used a variety of techniques, including showing physicians studies on the clinical utility of the tests, pointing to the compensation the practice would receive from the payment of process and handling fees, and stating that patients would not receive a bill. Ex. 6 at ¶ 28; see also Ex. 7 (Trial Tr. 935:11-18 (Defendant Johnson testified that he "look[s] for select criteria on a physician before I talk to them," including that the physician is "money hungry")). The BlueWave Defendants successfully marketed the HDL and Singulex tests; for instance, all

of Defendant Dent's client-physicians switched from Defendant Berkeley to HDL when Defendant Dent left Defendant Berkeley to start selling for HDL. Ex. 6 at ¶ 28. Notably, HDL and Singulex paid significantly higher process and handling fees to physicians than Berkeley. Compl. ¶¶ 78-79, 105, ECF No. 75.

Between 2010 and 2015, HDL paid BlueWave $223.9 million. Ex. 6 at ¶ 29. Singulex paid BlueWave $24.5 million during the same period. Id. In turn, BlueWave paid its sales representatives on a quarterly basis. Id. at ¶ 30. BlueWave tracked the number of samples physicians ordered from HDL and Singulex, as well as which of the samples were attributable to which sales representative. Id. Specifically, BlueWave paid HisWay $12 million and paid Royal Blue $5.9 million. Id. In 2013 alone, Defendant Dent earned approximately $5 million from HisWay. Id. BlueWave paid salaries to its two employees, Defendants Johnson and Dent; they each received over $58 million from BlueWave for the period from 2010-2014. Id.; see also Ex. 8 at ¶ 16.

Both Sales Agreements have been terminated. The Singulex Sales Agreement was terminated in October 2014. Ex. 8 at ¶ 17. HDL terminated its Sales Agreement with BlueWave on January 9, 2015. Ex. 2 at ¶ 19. BlueWave and HDL in turn cross-sued each other; BlueWave sued HDL for over $180 million in the Northern District of Alabama for breach of contract while HDL sued BlueWave in the Eastern District of Virginia seeking a non-compete injunction. See Exs. 2-3.[5] In its Complaint, HDL averred that: "Based on its analysis and information obtained

---

[5]    Defendant BlueWave has filed two lawsuits against HDL, only one of which is pending. Defendant BlueWave filed its first Complaint against HDL on January 9, 2015. See BlueWave v. HDL, No. 5:15-cv-0030-HGD (N.D. Ala. 2015). Defendant BlueWave voluntarily dismissed that action, which request was granted by the Court on April 2, 2015. Id. (ECF No. 15). Defendant BlueWave filed a subsequent lawsuit against HDL on May 28, 2015, for which HDL has filed a Suggestion of Bankruptcy and the Court has stayed those proceedings. See BlueWave v. HDL II (ECF No. 4). HDL and BlueWave have resolved the lawsuit filed by HDL in the

from other sources, HDL concluded that certain provisions of the Sales Agreement posed a potential risk of violating or potentially inducing the violation of Federal and state laws." Ex. 3 at ¶ 3. Furthermore, HDL explained that it terminated the Agreement based upon its "concer[n] that the sales agreement posed a risk of violating or inducing the violation of Federal and state laws." Id. at ¶ 26. For its part, Defendant BlueWave, in a separate lawsuit in the Northern District of Alabama, described that: "HDL has now claimed that the Contract contains a provision that poses a risk of violating federal or state laws." Ex. 2 at ¶ 10. In its lawsuit, Defendant BlueWave does not dispute HDL's claim that the Sales Agreement was potentially unlawful. [6] Rather, BlueWave argues that HDL did not comply with the Sales Agreement terms governing what transpires when the contract is deemed unenforceable. Id. at ¶¶ 14-17.

Because the BlueWave Defendants "arranged for" and "recommended" laboratory tests reimbursed by federal health care programs, they are liable under the AKS and, in turn, the FCA. The United States has established the probable validity of its claim under the FDCPA.

**B.      The BlueWave Defendants have concealed and disposed of property with the effect of hindering or delaying recovery by the United States.**

The United States is entitled to prejudgment remedies in this case because there is "reasonable cause to believe that" the debtors "ha[ve] or [are] about to assign, dispose, remove, conceal, ill treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States." 28 U.S.C. § 3101(b)(1)(B). Prejudgment remedies are also appropriate

---

Eastern District of Virginia via a Consent Judgment. See HDL v. BlueWave, No. 3:15-cv-0030-REP (E.D. Va. 2015) (ECF No. 13).

[6]    In its Complaint, Defendant BlueWave states: "On information and belief, the Contract was drafted or reviewed by the law firm of LeClair Ryan on behalf of HDL. Any illegality in the contract should have been apparent to that firm at the time that the Contract was prepared." Ex. 2 at ¶ 11. Defendant BlueWave offers no other response to the lawfulness of the contracts.

where the debtor "has or is about to convert the debtor's property into money, securities, or evidence of debt in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States." Id. at § 3101(b)(1)(C).

The United States must only demonstrate that the Defendants' actions have had the *effect* of, inter alia, disposing of or concealing assets that would hinder the ability of the United States to recover; the United States need *not* demonstrate that the Defendants intended to hinder the United States. Teeven, 862 F. Supp. at 1214 n.12 (FDCPA "does not require the Government to show that a debtor's actions are fraudulent or secretive. Rather, the Government must provide the Court with a reasonable cause to believe the Defendants have or are about to take actions with regard to their properties that would have 'the effect of hindering, delaying or defrauding the United States.' 28 U.S.C. § 3101(b). The statute contains no 'intent' requirement.").

Defendants Johnson and Dent have concealed and disposed of assets, which will have the effect of impeding or delaying the United States' recovery. Since notice of the investigation – particularly issuance of a HHS OIG subpoena to Defendant BlueWave on January 25, 2013 – Defendants Johnson and Dent have operated to divest and conceal their personal interest in real properties through corporate entities and family members. Some examples follow.

Defendant Dent

- Dent sold real property he purchased for approximately $1.6 million to his wife for $5 on May 1, 2013, the very same day that he purchased it. Ex. 18 at ¶ 6; Ex. 19. He also sold a nearby parcel of property, which he had purchased for approximately $2.7 million (just days prior), to her for $5 on August 21, 2013. Id. at ¶ 7; Exs. 20-21.

- Defendant Dent's wife, who has no previous corporations registered in South Carolina, registered four corporations in that state in 2014. Ex. 18 at ¶ 9. Two of those entities now hold property which had been originally purchased by Defendant Dent. Id.

- On February 20, 2014, Defendant Dent engaged in property reorganization which had the effect of removing his name from the ownership records for many properties previously titled in his name. Ex. 18 at ¶¶ 8, 10. First, Defendant Dent's wife sold the above-

described $2.7 million property to one of her corporations for $5. Id. at ¶ 11; Exs. 20-21. Defendant Dent in turn sold an additional six adjoining properties to his wife for $5. Ex. 18 at ¶ 10; Exs. 22-27. Finally, Dent also sold a nearby island to one of his wife's new corporate entities for $5. Ex. 18 at ¶ 8; Ex. 28. The result was that in less than six months eight nearby or adjoining properties switched from being held in Defendant Dent's name to those of his wife or her corporations.

- In February of 2014, Defendant Dent's wife, on behalf of one of her newly-formed corporations, granted a life estate in one of the eight properties (previously in Defendant Dent's name) to what appear to be her parents for $5. Ex. 18 at ¶ 11; Ex. 19. Defendant Dent's wife did the same for a separate, nearby property in December of 2014 which now has a life estate in it for Defendant Dent's parents. Ex. 18 at ¶ 6; Ex. 21.

- On July 19, 2014, Defendant Dent sold a property in Columbia, South Carolina, held in his own name to CAE Properties for $5. Ex. 18 at ¶ 12; Ex. 29. The listed agent for CAE Properties is Defendant Dent's father. Id.; Ex. 30. Defendant Dent has at least two companies that remain registered at this address, including Cobalt as well as a newly-formed Nevada company. Exs. 14, 18, 31.

Defendant Johnson

- On June 23, 2014, Defendant Johnson, who previously was the sole owner of his home at 106 View Point Circle in Hanceville, Alabama, filed a warranty deed reflecting that he and his wife were joint owners therein with rights of survivorship for $1. Ex. 18 at ¶ 16; Ex. 32. On June 30, 2015, Defendant Johnson sold this property for $562,000, divesting himself of one of only two real properties identified by the government held in his own name as of 2015. Ex. 18 at ¶ 16; Ex. 32.

- On April 5, 2013, Defendant Johnson sold a single family home in Blountsville, Alabama for $390,000, again divesting one of the only real properties held in his name at that time. Ex. 18 at ¶ 14; Ex. 33.

- On August 9, 2013, Defendant Johnson through his corporation, Eagle Ray Investments, purchased a condominium in the Gulf Shores valued at $873,400, placing a corporate shield between him and a newly-acquired asset. Ex. 18 at ¶ 15; Ex. 34.

- On September 21, 2014, Defendant Johnson sold his principal place of business, 307 Commercial Street, Hanceville, Alabama to his corporation, Royal Blue, for $42,800, again removing property in his name and placing it behind a corporate entity. Ex. 18 at ¶ 18; Ex. 9.

- Recently, on September 4, 2015, the title from "0" 15th Avenue, Attalla, Alabama was transferred from Defendant Johnson's corporation, Forse Investments, LLC ("Forse Investments"), to "Ball, Duane & WF Adrian Ball" and on March 3, 2015, the title for 108 5th Avenue, Attalla, Alabama was transferred from Forse Investments transferred to "Norman and Diane Chaviers." Ex. 18 at ¶ 17, 19; Exs. 35-36. The mailing addresses

for both properties had been 307 Commercial Street (where Defendant Johnson's other companies are located), and that address did not change after the names on the titles were changed. Ex. 18 at ¶ 17, 19; Exs. 35-36. In both instances, Defendant Johnson was previously listed as the owner and the title linking the properties to him through his corporations was removed; the mailing addresses demonstrate that the properties nevertheless remain affiliated with his businesses.[7]

Defendant Johnson also changed the listed agent on corporations that he incorporated, operating to conceal his interest. On November 21, 2014, Defendant Johnson changed the registered agent for five of his companies; those companies previously listed Defendant Johnson and now publicly list his accountant. Ex. 18 at ¶ 20; see also Exs. 11-13, 15, 37. Of those, three hold title to real property. Ex. 18 at ¶ 20 (The fourth company describes itself in its registration statements also as a real estate investment firm. Id.; Ex. 15.) Public real property records now show the corporations as owners and the public corporate documents show Defendant Johnson's accountant as the agent.

In addition to having sold and concealed these assets, Defendant BlueWave's cash-on-hand is routinely dissipated. In November of 2014, BlueWave's bank account listed that it had $181,840 available in cash. Ex. 6 at ¶ 33. In February 28, 2015, bank records show that BlueWave had approximately $1.8 million in an account. Id. at ¶ 34. This is in contrast to BlueWave's reported gross income of $74 million in 2013. Id. at ¶ 31, Ex. 8. Defendant BlueWave has represented to the United States that it has no ability to pay the damages in this case. Ex. 6 at ¶ 32; Ex. 8.

Most troubling, Defendants Dent and Johnson incorporated as co-owners a new healthcare marketing company, Cobalt, in January of 2013. Ex. 6 at ¶ 35; Ex. 14. Cobalt is operated out of the same location as BlueWave. Id. A review of a bank account in Cobalt's

---

[7]  If the government's request for financial discovery is granted by the Court, the government anticipates seeking information about whether these two properties were fraudulently conveyed or are titled in the name of nominees.

name at Cadence Bank in Blountsville, Alabama shows that since 2013 BlueWave has deposited $5.4 million into Cobalt's account, along with another $4.6 million from Defendant Dent and $1.275 million from Defendant Johnson personally. Id. at ¶ 36. Defendant Johnson has admitted that when "some legal issues arose" regarding a previous corporation he had owned and operated, Forse Medical, Inc., Defendant Johnson started a new company "to have a fresh new company with no past issues." Ex. 6 at ¶ 37. The assets being put into Cobalt are being taken from the BlueWave Defendants, hindering the United States' ability to recover.[8]

As set forth above, the BlueWave Defendants have been rapidly disposing of or concealing their assets. If prejudgment relief is not granted, there is a strong possibility that there will be nothing left to recover at the end of the suit, and the BlueWave Defendants will have disposed of or tied up their remaining assets, all with the effect of hindering the United States' recovery.

**C. The amount of the debt owing to the United States.**

The amount of the debt owing to the United States is at least $58 million for Johnson and Dent individually and $240 million for BlueWave. The United States is seeking liens and garnishment with the amount of security at approximately $16.7 million.[9] See Ex. 39 (declaration of undersigned counsel regarding the amount of security sought). As explained

---

[8] The United States also notes concern that both Defendants Dent and Johnson have recently opened new limited-liability partnerships in Nevada. Defendant Dent filed a certificate of limited partnership for Helm-Station Investments, LP, and in turn registered a limited-liability limited partnership, Helm-Station Investments, LLLP, on February 5, 2014. Ex. 31. Similarly, Defendant Johnson filed a certificate of limited partnership for War-Horse Properties, LP, on April 15, 2015, and then registered a limited-liability limited partnership, War-Horse Properties, LLLP on the same day. Ex. 38.

[9] This estimation is based upon the available real property assessment or sales price, whichever is higher. The estimations for the assets are based upon information for similar boats available online and from the county-assessed value of the airplane.

below, moreover, the prejudgment remedies sought should have little effect on Defendant BlueWave's current business since both Sales Agreements have been terminated and Defendant BlueWave has no other operations. The amount sought is based on single damages available under the FCA and common law, and is well below the amount of damages and penalties available under the FCA and common law. The FCA imposes liability for treble damages, as well as a minimum penalty of $5,500 and a maximum penalty of $11,000, for each false claim submitted. 31 U.S.C. § 3729(a), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note. See 28 C.F.R. § 85.3(a)(9) (adjusting FCA penalties). See United States v. United Techs. Corp., No. 3:99-cv-093, 2008 U.S. Dist. Lexis 61199, at *33 (W.D. Ohio Aug. 1, 2008) (awarding penalty for each invoice submitted), aff'd on liability, rev'd on damages calculation, 626 F.3d 313 (6th Cir. 2010); Cantrell v. N.Y. Univ., 326 F. Supp. 2d 468, 469 (S.D.N.Y. 2004) (each invoice constitutes a false claim). The United States' Complaint alleges that the BlueWave Defendants conspired with and caused HDL and Singulex to submit false claims to Medicare, resulting in at least $333 million in tainted reimbursement to HDL alone. Compl. ¶ 119, ECF No. 75. Furthermore, the Complaint alleges that the BlueWave Defendants received over $240 million in commission-based payments from client laboratories, HDL and Singulex. Id. at ¶¶ 122, 193-94. Of those payments, between 2010 and 2013, Johnson and Dent each received at least $58 million in illegal commission-based payments. Id. at ¶ 195; Ex. 8 at ¶ 16. The United States also seeks penalties on the tainted claims submitted to Medicare. Id. at ¶¶ 31, 51, 55, 60.[10]

The United States believes that the Court need not thoroughly analyze these factors at this

---

[10] Although the FCA generally has a six-year statute of limitations, 31 U.S.C. § 3731(b)(1), the United States' Complaint relates back to the date that the first relators filed their Complaint in this action, which is July 15, 2011. 31 U.S.C. § 3731(c).

early stage of the proceeding, because the United States is only seeking prejudgment remedies of $16.7 million, when damages under the FCA and common law total hundreds of millions of dollars. As described above, the Defendants' conduct is deliberate, repeated, and egregious. The Defendants entered into blatantly illegal Sales Agreements which bore out the exact concerns articulated by HHS OIG when commission-based sales representatives are not treated as employees. That is, a massive kickback scheme ensued between the laboratory clients and the BlueWave sales representatives to pay illegal process and handling fees to physicians, resulting in hundreds of millions of dollars of payment from Federal health care programs, operating to line the BlueWave Defendants' pockets. See Compl. ¶¶ 153-71, ECF No. 75.

### D.     Prejudgment remedies sought.

The United States seeks the prejudgment remedies of writs of attachment and garnishment. Despite the egregious and pervasive nature of the Defendants' conduct, the United States is tailoring its request so that it will have a minimal effect on the BlueWave Defendants at this stage of the proceeding.

### 1.     Writs of Attachment

The United States seeks writs against personal and real property held in the name of Defendants Johnson and Dent as well as their family members and respective corporations. The United States may seek a writ of attachment against "[a]ny property in the possession, custody, or control of the debtor and *in which the debtor has a substantial nonexempt[11] interest* . . . ." 28 U.S.C. § 3102(a)(1) (emphasis added); see also 28 U.S.C. § 3010(a) ("The remedies available to

---

[11]     The exemptions are found at 28 U.S.C. § 3014(a) and, briefly, concern certain property exempt under the Bankruptcy Code as well as under various Federal and state homestead laws. Defendant Johnson recently sold the real property at 106 View Point Circle in Hanceville, Alabama, which was believed to be his homestead. Defendant Dent's homestead is unknown.

the United States under this chapter may be enforced against property which is co-owned by a debtor and any other person only to the extent allowed by the law of the State where the property is located.") The FDCPA broadly defines "property" to "include . . . any present or future interest, whether legal or equitable, in real, personal (including choses in action), or mixed property, tangible or intangible, vested or contingent, wherever located and however held." See also Ex. 20 setting forth requirements of § 3102(b)). A writ of attachment merely serves as a lien upon property subject to the writ, 28 U.S.C. § 3102(f)(1), and does not entitle the United States to sell the property until further order of the Court. Id. at § 3102(d)(1). However, the lien preserves the United States' interest in the property and gives notice to creditors for the duration of the suit. Id. at § 3102(f). The writ of attachment must provide a reasonable description of the property to be attached. Id. at § 3102(c)(3)(E). The attached writs contain such information.

The below writs of attachment are sought against personal and real property held in the name of (1) Defendant Johnson and his respective alter ego corporations, Royal Blue, Forse Investments, and Blue Eagle Farming, as well as (2) Defendant Dent and his respective alter ego corporations, his wife, her alter ego corporations, and life estates in relatives' names.

Regarding properties titled in corporate names, attachment is appropriate because Defendants Dent and Johnson as the debtors have a substantial interest in those real properties, as that term is used in 28 U.S.C. § 3102(a)(1). That is, Defendants themselves have the required interest through their corporations. Moreover, and in any event, these corporations are the alter egos of the Defendants. In other FDCPA cases, courts have borrowed from the related tax lien framework. See Ex.-Im. Bank of the U.S. v. Asia Pulp & Paper Co., 609 F.3d 111, 117 (2d Cir. 2010); United States v. Meux, 597 F.3d 835, 838 (7th Cir. 2010) (noting that a lien under the FDCPA, with respect to an order of restitution, may attach to the same extent as under the tax

code); see also United States v. Fed. Res. Corp., No. 1:11-cv-00127, 2015 U.S. Dist. LEXIS 138489,at *9-10 (D. Idaho Oct. 9, 2015) (holding that "the relationship of a judicial lien [under the FDCPA] to the real property it encumbers is similar to that of a tax lien"). In federal tax lien enforcement actions, courts have determined that a corporation is an alter ego, nominee, or instrument of the debtor under both Alabama and South Carolina law.[12]  See Mama's Enters., LLC v. United States, 883 F. Supp. 2d 1128, 1135 (N.D. Ala. 2012) (declining to lift federal tax liens on alter egos, finding that Alabama law has long provided that a corporation may be the alter-ego of a person or another entity); United States v. Vito, No. 99-0630-RV-S, 2000 U.S. Dist. LEXIS 11258, at *2-3 (S.D. Ala. July 13, 2000) (imposing federal tax liens on real property held in the name of defendant's alter ego and/or nominee corporation).

An FDCPA writ of attachment may also be issued against property titled in the name of another when the debtor is the true owner of the property. Again borrowing from the context of tax liens, nominee liens focus on who the true beneficial owner of the property is. See United States v. Alexander, No. 6:08-cv-03760-GRA, 2010 U.S. Dist. LEXIS 40108 (D.S.C. Apr. 22, 2010) (enforcing nominee tax lien and observing that the Fourth Circuit "does not appear to have adopted a test in determining whether to enforce a nominee lien"). The Court in Alexander went on to apply a comprehensive six-factor analysis employed by other Circuits in determining whether to enforce a nominee tax lien:

> (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a

---

[12]    An interest in property is generally determined by the relevant state law under the FDCPA Ex.-Im. of the U.S., 609 F.3d at 117; see also United States v. Kollintzas, 501 F.3d 796, 802-03 (7th Cir. 2007) (applying FDCPA to enforcement of criminal, rather than civil, judgment requires reliance on state law to determine an "interest" in property.).

close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retained possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.

Id. (citing and quoting Holman v. United States, 505 F.3d 1060, 1065 n.1 (10th Cir. 2007) and Spotts v. United States, 429 F.3d 248, 251 (6th Cir. 2005)).  See May v. A Parcel of Land, 458 F. Supp. 2d 1324, 1334-1341 (S.D. Ala. 2006) (attaching federal tax liens against real property held by nominees, where husband transferred title to spouse and applying similar seven factor analysis); see also United States v. Craft, 535 U.S. 274, 283 (2002) ("[I]n determining whether a federal [taxpayer-debtor's] state-law rights constitute 'property' or 'rights to property,' the important consideration is the breadth of the control the [debtor] could exercise over the property.") (internal quotations and citations omitted).  As described below, the property sought to be attached is variously held in Defendants' name, held through a corporate alter ego, or held through a nominee.

### a. Writs of Attachment – Personal Property

The United States seeks writs of attachment on an airplane owned by Defendant Johnson through his corporation, Royal Blue, as well as four boats owned by Defendant Dent personally. Defendant Dent has the requisite interest, where he is the named owner of the boats.  The airplane and boats are specifically described by manufacturer, descriptive information, title number, and location of registration in the proposed writ that accompanies this Application.

As to Defendant Johnson's nonexempt substantial interest in the plane, Defendant Johnson incorporated Royal Blue on June 27, 2007, and is the only listed officer and agent.  Ex. 10.  He is also the owner.  Ex. 6 at ¶ 19.  Royal Blue is operated out of the real property from which Defendant Johnson operates at least five of his other corporate alter egos.  Exs. 5, 10-15. Royal Blue has a bank account at Cadence Bank in Blountsville, Alabama, and Defendant

Johnson is the only signatory on that account. Ex. 6 at ¶ 38. Defendant Johnson most recently paid the personal property tax levied on the airplane by Marshall County, Alabama from that account. Exs. 40-41. Defendant Johnson also paid the City of Albertville, which is located in Marshall County, Alabama, from that same account; the check memo describes that it is for: "Brad Johnson hanger." Ex. 42. Defendant Johnson routinely wrote checks to an aircraft maintenance company located in Marshall County, Alabama. Ex. 43. Defendant Johnson is a pilot. Ex. 44. Finally, Defendant Johnson had access to the plane and was the decision-maker regarding whether to pay sales tax on the plane. Ex. 45. The United States has established that Defendant Johnson through Royal Blue has a substantial interest in the airplane.

In this instance, the United States does not intend to take possession of the boats or the airplane. Rather, the United States would merely make a UCC filing with the South Carolina and Alabama Secretaries of State that gives notice to potential creditors of the United States' interest in the property. Defendants Dent and Johnson would continue to possess and be able to use the property.

### b. Writs of Attachment – Real Property

The United States is also seeking writs of attachment for real property in which Defendants Johnson and Dent have a substantial nonexempt interest.

### 1. Writs of Attachment – Real Property – Defendant Johnson

The United States seeks writs of attachment on forty-nine properties in which Defendant Johnson has such an interest; one is held by the Defendant in his own name, one is held through Eagle Ray Investments, seventeen are held by Blue Eagle Farming, and the remainder are held through Forse Investments. Defendant Johnson has a substantial nonexempt interest within the meaning 28 U.S.C. § 3102(a)(1) in the properties held by Eagle Ray Investments, Blue Eagle

Farming, and Forse Investments.

Defendant Johnson registered Forse Investments on November 20, 2003, listing the purposes as: "[r]eal estate activities including but not limited to purchase and sell [sic] of real estate; rental activities; and all other lawful business activities allowed under the State of Alabama." Ex. 37. He lists himself as the initial member and organizer, as well as the manager. Id. Defendant Johnson registered Blue Eagle Farming on April 5, 2012, and is listed as the initial member as well as registered agent. Ex. 11. Defendant Johnson registered Eagle Ray Investments on September 28, 2012, listing himself as the organizer, sole manager, and registered agent. Ex. 13.

Defendant Johnson treats his corporate alter egos interchangeably as himself and without regard to corporate form. Defendant Johnson operates six businesses from 307 Commercial St., SE, Birmingham, Alabama (the 14,000 square foot lot containing a single family residence and a garage): BlueWave, Royal Blue, Blue Eagle Farming, H J Farming, Eagle Ray Investments, Cobalt and Blue Smash Investments. Exs. 5, 10-15. He operates Forse Investment out of a location in Birmingham, Alabama. Ex. 37. On November 21, 2014, Defendant Johnson authorized a change in registered agent from himself to his accountant on many of his companies, including Forse Investments, Blue Eagle Farming, H J Farming, Eagle Ray Investments, and Blue Smash Investments. Exs. 11-13, 15, 37.

Defendant BlueWave sent a Confidentiality Agreement to two of its independent sales contractors in 2010, requiring confidentiality between the representatives and BlueWave, Royal Blue, Forse Medical, Forse Investments, and Defendant Johnson; a 2012 version of the same Agreement required confidentiality with BlueWave, Royal Blue, Johnson Farming, Inc., and Forse Investments, which are collectively referred to as BlueWave. Exs. 46-47. These

agreements show that he treated these corporations as interchangeable with himself.

Defendant Johnson owns (or has owned) several real properties in and around the city of Hanceville, which is located in Cullman County, Alabama, as described below. He has owned these properties in his own name or through his corporate alter egos. In 2012, however, those real properties were held only in his own name or through one of his companies, Forse Investments. Defendant Johnson paid "water and sewer," "Cullman gas" and "Cullman electric" from his Royal Blue checking account. See, e.g., Ex. 48. Defendant Johnson owns two properties in Albertville located in Marshall County, Alabama, through Forse Investments; he pays the city of Albertville through his Royal Blue checking account. Ex. 42. Moreover, the real property records for one of those properties, in the name of Forse Investments, showed that Defendant Johnson individually paid the tax liability on the property in January of 2011. Ex. 33.

Finally, Defendant Johnson has routinely moved many of the properties between and among his personal name and his various corporate alter egos, as described below. Defendant Johnson is the signatory on the available deed documents which evidence the transfers. See, e.g., Exs. 9, 50.

The United States seeks writs of attachment on the following real properties, in which Defendant Johnson has a substantial nonexempt interest:

| Ex.[13] | Property Identification | Listed Owner | Relevant Background |
|---|---|---|---|
| 49 | 1075 Lakemont Dr., Gadsden, AL 35907 21-09-30-0-001-005.000 | Forse Investments LLC | Previous owner listed: Defendant Johnson |
| 50 | 1182 Cnty. Rd 702 Hanceville AL 35077 17-06-24-0-001-041.009 | Forse Investments LLC | Defendant Johnson sold to Forse Investments on |

---

[13] For each real property for which the United States seeks a writ of attachment, the United States is providing the Court with available property records – including records certified by the county in which the property is located (if available) as well as deed and appraisal records available online through those counties. Those records vary depending upon what was available from the county.

| | | | 09/21/2012 for $89,800 |
|---|---|---|---|
| 51 | 1503 Wilderness Lane, Birmingham, AL 35235 12 00 21 3 001 049.035 | Forse Investments LLC | Previous listed owner: Defendant Johnson |
| 52 | 1712 Alabama St., SW, Attalla, AL 35954, 16-02-09-4-000-137.000 & 16-02-09-4-000-140.000 | Forse Investments LLC | Previous owner listed: Defendant Johnson |
| 53 | 1772 West Beach Blvd., # 302, Gulf Shores, AL 36542, 67-06-23-4-001-065.000-918 | Defendant Johnson | |
| 54 | 1804 3rd St., SW, Gadsden, AL 35904 16-02-09-4-000-136.000 | Forse Investments LLC | Previous owner listed: Defendant Johnson |
| 55 | 1924 Springlake Ct., Birmingham, AL 35215, 12 00 17 4 000 078.000 | Forse Investments LLC | |
| 56 | 2009 Wood Dale Rd., Fultondale, AL 35068, 35068 14 00 25 2 003 006.000 | Forse Investments LLC | Defendant Johnson sold to Forse Investments for $500 on Feb. 1, 2009 |
| 57 | 2229 Lynngate Dr., Birmingham, AL 35216  40 00 07 3 005 002.000 | Forse Investments LLC | |
| 9 | 307 Commercial St., Hanceville, AL 35077, 23-04-20-0-005-101.000 | Royal Blue Medical, Inc. | Previous owner listed: Defendant Johnson |
| 58 | 3417 Sudie Ave., Gadsden, AL 35904 16-01-01-3-000-145.000 | Forse Investments LLC | Previous owner listed: Defendant Johnson |
| 59 | 377 St. John Rd., Birmingham, AL 35215 12 00 06 2 000 028.008 | Forse Investments LLC | |
| 60 | 389 St. John Rd., Birmingham, AL 35215, 12 00 06 2 000 028.005 | Forse Investments LLC | Defendant Johnson sold to Forse Investments for $500 on Feb. 1, 2009 |
| 61 | 394 St. John Rd., NW, Birmingham, AL 35215, 12 00 06 2 000 028.029 | Forse Investments LLC | |
| 62 | 509 Ridge Rd., Birmingham, AL 35206 23 00 12 2 002 024.000 | Forse Investments LLC | Defendant Johnson sold to Forse Investments for $500 on Feb. 1, 2009 |
| 63 | 5345 Tyler Loop Rd., Pinson, AL  35126, 12 00 09 2 001 007.010 | Forse Investments LLC | Defendant Johnson sold to Forse Investments for $500 on Feb. 1, 2009 |
| 64 | 54 H. T. Greer Rd., Albertville, AL 35951, 35950 16-09-31-0-001-054.000 | Forse Investments LLC | |
| 65 | 5866 Brenda Dr., Trussville, AL 35173 10 00 17 4 009 016.000 | Forse Investments LLC | Defendant Johnson sold to Forse Investments for $500 on Feb. 1, 2009 |
| 66 | 5881 Janet Dr., Trussville, AL 35173 35173, 12 00 17 4 007 012.000 | Forse Investments LLC | Previous owner listed: Defendant Johnson |
| 67 | 5938 Stonebriar Terr., Birmingham, AL 35126, 35126, 09 00 22 4 000 027.000 | Forse Investments LLC | Previous owner listed: Defendant Johnson |

| 68 | 600 6th Ave., NW, Attalla, AL 35954 35954 09-08-34-0-001-219.000 | Forse Investments LLC | Previous owner listed: Defendant Johnson |
|----|----|----|----|
| 69 | 628 15th Ct., NW, Birmingham, AL 35215, 13 00 24 3 001 009.000 | Forse Investments LLC | Previous owner listed: Defendant Johnson |
| 70 | 6500 Kathy Cir., Birmingham, AL 35126 09 00 34 1 000 133.000 | Forse Investments LLC | |
| 72 | 6935 Heather Ln., Pinson, AL 35126 09 00 28 1 000 061.000 | Forse Investments LLC | Defendant Johnson sold to Forse Investments for $500 on Feb. 2, 2009 |
| 72 | 704 Hopewell Dr., Cullman, AL 35077 23-04-18-0-001-055.000 | Forse Investments LLC | |
| 73 | 7322 Cavern Rd., Birmingham, AL 35173 09 00 24 1 000 016.000 | Forse Investments LLC | Defendant Johnson sold to Forse Investments for $500 on Feb. 1, 2009 |
| 74 | 74 Cnty. Rd. 460 Hanceville AL 35077 17-09-29-0-000-015.002 | Forse Investments LLC | |
| 75 | 742 Eastern Manor Ln., Birmingham, AL 35215, 13 00 27 2 005 012.000 | Forse Investments LLC | Defendant Johnson sold to Forse Investments for $500 on Feb. 1, 2009 |
| 76 | 747 E. Manor Ln., Birmingham, AL 35215, 13 00 27 2 006 014.000 | Forse Investments LLC | Defendant Johnson sold to Forse Investments for $500 on Feb. 1, 2009 |
| 77 | 7542 Section Line Rd., Albertville, AL 35950, 20-03-08-0-000-076.009 | Forse Investments LLC | |
| 34 | 825 W. Beach Blvd., # 1201, Gulf Shores, AL 35642, 66-04-19-4-000-033.000-912-A | Eagle Ray Investments LLC | |
| 78 | 916 Manor Dr., NE Cullman, AL 35055 17-01-11-1-008-003.001 | Forse Investments LLC | Defendant Johnson sold to Forse Investments on 09/21/2012 for $165,2000 |
| 79 | Blount Farm 51 acres, 09-03-05-0-000-014.000-O, PPIN 15406, Blount Cnty., AL | Blue Eagle Farmings, LLC[14] | Previous owner listed: Defendant Johnson |
| 80 | Blount Farm 51 acres, 09-03-05-0-000-014.000-I, PPIN 015399, Blount Cnty., AL | Blue Eagle Farmings, LLC | Previous owner listed: Defendant Johnson |
| 81 | Blount Farm 640 acres, 28-05-16-0-000-001.000, PPIN 011981, Blount Cnty., AL | Blue Eagle Farming, LLC | |

[14] Neither "Blue Eagle Farmings, LLC" nor "Blue Eagle Farms, LLC" is a registered corporation with the Alabama Secretary of State. The use of "Farms" or "Farmings" as opposed to "Farming" appears to be simply an entry error by the property clerk. All properties listed in these names also have a mailing address of 307 Commercial St., SE, Hanceville, Alabama.

| 82 | Blount Farm 640 acres, 28-02-03-0-000-001.000, PPIN 6098, Blount Cnty., AL | Blue Eagle Farming, LLC | |
|----|----|----|----|
| 83 | Blount Farm, 117 acres, 20-02-04-0-000-012.000, PPIN 027005, Blount Cnty., AL | Blue Eagle Farming, LLC | |
| 84 | Blount Farm, 120 acres, 10-06-23-0-000-012.000, PPIN 006271, Blount Cnty., AL | Blue Eagle Farming, LLC | |
| 85 | Blount Farm, 13 acres, 04-09-32-0-000-009.000, PPIN 031598, Blount Cnty., AL | Blue Eagle Farmings, LLC | 2013 listed owner: Forse Investments LLC |
| 86 | Blount Farm, 15 acres, 10-06-24-000-012.000, PPIN 006279, Blount Cnty., AL | Blue Eagle Farming, LLC | |
| 87 | Blount Farm, 159 acres, 28-02-09-0-000-012.001, PPIN 055917, Blount Cnty., AL | Blue Eagle Farming, LLC | |
| 88 | Blount Farm, 160 acres, 28-05-15-0-000-003.000, PPIN 011975, Blount Cnty., AL | Blue Eagle Farming, LLC | |
| 89 | Blount Farm, 17 acres, 05-09-32-0-000-014.001, PPIN 057949, Blount Cnty., AL | Blue Eagle Farmings, LLC | 2012-13 listed owner: Defendant Johnson |
| 90 | Blount Farm, 40 acres. 20-03-05-0-000-009.001, PPIN 049046, Blount Cnty., AL | Blue Eagle Farming, LLC | |
| 91 | Blount Farm, 50 acres, 04-09-32-0-000-010.006, PPIN 057414, Blount Cnty., AL | Blue Eagle Farmings, LLC | 2013 listed owner: Forse Investments LLC |
| 92 | Blount Farm, 59 acres, 21-08-34-0-000-010.000, PPIN 006102, Blount Cnty., AL | Blue Eagle Farming, LLC | |
| 93 | Blount Farm, 80 acres, 10-07-26-0-000-001.000, PPIN 006274, Blount Cnty., AL | Blue Eagle Farming, LLC | |
| 94 | Blount Farm, 93 acres, 05-09-32-0-000-002.001, PPIN 040956, Blount Cnty., AL | Blue Eagle Farmings, LLC | 2012-13 listed owner: Defendant Johnson |
| 95 | Blount Farm, 120 acres, 21-08-34-0-000-012.000, PPIN 006094, Blount Cnty., AL | Blue Eagle Farms, LLC | |

## 2. Writs of Attachment – Real Property – Defendant Dent

The United States seeks writs of attachment on the following twelve properties in which Defendant Dent has a substantial non-exempt interest within the meaning 28 U.S.C. § 3102(a)(1).

| Ex. | Property Address and Property Number | Listed Owner |
|----|----|----|
| 19 | 151 W Circle Drive, Lexington, SC 29072, TMS 003221-01-035 | Lakelin Pines LLC subject to Floyd & Joanne Dent Life Estate |
| 29 | 3318 Blossom St., Columbia, SC, 29201 TIN R13803-04-05 | CAE Properties LLC |

| 20 | 425 Dent Drive, Lexington, SC 29072, 003200-06-027 | Lakelin Pines LLC |
|---|---|---|
| 21 | 437 Dent Drive, Lexington, SC 29072, 003200-06-090 | Lakelin Pines LLC, subject to Joseph & Sherry Bradley Life Estate |
| 96 | 530 Lady Street, Suite 202, Columbia, SC 29201, R08983-02-02 | AROC Enterprises LLC |
| 22 | 615 Panorama Point, Lexington, SC 29072, Panorama Point PH I Lot 10, 003214-01-010 | Christina M. Dent |
| 23 | 619 Panorama Point, Lexington, SC 29072,Panorama Point PH I Lot 9 003214-01-009 | Christina M. Dent |
| 24 | 623 Panorama Point, Lexington, SC 29072, Panorama Point PH I Lot 8, TIN 003214-01-008 | Christina M. Dent |
| 25 | 627 Panorama Point, Lexington, SC 29072, Panorama Point PH I Lot 7, TIN 003214-01-007 | Christina M. Dent |
| 26 | 631 Panorama Point, Lexington, SC 29072, Panorama Point PH I LT 5, TMS 003214-01-005 | Christina M. Dent |
| 27 | 640 Panorama Point, Lexington, SC 29072, Panorama Point PH I LT 6, TIN 003214-01-006 | Christina M. Dent |
| 28 | Island, Parcel J Island, Lexington, SC 29072, TIN 003200-06-086 | Trini "D" Island LLC |

First, as to 151 W Circle Drive in Lexington, Defendant Dent purchased the property in his own name for $1,590,000 on May 1, 2013. Ex. 19. That very day, he sold it to his wife, Christina Dent, for $5. Id. Approximately fourteen months later, on February 20, 2014, Mrs. Dent gave a life estate in the property to Defendant Dent's father and spouse for $5. Id.

Second, as to 3318 Blossom Street in Columbia, Defendant Dent purchased the property in his own name for $155,000 on April 12, 2002. Ex. 29. On March 3, 2010, Defendant Dent listed this address as the location of HisWay of South Carolina (his independent contractor sales company that sold HDL and Singulex tests for BlueWave). Ex. 97. On January 6, 2013, Defendant Dent listed this address (along with 307 Commercial Street in Alabama) as the location of Cobalt, the new sales and marketing company of partners, Defendants Johnson and Dent. Ex. 14. On July 19, 2014, Defendant Dent sold this property to CAE Properties for $5. Ex. 29. The listed agent for CAE Properties is Defendant Dent's father, Floyd C. Dent, Jr. Ex.

30. Moreover, post-sale, Defendant Dent registered his new Nevada-based partnership, Helm-Station Investments, LLLP, in South Carolina at this address. Ex. 31.

Third, as to 425 Dent Drive and 437 Dent Drive in Lexington, which were previously one tract with the address of 2 Panorama Drive, Defendant Dent purchased the property in his own name for $2,775,000 on August 16, 2013. Exs. 20-21. Five days later, on August 21, Defendant Dent sold this property to his wife, Christina Dent, for $5. Exs. 20-21. At that time, the property obtained two tax identification numbers, one associated with the new address of 425 Dent Drive and the other associated with 437 Dent Drive. Exs. 20-21. On February 20, 2014, Mrs. Dent sold both properties to Lakelin Pines for $5. Exs. 20-21. Mrs. Dent had registered Lakelin Pines just one month prior, on January 21, 2014; she is listed as the agent for service of process for Lakelin Pines and Lakelin Pines lists its address at this property. Ex. 98. On December 17, 2014, Lakelin Pines sold 437 Dent Drive to Lakelin Pines "with a life estate of Joseph and Sherry Bradley" (who appear to be Mrs. Dent's parents) for $5. Ex. 21. The other property, 425 Dent Drive, remains in the name of Lakelin Pines. Ex. 20.

Fourth, as to 530 Lady Street in Columbia, AROC Enterprises purchased this property for $506,500 on July 25, 2011. Ex. 96. The articles of incorporation list Defendant Dent as the agent for service of process and the organizer of AROC Enterprises, which has its place of business at this property. Ex. 99. Defendant Dent incorporated Crosspoint Properties, LLC, in March of 2013; he lists this property as the location of that business. Ex. 100. Defendant Dent's wife lists this address as the location of her companies, Trini "D" Island and Riverland Pines, LLC as of 2014. Exs. 101-102. Moreover, tax assessments for two of the Lexington, South Carolina properties owned by Defendant Dent are paid from this address. Exs. 20-21. It currently remains in the name of AROC Enterprises. Ex. 96.

Fifth, as to Lots 5-10 with addresses at 615, 619, 623, 627, 631, and 640 Panorama Point in Lexington, Defendant Dent purchased these properties in his own name between June 2011 and September of 2012 for $1,606,500. Exs. 22-27. On February 20, 2014, Defendant Dent sold the properties in one transaction to his wife for a total of $5. Id. These properties remain in Mrs. Dent's name. Id.

Finally, as to the Parcel J Island in Lexington, Defendant Dent purchased this property in his own name for $10,000 on January 3, 2012. Ex. 28. As with his other nearby properties, he transferred this island to Trini "D" Island for $5 on February 20, 2014. Id. Mrs. Dent is registered as the agent for service of process on this corporate entity (which was created on February 20, 2014), and the designated address of Trini "D" Island is the 530 Lady Street address above. Ex. 100.

### 2. Writ of Garnishment

The United States may also seek writs of garnishment (except on earnings) as part of its prejudgment remedies. 28 U.S.C. §§ 3101(c)(2), 3104. See also Ex. 20 (setting forth requirements of § 3104(a)). The court may issue a writ of garnishment against property "in which the debtor has a substantial nonexempt interest and which is in the possession, custody, or control of a person other than the debtor . . . ." 28 U.S.C. § 3104(a).

The United States seeks to issue one writ of garnishment to Cadence Bank for three accounts. Defendant BlueWave has an account ending in 4230 that held approximately $1.8 million as of February 2015; Defendants Dent and Johnson are the only owners and signatories on this account. Ex. 6 at ¶ 38. Defendants Dent and Johnson, through their newly-formed company, Cobalt, have an account ending in 6450 which held approximately $2 million as of April 2015; Defendants Dent and Johnson are the only owners and signatories on this account.

*Id.*  Finally, Royal Blue also has an account ending in 1155, which held approximately $32,000 as of April 2015; Defendant Johnson is the only owner and signatory on this account.  *Id.*

### E.  Defendant Dent made eleven fraudulent transfers of real property.

As to Defendant Dent's real property, the United States alternatively requests that the court set aside eleven conveyances of real property and issue writs of attachment pursuant to Subchapter D of the FDCPA, which governs fraudulent conveyances.  The government seeks to void the transactions that removed Defendant Dent as the owner for the real properties described above, with the exception of 530 Lady Street in Columbia; that property has not recently been transferred.  The United States seeks to void the transactions described above for:

| Property Address and Property Number |
|---|
| 151 W Circle Drive, Lexington, SC 29072, Hallmark Shores, LT 31 Blk C & UN#D Tract, TMS 003221-01-035 |
| 3318 Blossom St., Columbia, SC, 29201 TIN R13803-04-05 |
| 2 Panorama Drive, Lexington, SC 29072, 13.42 acres, 003200-06-027, 003200-06-087, 003200-06-084<br>• 425 Dent Drive, Lexington, SC 29072,  003200-06-027<br>• 437 Dent Drive, Lexington, SC 29072, 003200-06-090 |
| 615 Panorama Point, Lexington, SC 29072, Panorama Point PH I Lot 10,  003214-01-010<br>619 Panorama Point, Lexington, SC 29072,Panorama Point PH I Lot 9 003214-01-009<br>623 Panorama Point, Lexington, SC 29072, Panorama Point PH I Lot 8, TIN 003214-01-008<br>627 Panorama Point, Lexington, SC 29072, Panorama Point PH I Lot 7, TIN 003214-01-007<br>631 Panorama Point, Lexington, SC 29072, Panorama Point PH I LTS 5,6,7,8,9&10, TMS 003214-01-005<br>640 Panorama Point, Lexington, SC 29072, Panorama Point PH I LTS 5,6,7,8,9&10, TIN  003214-01-006 |
| Island, Parcel J Island, Lexington, SC 29072, TIN 003200-06-086 |

According to 28 U.S.C. § 3304(b)(1)(A),

> a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether such debt arises before or after the transfer is made or the obligation incurred, if the debtor makes the transfer or incurs the obligation with actual intent to hinder, delay, or defraud a creditor . . . .

In determining "actual intent" under § 3304(b)(1), the court may consider a number of factors including whether,

(A) the transfer or obligation was to an insider;
(B) the debtor retained possession or control of the property transferred after the transfer;
(C) the transfer obligation was disclosed or concealed;
(D) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(E) the transfer was of substantially all the debtor's assets;
(F) the debtor absconded;
(G) the debtor removed or concealed assets;
(H) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(I) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(J) the transfer occurred shortly before or shortly after a substantial debt was incurred;
(K) the debtor transferred the essential assets of the business to a lien or who transferred the assets to an insider of the debtor.

28 U.S.C. § 3304(b)(2). After showing that a fraudulent transfer has occurred, the United States may obtain "(1) avoidance of the transfer or obligation to the extent necessary to satisfy the debt to the United States; (2) a remedy under this chapter against the asset transferred or other property of the transferee; or (3) any other relief the circumstances may require." 28 U.S.C. § 3306(a).

Since notice of the investigation – particularly issuance of the HHS OIG subpoena to Defendant BlueWave on January 25, 2013 – Defendant Dent has fraudulently conveyed these eleven properties to family members and their corporations for little consideration with the intent to hinder the United States' recovery. These transactions are described in detail above. In sum, Defendant Dent purchased real property for nearly $6 million in and around Lake Murray in Lexington, South Carolina, which he then fraudulently conveyed to his wife or her newly-formed companies for $20. The other property, located at 3318 Blossom Street in Columbia, Defendant Dent fraudulently conveyed to his father for $5; the 2014 taxable value of the property is listed at $384,900. These transactions were to insiders for little to no consideration after the United States served a subpoena on Defendant BlueWave and thus

should be voided.  <u>See</u> <u>Audio Invs. v. Robertson</u>, 203 F. Supp. 2d 555  (D.S.C. 2004) (voiding interfamily property transfers where United States asserted tax lien) ("Longstanding South Carolina case law on the Statute of Elizabeth provides that voluntary conveyances to family members will receive close scrutiny.")

F.         **Financial Discovery**

Finally, and importantly, the United States also requests that it be permitted to conduct financial discovery as part of this suit to discover any assets that the BlueWave Defendants may have.  Financial discovery is specifically permitted by 28 U.S.C. § 3015.  Discovery will be essential to determine necessary follow-up information, such as the location and existence of other assets available to secure the debt owed to the United States and whether assets are encumbered.  BlueWave operated for many years as a mere pass through entity, which Defendants Dent and Johnson routinely dissipated for their personal gains.  The United States seeks to ascertain whether there are significant other assets available to satisfy its claims in this litigation.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court authorize the prejudgment writs of attachment and garnishment, direct the Clerk of Court to sign the notices of attachment and garnishment, and authorize financial discovery.

A proposed order, proposed Clerk's notices, and proposed writs of attachment and garnishment are attached, and will also be emailed to Chambers in Word.

Respectfully submitted,

Benjamin C. Mizer
Principal Deputy Assistant Attorney General

WILLIAM N. NETTLES
United States Attorney

By:     s/ James C. Leventis, Jr.
        JAMES C. LEVENTIS, JR. (#9406)
        JENNIFER J. ALDRICH (#6035)
        Assistant United States Attorneys
        1441 Main Street, Suite 500
        Columbia, S.C. 29201
        Telephone (803) 929-3000

        MICHAEL D. GRANSTON
        PATRICIA L. HANOWER
        ELIZABETH STRAWN
        MARY CHRIS DOBBIE
        MICHAEL EDMUND SHAHEEN
        Attorneys, Civil Division
        United States Department of Justice
        Post Office Box 261
        Ben Franklin Station
        Washington, DC 20044

        Attorneys for the United States of America

**Declaration**

I declare under penalty of perjury that, to the best of my knowledge and based on my review of the declarations and exhibits referenced in this Application, that the foregoing is true and correct.

s/ James C. Leventis, Jr.
Assistant United States Attorney (#9406)
District of South Carolina

**Certification**

In accordance with 28 U.S.C. § 3101(a)(3)(B), I hereby certify that all statutory requirements under 28 U.S.C., Subchapter B have been satisfied.

s/ James C. Leventis, Jr.
Assistant United States Attorney (#9406)
District of South Carolina

**CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2016, I caused a true and correct copy of the United States' Application for Prejudgment Remedies to be filed with the Court using the Court's CM/ECF filing system, which will send an electronic notice of filing to all CM/ECF users.

I hereby certify that Exhibit 8 will be served on counsel for Relators when an appropriate Court order is entered authorizing disclosure.

s/ James C. Leventis, Jr.
Assistant United States Attorney (#9406)
District of South Carolina