IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| The United States of America and the States of North Carolina, California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, New Jersey, New York, Tennessee, Texas, Virginia, and Wisconsin, <u>ex rel.</u> Scarlett Lutz, Kayla Webster, Dr. Michael Mayes, and Chris Reidel, | ) ) ) ) ) ) ) ) | **C/A No.: 9:14-cv-0230-RMG** (Consolidated with 9:11-cv-1593-RMG and 9:15-cv-2485-RMG) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Berkeley Heartlab, Inc., BlueWave Healthcare Consultants, Inc., Latonya Mallory, Floyd Calhoun Dent, III, and Robert Bradford Johnson, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS BLUEWAVE HEALTH CONSULTANTS, INC., FLOYD CALHOUN DENT III, AND ROBERT BRADFORD JOHNSON'S MOTION TO QUASH ORDER GRANTING PREJUDGMENT REMEDIES**

## Table of Contents

**INTRODUCTION**......................................................................................................1

**FACTS** .................................................................................................................2

**ARGUMENT** ........................................................................................................9

**I.     This Court should quash its order granting the Government's application for prejudgment remedies** ................................................................................9

    A. The Government fails to show the probable validity of any claim for debt against BlueWave, Dent, or Johnson. ..........................................10

        1.  THE GOVERNMENT CANNOT SHOW A "CLAIM FOR DEBT." ..............................10

        2.  TO THE EXTENT THE FDCPA APPLIES IN THE ABSENCE OF A PRE-EXISTING OBLIGATION, DUE PROCESS REQUIRES THE COURT TO INTERPRET "PROBABLE VALIDITY" TO REQUIRE THE GOVERNMENT TO SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS ............................................................................................14

        3.  THERE IS NO EVIDENCE OF CRIMINAL INTENT TO SUPPORT AN AKS VIOLATION................................................................................................ 17

        4.  THERE CAN BE NO "KNOWING" VIOLATION WHERE THE CONTROLLING LAW IS UNCLEAR................................................................................................20

    B.  The Government failed to comply with the FDCPA's statutory requirements...23

        1.  THE GOVERNMENT'S DECLARATIONS DO NOT SPECIFICALLY IDENTIFY THE AMOUNT OF THE DEBT CLAIMED OR ANY INTEREST OR COSTS ATTRIBUTABLE TO SUCH DEBT................................................................................................ 24

        2.  THE GOVERNMENT'S DECLARATIONS DO NOT MEET THE REQUIREMENTS OF 28 U.S.C. § 3102(B).........................................................................................24

    C.  There is no reasonable cause that BlueWave, Dent, or Johnson have taken any steps that would hinder the Government in any future collections efforts. ....................................................................................25

    D.  The Government has other adequate remedies. ............................... 29

**CONCLUSION** ....................................................................................................30

**Table of Authorities**

**CASES**

Board of Regents v. Roth, 408 U.S. 564, 577 (1972) ........................................................14

Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 903, 47 L. Ed. 2d 18
    (1976)..................................................................................................................15, 17

SEC v. ETS Payphones, Inc., 408 F.3d 727, 735 (11th Cir. 2005) ...................................11

SEC v. ICP Masset Mgmt, LLC, No. 10-4791, 2012 WL 204098, at *4
    (S.D.N.Y. Jan. 24, 2012)..........................................................................................14

United States v. Cap Quality Care, Inc., 400 F. Supp. 2d 295, 298-300
    (D. Me. 2005).....................................................................................................12, 26

United States v. First Choice Armor & Equip, 808 F. Supp. 2d 68 (D.D.C. 2011)...........11

United States v. Patel, 17 F. Supp. 3d 814, 824 (N.D. Ill. 2014) aff'd, 778 F.3d 607
    (7th Cir. 2015)......................................................................................................18, 19

United States v. Rogan, 459 F. Supp. 2d 692, 716 (N.D. Ill. 2006) aff'd, 517 F.3d 449
    (7th Cir. 2008).............................................................................................................18

United States v. Teveen, 862 F. Supp. 1200, 1216-1217 (D. Del. 1992) .........................10

U.S. ex rel. deCastro v. Jacquet Const. Serv's, LLC, No. 07-3584,
    2012 WL 2049489, at *6 (E.D. La. Jun. 6, 2012)....................................................25

U.S. ex rel. Doe v. DeGregorio, 510 F. Supp. 2d 877, 881-883 (M.D. Fl. 2007) .......10, 11

U.S. ex rel. Purcell v. MWI Corp., 807 F.3d 281, 287-88 (D.C. Cir. 2015).....................20

U.S. ex rel. Sharp v. Consol. Med. Transp., Inc., No. 96 C 6502, 2001 WL 1035720,
    at *10 (N.D. Ill. Sept. 4, 2001)..................................................................................18


**STATUTES**

28 U.S.C. § 3001.......................................................................................................11, 12

28 U.S.C. § 3002.......................................................................................................12, 13

28 U.S.C. § 3006...............................................................................................................24

28 U.S.C. § 3101...................................................................9, 10, 11, 12 19, 23, 24, 25, 29

28 U.S.C. § 3102.........................................................................................................24, 25

28 U.S.C. § 3301(3)....................................................................................................12, 13

28 U.S.C. § 3729...............................................................................................................19

31 U.S.C. § 3005.........................................................................................................12, 13

31 U.S.C. § 3729...............................................................................................................18

42 U.S.C. § 1320a-7b.............................................................................18, 20, 21, 22, 23


**RULES**

Federal Rules of Civil Procedure 11 .................................................................................16

Federal Rules of Civil Procedure 12 .................................................................................16

AKS, Final Rule, 56 Fed. Reg. 35952-01, 35952, 35954 (Jul. 29, 1991)..........................20

AKS Scienter ....................................................................................................................20


**OTHER**

Advisory Opinion 10-23 ..................................................................................................22

Advisory Opinion No. 98-1 ..............................................................................................22

Advisory Opinion 98-10: ...............................................................................22
Advisory Opinion 99-3 . ................................................................................22
ASD Federal Debt Collection Procedure: Hearing before the Subcomm. on
    Economic and Commercial Law of the H. Comm. on the Judiciary,
    101 Cong. 2d Sess. at 43 (Jun. 14, 1990)...................................................14
Dep't of Justice Debt Collection: So Many Intentions, So Little Money,
    H.R. Rep. 101-825, 1990 WL 200549 (Oct. 10, 1990)DF .........................13
False Claims Act ........................................................................18, 20, 21
FDCPA...........................................................1, 2, 3, 10, 11, 12, 13, 14, 15, 16
Federal Debt Collection Procedure: Hearing before the Subcomm. on Economic and
    Commercial Law of the H. Comm. on the Judiciary, 101 Cong. 2d Sess. At 43
    (Jun. 14, 1990) .........................................................................................13
U.S. Const., Amend. V. .................................................................................15

This Court granted Plaintiff the United States of America's application for prejudgment remedies under the Federal Debt Collection Procedure Act.  Defendants BlueWave Healthcare Consultants, Inc., Robert Bradford Johnson, and Floyd Calhoun Dent III, now move to quash the writs issued pursuant to that order.  For the reasons below, this Court should quash the writs of attachment and garnishment and enjoin the United States from re-applying for such prejudgment remedies without new facts.

## INTRODUCTION

The Federal Debt Collection Procedure Act (FDCPA) is a collections statute.  Passed in 1990, the executive branch asked Congress for a uniform, federal collections apparatus to preempt the patchwork of state collection laws.  Congress responded and passed the FDCPA.  Today, the FDCPA gives the Plaintiff ("the Government") nationwide jurisdiction to seize property and assets during a collections action to recover a debt.  But this is not a collections case.  This case presents no pre-existing debt, penalty, or judgment.  Defendants BlueWave Healthcare Consultants, Inc. ("BlueWave"), Cal Dent ("Dent"), and Brad Johnson ("Johnson") owe no debt to any federal agency.  There is no final agency action (or pending agency action) assessing a civil money penalty or fine against BlueWave, Dent, or Johnson.  And there is no outstanding restitution judgment or any other judgment against BlueWave, Dent, or Johnson.  By using a collections statute in the absence of any underlying obligation, the Government overreaches, legally and factually.  Factually, the Government mischaracterizes benign, common mechanisms for limiting liability, organizing corporate assets, and estate planning and routine transactions in the normal course of business as concealment, waste, and conversion.  Legally, the Government seeks to use the FDCPA—with its burdens of proof that are predicated on the existence of a prior debt, judgment, or penalty—to freeze significant assets based purely on

1

allegations of wrongdoing.  Not only is there no pre-existing debt, but—as will be shown

below—the Government has not demonstrated that it can ever prevail on all of the essential

elements of its claims against the Defendants.

The Government's attachments and garnishments have caused palpable harm to these

Defendants, without ever establishing the existence of an underlying debt through any legal

process, let alone due process. Even though the Defendants and other subjects of the attachments

and garnishments offered to accept service of the writs and to waive physical posting of their

properties, the Government insisted on sending United States Marshalls out to physically post the

writs on the front doors of dozens of their properties—to the great consternation of neighbors

and tenants and the utter humiliation of the Defendants.  The Defendants' business bank

accounts have been garnished, meaning that—if the writs are allowed to stand—the Defendants

and the companies that they are responsible for running will have no access to their money for

the duration of this lawsuit.  The Government has recently served "financial discovery"

requests—again under the FDCPA—that leave no doubt that the Government intends to attach

every piece of property and seize every bank account that the Defendants own or have any

interest in or control over. This Court should not condone such overreach absent a much stronger

showing of indebtedness than it can possibly make in this case.

For the reasons below, this Court should quash its entire order granting prejudgment

remedies and enjoin the United States from re-applying for such remedies without new facts.

## FACTS

Contrary to the Government's apparent theory of this case, success in business is not

proof, or even evidence, of unlawful acts.  Rather, the story of Brad Johnson, Cal Dent, and

BlueWave's success is far less sensational.  Their story is one of talent, hard work, better ideas,

and careful investments.  Importantly, it is a story devoid of and antithetical to the nefarious intentions and actions that comprise the Government's theory.

*Cal Dent and Brad Johnson*

Cal Dent graduated from the United States Naval Academy in 1992 with a degree in general engineering.  After resigning his commission in 1997, he started working as a marketing representative for Pfizer.  Dent quickly moved up.  Pfizer paid Dent a base salary plus commissions.  In the early 2000s, Dent moved to Aventis and continued to market pharmaceuticals.  Aventis paid Dent a base salary plus commissions.  Dent's commissions grew each year.  In 2005, Dent joined Berkeley Heart Lab ("Berkeley"), where he met Johnson. Declaration of Cal Dent ¶¶ 2-11 (attached as Ex. A) ("Dent Dec.").

Prior to joining Berkeley, Johnson graduated from Auburn University in 1990 with a degree in marketing and a minor in biology.  He then went to work for Merck as a marketing representative.  During his time at Merck, Johnson acquired an MBA and climbed in the ranks at Merck.  Merck paid Johnson a base salary plus commissions.  In 1998, Johnson left Merck to work at Takeda Pharmaceuticals.  Takeda paid Johnson a base salary plus commissions.  Then, in 2001, Johnson started working with Berkeley.  Berkeley paid Johnson a base salary plus commissions.  Declaration of Brad Johnson ¶¶ 2- 8 (attached as Ex. B) ("Johnson Dec.").

*Berkeley*

Berkeley presented Johnson and Dent an opportunity to market highly advanced cardiovascular lab tests and to set up lipid clinics, and they did well. At the time Johnson and Dent were at Berkeley, Berkeley offered cutting edge laboratory studies.  Because heart attack and stroke victims often have normal lipid levels and blood pressure values, Berkeley provided a panel of blood tests that used different identifiers to discover and diagnose potential cardiac

issues.  In fact, including Berkeley, only three labs did such advanced blood testing, and Berkeley was considered the gold standard.  Berkeley had a unique product, and Johnson and Dent were successful in their efforts to market that product.  Dent Dec. ¶¶ 12-15; Johnson Dec. ¶¶ 9-12.

For both, Berkeley was very profitable.  Berkeley paid Johnson and Dent a low base salary plus commissions.  Johnson and Dent's individual incomes, based predominantly on commissions, increased significantly during their time at Berkeley.  In fact, during their course of employment, Berkeley re-worked both of their compensation packages.  During their time together at Berkeley, Johnson and Dent were Berkeley's top producers.  Dent Dec. ¶¶ 16-18; Johnson Dec. ¶¶ 13-16.

Berkeley gave Johnson and Dent experience with standard, industry-wide practices associated with marketing lab tests.  Berkeley knew that the federal government had enacted ever-evolving regulations regulating the health care industries.  Berkeley provided its marketing staff with compliance training on a regular basis.  Attorneys and Berkeley's compliance officers presented seminars to Berkeley's marketing team about complying with the Anti-Kickback Statute, Stark Statute, and False Claims Act, and Berkeley provided marketing representatives with compliance bulletins based on legal opinions.  Declaration of Dent Dec. ¶ 20-22; Johnson Dec. ¶ 18-20; Declaration of Attorney Gene Sellers ¶ 4, Ex. A (attached as Ex. C) ("Attorney Sellers Dec.").

Berkeley, like other labs, reimbursed physician groups for preparing and shipping samples to their lab.  To prepare, package, and ship a bloodwork sample, a lab tech, nurse, or phlebotomist must undertake various steps, including but not limited to centrifuging, pouring off blood, freezing, packing, and shipping.  Berkeley would agree to reimburse the physician

4

practice for the time and effort it took their staff to prepare and ship the sample to Berkeley.
Berkeley set the reimbursement amounts, and Johnson and Dent followed their employer's
directions in good faith.  The reimbursements actually reduced the net collections against which
their commissions were computed.  Johnson and Dent did not invent the practice of reimbursing
physician practices for their expenses of processing and handling blood specimens.  This was an
industry-wide practice, and Berkeley and its attorneys taught Johnson and Dent that it was
appropriate and legal.  Dent Dec. ¶¶ 23-26; Johnson Dec. ¶¶ 21-24.  Johnson and Dent, using
widely accepted and Berkeley-approved policies and techniques, greatly increased Berkeley's
market share and, as a result, earned significant commissions.  Contrary to the inference that
drives the Government's case, this success was attributable to the excellent products and services
being provided, not to the paltry fair market value reimbursements Berkeley was paying to its
physician customers.

*Johnson's Investments: 2001 to 2010*

With the income that he earned at Berkeley, Johnson invested heavily in residential real
estate.  Between 2001 and 2010—as the Government's exhibits reveal—Johnson purchased at
least thirty-one residential properties and one farm (comprising seventeen parcels).  The
residential properties were purchased to rent, and nearly all of them remain residential rental
properties.  Johnson initially bought these properties in his own name, and he managed and
rented them through Forse Investments, LLC ("Forse"), a company he started in 2003 for that
purpose.  Johnson Dec. ¶¶ 40-43.

In 2009, upon advice of legal counsel and business consultants, Johnson transferred
ownership in all of the residential properties to Forse.  These transfers served three primary
purposes.  First, as Johnson's real estate holdings grew, his liability for personal injury increased.

Placing the properties in Forse's name would limit his potential personal liability to renters, their guests, etc.  Second, these transfers allowed Johnson to organize his holdings for tax, management, and accounting purposes.  Third, each property needed to be insured, and without a holding company insurance companies would not provide Johnson additional homeowners policies.  Though this transfer process was intended to be complete in February 2009, additional transfers for the same purposes have occurred after 2010.  Johnson Dec. ¶¶ 44-47.

In addition to buying real estate, Johnson opened Royal Blue Medical, Inc. ("Royal Blue") in 2007.  Royal Blue acts as a marketing agency for Eagle Pharmacy, LLC, a closed door compounding pharmacy specializing in sterile products.  Eagle Pharmacy, LLC maintains status as a 503B FDA Sterile Compounding Pharmacy, and it uses Royal Blue as its exclusive marketing agency.  Johnson Dec. ¶¶ 53-55.  It is not a party to this action.

<em>2010: BlueWave</em>

In January 2010, Dent and Johnson left Berkeley and formed BlueWave.  Previously, in 2008, Defendant Latonya Mallory ("Mallory")—another Berkeley employee—left Berkeley and opened Health Diagnostics Laboratories, Inc.  ("HDL").  HDL would be a diagnostics laboratory, offering physician practices advanced lab tests, and BlueWave would act as HDL's exclusive marketing agency in certain territories.  Dent Dec. ¶¶ 27-31; Johnson Dec. ¶¶ 25-29.

From the very beginning, HDL sought and followed advice of its legal counsel with regard to marketing its services.  HDL's attorneys drafted the exclusive marketing contract between HDL and BlueWave.  Attorney Sellers Dec. ¶ 5, Ex. B; Dent Dec. ¶¶ 33-39; Johnson Dec. ¶¶ 31-36.  BlueWave, with its own independent counsel, reviewed and signed the contract. Id.  The agreement, on its face, confirms this:

19.   **Advice of Counsel.** Contractor acknowledges that Contractor has reviewed carefully all provisions contained in this Agreement prior to its execution. Contractor acknowledges further that Contractor has had the advice of an attorney of Contractor's choice. Contractor has executed this Agreement freely and voluntarily and believes this Agreement to be equitable, just, and reasonable.

Id. Similarly, the HDL agreement was intended to comply with all relevant laws:

18.   **Compliance.** This Agreement shall be construed to be in accordance with any and all federal and state laws, including laws relating to Medicare, Medicaid, and other third-party payors. In the event there is a change in such laws, whether by statute, regulation, agency or judicial decision, that has any material effect on any term of this Agreement, or in the event that counsel to one party determines that any term of this Agreement poses a risk of violating such laws, then the applicable term(s) of this Agreement shall be subject to renegotiation and either party hereto may request renegotiation of the affected term or terms of this Agreement, upon written notice to the other party, to remedy such condition. In the interim, both Company and Contractor shall perform their obligations in full compliance with applicable law.

Id.

Though they would be working for themselves, Johnson and Dent would, essentially, continue to market lab tests and earn commissions on HDL's collections as they had previously done. Attorney Sellers Dec. ¶¶ 5, 10. This paradigm was consistent with their fifteen years of experience in the industry and years of experience, training, and practice with Berkeley. BlueWave also entered into a similar contract with Singulex, another lab company. That contract was also entered into with the advice of counsel, and it was believed that it complied with all relevant laws. Attorney Sellers Dec. ¶ 6, Ex. C.

HDL was able to offer the most technologically advanced and effective cardiac tests under one roof. Previously physicians would have to go to two or more laboratories to get all the tests they needed. Dent and Johnson learned the science behind the tests and were able to educate physicians about them. Physicians found it advantageous to be able to have all of their most desired cardiac labs run by one laboratory. Dent Dec. ¶¶ 31-32; Johnson Dec. ¶¶ 29-30.

7

Over the next three years, HDL and BlueWave successfully marketed HDL's lab studies. Every step of the way both companies gave high priority to legal compliance. In 2012, HDL provided BlueWave, Jonson, Dent, and Attorney Sellers a letter from counsel confirming the continued validity and legality of HDL's P&H reimbursements to physician practices, and this opinion was relied upon in good faith. Attorney Sellers Dec. ¶ 7, Ex. D; Dent Dec. ¶¶ 33-39; Johnson Dec. ¶¶ 31-36. Similarly, HDL acquired a time and motion study from Exponent to confirm the continued validity of its reimbursement amount. Attorney Sellers Dec. ¶ 8, Ex. E. Finally, BlueWave obtained a third party compliance audit by a company that specialized in compliance with Anti-Kickback laws. Draft Navigant Compliance Audit (attached as Ex. D). Johnson, Dent, and BlueWave took all these steps to ensure good faith compliance with all relevant laws, regulations, and policy memos. Dent Dec. ¶¶ 33-39; Johnson Dec. ¶¶ 31-36. Nothing in the Government's submission purports to refute these foregoing good faith efforts.

*January 2013: The Government's Discrete Actions*

The Government issued a subpoena to BlueWave in January of 2013. 2013 Subpoena (attached as Ex. E). The subpoena was very general. It requested all corporate documents from BlueWave, but it did not allege or imply that BlueWave had done anything wrong. It noted that the Government was seeking the information to conduct an investigation related to healthcare laws. But it did not state that a lawsuit was pending, that BlueWave (or its owners) should not transfer any property, or that BlueWave must stop any marketing practices. Rather, it simply asked for documents. BlueWave fully complied. Dent Dec. ¶ 41; Johnson Dec. ¶ 39. BlueWave, Johnson, and Dent continued with business as usual.

In mid-2014, Dent voluntarily met with attorneys for the Government in Washington, DC, and Johnson met with government attorneys in Birmingham, Alabama. Dent Dec. ¶ 41;

8

Johnson Dec. ¶ 39.  They answered questions, provided documents, and complied with all requests.  At no point during the interviews did the Government tell BlueWave, Dent, or Johnson not to transfer any assets or property.  After the interviews, on June 25, 2014, the Government sent out a fraud alert related to "process and handling fees." Attorney Sellers Dec. ¶ 9, Ex. F. BlueWave discontinued the practice to ensure ongoing compliance, but otherwise continued with business.  The Government did not initiate this action until August of 2015 when it filed the instant complaint.   The Relators' complaints remained under seal until August 2015 as well.

## <u>ARGUMENT</u>

**I.    This Court should quash its order granting the Government's application for prejudgment remedies.**

This Court should quash its order granting the Government's application for prejudgment remedies.  Under the FDCPA, the Government may apply for prejudgment remedies in an action to collect a pre-existing debt, penalty, judgment, or fine.  <u>See</u> 28 U.S.C. § 3101.  If the Court finds the Government's application meets the requirements in § 3101(a)-(c), "the court shall issue all process sufficient to put into effect the prejudgment remedy."  28 U.S.C. § 3101(e).  In response, a debtor may move to quash such order.  28 U.S.C. § 3101(d)(2).

In its motion to quash, the debtor may only challenge:

(A)    the probable validity of the claim for the debt for which such remedy was granted and of any defense or claim of exemption asserted by such person;

(B)    compliance with any statutory requirements for the issuance of the prejudgment remedy granted;

(C)    the existence of any ground set forth in [28 U.S.C. § 3101(b)]; and

(D)    the inadequacy of alternative remedies (if any) to protect the interests of the United States.

§ 3101(d)(2)(A)-(D).  A court "shall hold a hearing on such motion as soon as practicable[.]"

§ 3101(d)(2).  For the reasons below, this Court should quash its entire order.[1]

> A.    The Government fails to show the probable validity of any claim for debt against BlueWave, Dent, or Johnson.

The Government fails to show the probable validity of any claim for debt against BlueWave, Dent, or Johnson.  This Court should review the "totality of the circumstances" to determine whether the Government's claim for the debt has "probable validity."  Govt. App. at 15 (citing U.S. ex rel. Doe v. DeGregorio, 510 F. Supp. 2d 877 (M.D. Fl. 2007) and United States v. Teveen, 862 F. Supp. 1200 (D. Del. 1992)).  To prevail on a motion to quash, defendants need only place "the Government's showing of the probable validity of the claim for debt *in dispute*."  Teveen, 862 F. Supp. at 1216 (emphasis added).  This requires a defendant to "make an affirmative showing as to why the claim for debt is probably not valid."  Id. at 1217.

> 1.    THE GOVERNMENT CANNOT SHOW A "CLAIM FOR DEBT."

This Court should quash its order because the Government cannot show a "claim for debt" as defined by the FDCPA.  The text, structure, and history of the FDCPA indicate that it authorizes prejudgment remedies only in an action for the collection of a pre-existing debt, fine, obligation, or penalty.  The FDCPA states:

> (3) "Debt" means—
>
> > (A) an amount that is owing to the United States on account of a direct loan, or loan insured or guaranteed, by the United States; or

---

[1] In addition to granting the Government's requests for writs of attachment and garnishment, this Court granted the Government's request for discovery under the FDCPA.  [ECF No. 173].  The Government served such discovery on March 17, 2016.  As explained infra, the FDCPA does not apply to this case.  For those same reasons, this Court should quash such discovery requests or grant these Defendants' a protective order from answering any such discovery until after this Court's decision on the instant motion.

{Memorandum in Support of Motion to Quash.docx.1 }

(B) an amount *that is owing* to the United States on account of a fee, duty, lease, rent, service, sale of real or personal property, overpayment, fine, assessment, penalty, restitution, damages, interest, tax, bail bond forfeiture, reimbursement, recovery of a cost incurred by the United States, or other source of indebtedness to the United States, but that is not owing under the terms of a contract originally entered into by only persons other than the United States;

And includes any amount owing to the United States for the benefit of an Indian tribe or individual Indian, but excludes any amount to which the United States is entitled under section 3011(a).

28 U.S.C. § 3002(3) (emphasis added). Such definition limits "debt" under the FDCPA to any amount "that is owing." Id. In light of this present tense definition, the plain language of the FDCPA requires a preexisting debt "that is owing," not a potential, inchoate debt that may someday be owed. United States v. Cap Quality Care, Inc., 400 F. Supp. 2d 295, 299 (D. Me. 2005); see SEC v. ETS Payphones, Inc., 408 F.3d 727, 735 (11th Cir. 2005).[2] To read the remaining portions of the FDCPA to allow for its use to attach, garnish, or sequester a

---

[2] The Government cites to DeGregorio and United States v. First Choice Armor & Equip, 808 F. Supp. 2d 68 (D.D.C. 2011), to support its claim that no pre-existing debt, obligation, or penalty is necessary to seek pre-judgment remedies under the FDCPA. Govt. App. at 3. This Court should not adopt the rationale of either of these cases. First, neither case is binding on this Court, and whether pre-existing debt is necessary to sustain actions under the FDCPA has not been definitively answered in the District of South Carolina and the Fourth Circuit. Second, neither case fully addressed the legislative history of the FDCPA. Third, in its analysis (which First Choice adopted), DeGregorio used the definition of "claim" from 28 U.S.C. § 3301(3) to interpret the statutory phrase "claim for a debt" from 28 U.S.C. § 3001(a)(2). DeGregorio, 510 F. Supp. at 883. Such reliance was in error because the section 3301(a)(3) definition for "claim" only applies to that term in Subchapter D of the FDCPA, which addresses only fraudulent transfers, see 28 U.S.C. § 3301 ("as used in this subchapter"), not Subchapter A or B, which include general definitions for the entire FDCPA and the requirements for prejudgment remedies. See 28 U.S.C. §§ 3001, 3101. Finally, both cases are factually distinguishable: (1) in DeGregorio, the government alleged the FCA Defendant submitted wholly false claims and the FCA Defendant was in jail, DeGregorio, 510 F. Supp. 2d 881-83; and (2) in First Choice, there was an underlying contract with a warranty for the goods in dispute. First Choice, 808 F. Supp. 2d at 72-73.

defendant's assets for a mere claim would read this definition out of the statute.  <u>Cap Quality</u>, 400 F. Supp. 2d at 299.

The structure of the FDCPA also supports this plain language interpretation.  First, the FDCPA defines its purpose as two-fold:  "(1) to recover a judgment on a debt; or (2) to obtain, before judgment on a claim for a debt, a remedy in connection with such claim."  28 U.S.C. § 3001(a)(1)-(2).  The FDCPA's very purpose is limited to acquiring a judgment on a pre-existing debt.  To be clear, section 3001(c)—a section entitled "Amounts Owing Other Than Debts"—states "This chapter shall not apply with respect to an amount owing that is not a debt or a claim for an amount owing that is not a debt."  28 U.S.C. § 3001(c).  The FDCPA is clear, if there is no pre-existing debt, the FDCPA does not apply.  Reinforcing this intent, the very next section then goes on to define "debt" as an amount that is owing.  28 U.S.C. § 3002(3). Second, the FDCPA defines "claim" differently for different purposes.  In 28 U.S.C. § 3301(3), the FDCPA defines a claim as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  28 U.S.C. § 3301(3).  This definition of "claim," which more clearly includes an inchoate claim for a money judgment, applies only to the fourth section of the FDCPA.  It does not apply to the term "claim" that is used throughout the previous three sections of the FDCPA.  If claim had to be defined to include "a right to payment, whether or not the right is reduced to judgment" in the fourth section, its use in the previous three sections must mean something different.  In those three sections, "claim" is nearly always used in the phrase "claim for a debt."  Because "debt" is defined in the present tense, a "claim" to such debt requires a pre-existing debt.  If "claim" meant an allegation of debt without a final judgment throughout the FDCPA, the definition of claim in section 3301(3) would be superfluous.  Finally, 31 U.S.C.

§ 3005 creates an initial look-back period for older, pre-existing debts: "This chapter shall not apply with respect to a judgment on a debt if such judgment is entered more than 10 years before the effective date of this chapter." This indicates that the FDCPA was intended to go after pre-existing debts, but not debts that accrued prior to 1981.

The history of the FDCPA further indicates that a pre-existing debt is required in order to proceed under the FDCPA. On a background of failed debt collection regimes and statutes, Congress sought to provide the Department of Justice with a tool to effectively collect pre-existing debts. See Dep't of Justice Debt Collection: So Many Intentions, So Little Money, H.R. Rep. 101-825, 1990 WL 200549 (Oct. 10, 1990). In a house report, the Department of Justice explained that passage of the FDCPA would provide an effective tool for collecting pre-existing debts:

> The Assistant Attorney General for Debt Management testified that the "single most important thing that could be done to add significant debt collection weapons to our arsenal would be the enactment of S. 84, the Federal Debt Collection Procedures Act of 1990 it would bring an end to the present situation whereby a crazy patchwork of laws in the 50 states dictate the debt collection remedies available to us in collecting Federal debts. It would provide consistent and fair creditors' rights to the Government regardless of the state of residence of the debtor and eliminate the preferences certain state laws presently confer on Federal debtors who just happen to live in states which are regarded as notorious 'debtors havens'."

Id. The Department of Justice Report does not describe any issues with freezing assets during litigation; it only describes the problems of collecting pre-existing debts. In an initial draft of the bill, a definition of "claim" was proposed for the entire FDCPA that would "cover all situations in which monies are owed to the United States, however remote or contingent," Federal Debt Collection Procedure: Hearing before the Subcomm. on Economic and Commercial Law of the H. Comm. on the Judiciary, 101 Cong. 2d Sess. At 43 (Jun. 14, 1990), but that definition did not make the final law. See 28 U.S.C. § 3002. Even the "broad" definition of "debt" contemplated a

pre-existing debt.  See SEC v. ICP Masset Mgmt, LLC, No. 10-4791, 2012 WL 204098, at *4 (S.D.N.Y. Jan. 24, 2012).

Here, the text, structure, and history of the FDCPA make it clear that Congress intended the FDCPA to apply only in situations where there was a pre-existing debt to collect, not a potential judgment years down the road.  The purpose of the FDCPA was to provide a tool for the Department of Justice to try to collect the billions of dollars owed in unpaid debts, not as a tool to freeze assets for ongoing cases with no established debt.  When viewed in this light the standards set out for the prejudgment remedies take on a new light.  For example, the "probable validity" standard is simple to apply if a court is asked to look at the validity of a pre-existing debt, whereas it is an atypical standard for preliminary relief in a case where there is no pre-existing judgment and only a claim for damages.   As such, the first reason why this Court should quash its order granting prejudgment remedies is that the FDCPA does not apply unless there is an established debt, which is not the case here.

2.    TO THE EXTENT THE FDCPA APPLIES IN THE ABSENCE OF A PRE-EXISTING OBLIGATION, DUE PROCESS REQUIRES THE COURT TO INTERPRET "PROBABLE VALIDITY" TO REQUIRE THE GOVERNMENT TO SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS.

To the extent this Court finds the FDCPA can apply in the absence of pre-existing debt, obligation, or penalty, procedural due process requires the Government to demonstrate a likelihood of success on the merits.  Procedural Due Process under the Fifth Amendment applies to governmental deprivations of life, liberty, or property.  U.S. Const., Amend. V.   "Property" under the Fifth Amendment is protected if an individual has a "legitimate claim of entitlement" to it.  Board of Regents v. Roth, 408 U.S. 564, 577 (1972).  When such due process interest is present, the Court should balance three factors to determine if the existing process is sufficient:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

Here, as a threshold matter, BlueWave, Dent, and Johnson have a due process interest in their real and personal property. There is no dispute that BlueWave, Dent, and Johnson have a legitimate claim of entitlement to their real estate, bank accounts, airplane, and boats. BlueWave, Dent, and Johnson own such real and personal property. Due Process clearly applies.

Further, absent a pre-existing debt, the Matthews factors require the Government to bear a higher burden of proof—a likelihood of success on the merits, rather than probable validity—in order to sustain their writs and garnishments. First, absent a preexisting debt, the private interests here are significant. BlueWave, Dent, and Johnson have an interest in unfettered access, control, use, and alienation of their real and personal property. This interest is heightened by the sheer size of the property interests involved. By its own estimation, the Government has garnished and attached real and personal properties valued at over $16 million dollars, though some of that amount is owned by non-parties to this action. In the absence of any underlying debt, administrative sanction, or contractual breach, BlueWave, Dent, and Johnson's interests in their property are significant.

Second, in the absence of a pre-existing obligation, there is a serious risk that the Government will erroneously deprive BlueWave, Dent, and Johnson of their property without a higher burden of proof. The Government contends that it can deprive BlueWave, Dent, and Johnson of their property based solely on a claim based on good faith allegations. This allows the Government to deprive all civil defendants of their property in any civil case where the

Government merely satisfies the pleading requirements of Federal Rules of Civil Procedure 11 and 12. Such a standard would tie the Government's ability to deprive a civil defendant of its property to the Government's unproven allegations of wrongdoing alone; it would be completely divorced from the actual merits of a contested claim. This is in great contrast to a typical FDCPA case where the Government seeks to collect contractual damages, a civil money penalty assessed through a final agency action, or restitution ordered as part of a criminal sentence. In those cases, review for mere probable validity of the underlying debt is sufficient because there was an underlying adjudication on the merits or written obligation. But in cases with no such underlying obligation, there is no analogous finding of wrongdoing; instead the deprivation is based on mere allegations of wrong doing.

A higher burden of proof—a likelihood of success on the merits—bears significant value. In the absence of a pre-existing obligation, the heightened standard will tie any prejudgment remedies to a threshold showing of the merits of the case. In cases with a pre-existing debt, that pre-existing debt carries such indicia of strength, and as such, a "probable validity" is sufficient for due process. Further, this higher burden is commonplace. Generally, to enjoin a defendant, a litigant must prove at least a likelihood of success on the merits of the underlying claim (in addition to the other elements of injunctive relief). The probable value of such safeguard would be significant because the Government would be required to make a showing of the merits of the case before it could deprive a civil defendant of its property. Again, such heightened standard is only necessary in the absence of any underlying obligation.

Finally, the Government interest would not be harmed by use of a heightened standard in the absence of a pre-existing obligation. The Government's ostensible interest here is freezing assets to ensure it can collect any judgment it may acquire. With a heightened standard, such

interest can still be realized, but only in cases where the Government can show a likelihood of success on the merits. Such heightened standard would not impose any additional administrative or fiscal burden on the Government.

Under Matthews, BlueWave, Dent, and Johnson's private interests are significant. The potential risk of erroneous deprivation is high, and the application of a likelihood of success standard in cases where there is no pre-existing obligation requires no additional steps or procedures. Finally, a heightened standard will not impede the government from freezing assets in cases where it can show a likelihood of success on the merits of its case. Thus, this Court should require the Government to prove that it has a likelihood of success on the merits to satisfy the "probable validity" of its claims.

      3.     THERE IS NO EVIDENCE OF CRIMINAL INTENT TO SUPPORT AN AKS VIOLATION.

Even assuming that the Act should be construed to turn due process on its head and require a defendant to prove the absence of a debt in order to prevent the Government from seizing all his property, Defendants easily meet their burden in this case. The Government cannot show a probable validity that it will succeed on its claims against BlueWave, Johnson, and Dent because there is no evidence of criminal intent.[3] The Government's claims under the False Claims Act are dependent on its allegations that BlueWave, Dent, and Johnson violated the Anti-Kickback Statute ("AKS").[4] Govt App. at 3-15. Because the Anti-Kickback Statute is a

---

[3] The Government relies solely on its allegations that BlueWave's agreements with HDL and Singulex are, per se, a violation of the Anti-Kickback Statute and, therefore, per se violations of the False Claims Act. Govt App. at 5. As such, BlueWave will focus on that limited ground.

[4] Essentially, the Government alleges that BlueWave, Dent, and Johnson violated the Anti-Kickback Statute and, therefore, violated the FCA because "a claim [for reimbursement under a federal healthcare program] that includes items or services resulting from a violation of [the

17

criminal statute, it punishes only knowing and willful violations.  See 42 U.S.C. § 1320a-7b(b).

In such cases, "[i]f a plaintiff cannot prove a knowing violation of the kickback statute, it will be

impossible for that plaintiff to prosecute successfully the suit under the FCA."  U.S. ex rel. Sharp

v. Consol. Med. Transp., Inc., No. 96 C 6502, 2001 WL 1035720, at *10 (N.D. Ill. Sept. 4, 2001)

(allowing FCA "claims to proceed does not dilute the burden of proof under the Anti-Kickback

Act (which requires criminal intent)").  Even under the 2010 amendments to the AKS, the AKS

criminal intent —or mens rea— element requires the Government to "prove that [a] Defendant

intended to engage in conduct that he knew was wrongful, though it need not prove that he was

aware of the specific statutory provisions that he is alleged to have violated."  United States v.

Patel, 17 F. Supp. 3d 814, 824 (N.D. Ill. 2014) aff'd, 778 F.3d 607 (7th Cir. 2015). The

"government must demonstrate 'criminal intent,' i.e., a knowing violation of the Anti–Kickback

Statute, if it is to use the Anti–Kickback Statute as a predicate statute for an FCA violation."

United States v. Rogan, 459 F. Supp. 2d 692, n. 12 (N.D. Ill. 2006) aff'd, 517 F.3d 449 (7th Cir.

2008).  The Government is required to prove such knowingly wrongful conduct by a

preponderance of the evidence.  Id. at 716.  Thus, to prove its FCA claims, the Government must

show, inter alia,[5] that BlueWave, Dent, and Johnson each had criminal intent to violate the AKS

Statute and each knowingly violated the FCA.

Here, the Government's application wholly fails to show that BlueWave, Dent, or

Johnson intended to act wrongfully by entering into BlueWave's contracts with HDL or

Singulex.  Neither the Government's application (filed under oath) nor its attendant Declarations

---

Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of the [FCA]."  42
U.S.C. § 1320a-7b(g).

[5] In addition, the FCA also requires that any false claims be submitted "knowingly."  28 U.S.C.
§ 3729.

assert that BlueWave, Dent, or Johnson acted with an ill intent when they agreed to HDL and Singulex's contracts.  See Govt App. at 15-20 (failing to address the scienter requirement in its probable validity analysis); Declaration of Su H. Kim at ¶¶ 5-30 [ECF No. 173-2 at 55-60] (failing to even allege that Dent, Johnson, or BlueWave intended to engage in conduct they knew was wrongful); Declaration of Kendrick Bailey [ECF No. 173-3 at 62-73] (failing to even address probable validity).  Furthermore, neither Government declaration addresses the Government's right to recover.  See 28 U.S.C. § 3101(c).

Further, there is ample evidence that BlueWave, Dent, and Johnson made good faith efforts to follow and comply with the law.  They were provided and relied in good faith upon legal opinions validating the lawfulness of the P&H reimbursement paradigm.[6]  Attorney Sellers Dec. ¶¶ 2-8.  They were provided and relied in good faith upon a time and motion study validating HDL's reimbursement amounts.  Id.  They participated in a compliance audit with experts experienced with AKS Statute and Stark Law compliance requirements. Ex. D. Significantly, Dent, Johnson, and BlueWave fully cooperated with the Government's investigation and have already provided the Government with ample evidence of materials related to their good faith efforts to comply and their reliance on counsel, yet the Government fails to mention any such evidence in their application.  Dent Dec. ¶ 32; Johnson Dec. ¶ 30. This evidence alone is sufficient to raise a question of fact as to BlueWave, Johnson, and Dent's scienter, and as such, is enough to put the Government's claim in dispute.  Once the validity of the Government's claim is put in dispute, its right to prejudgment remedies evaporates.

---

[6] In fact, the Department of Health and Human Services did not clarify its position on P&H reimbursements until it issued a June 25, 2014 special fraud alert.  Attorney Sellers Dec. ¶9, Ex. F.  In another display of good faith efforts of compliance, HDL and Singulex stopped their P&H reimbursement program thereafter.

4.    THERE CAN BE NO "KNOWING" VIOLATION WHERE THE CONTROLLING LAW
IS UNCLEAR.

Dent, Johnson, and BlueWave cannot commit an FCA violation where the controlling

law is unsettled and therefore unclear.  In addition to the AKS scienter, to be liable under the

FCA, a defendant must have made a false claim "knowingly."  31 U.S.C. § 3729(a)(1)(A)-(B).

> Consistent with the need for a knowing violation, the FCA does not reach an
> innocent, good-faith mistake about the meaning of an applicable rule or
> regulation.  Nor does it reach those claims made based on reasonable but
> erroneous interpretations of a defendant's legal obligations.  As this court has
> recognized, establishing even the loosest standard of knowledge, i.e., acting in
> reckless disregard of the truth or falsity of the information is difficult when falsity
> turns on a disputed interpretive question.

U.S. ex rel. Purcell v. MWI Corp., 807 F.3d 281, 287-288 (D.C. Cir. 2015) (internal quotation

marks and citations omitted).  In addition to their good faith reliance on counsel and compliance

experts, if an FCA defendant relied on an objectively reasonable interpretation of an ambiguous

provision, as a matter of law, the defendant cannot violate the FCA.  Id. at 288.

Here, BlueWave, Dent, and Johnson did not (and could not) commit a violation of the

FCA because, at best, it is unclear whether BlueWave and HDL's contract violated the AKS or

its attendant regulations.  The AKS broadly outlaws remunerations in the medical context, but it

is so broad that, originally, regulated parties were concerned that "innocuous, or even beneficial,

commercial arrangements" violated the AKS.  Final Rule, 56 Fed. Reg. 35952-01, 35952 (Jul.

29, 1991).  To address this concern, the United States Department of Health and Human Services

(HHS) engaged in notice and comment rulemaking to define various safe-harbors of lawful

conduct.  Id.  However, HHS made clear that a failure to comply with a safe-harbor did not

necessarily mean that a business arrangement violated the AKS.  In other words, an entity's

business arrangement can fail to comply with a safe-harbor, but still not violate the AKS because

HHS's articulation of various safe-harbors did "not expand the scope of activities the [AKS] prohibits." Id. at 35954.

The AKS and its attendant regulations and guidance do not obviously outlaw BlueWave and HDL's contractual relationship.   HDL hired BlueWave to market its tests in certain states. Attorney Sellers Dec. ¶5, Ex. B.  The contract did not require BlueWave to induce, recommend or arrange for referrals; it required BlueWave to perform marketing services "in compliance with the laws, rules and regulations of all jurisdictions" and all obligations in the agreement were to "be construed to be in accordance with any and all federal and state laws, including laws relating to Medicare, Medicaid, and other third-party payors." Id. at 6, 7.  Such contract set up a scenario where BlueWave would present HDL's tests to medical providers in compliance with all relevant law.  Such arrangement does not, in and of itself, violate the AKS because it does not require improper inducement; in fact it precludes it by requiring compliance with all laws.  At all times it was up to the physicians, in their medical judgment, to determine whether or not it was medically appropriate to order one of the subject lab tests.  Regardless of whether this business arrangement fits within one of the regulatory safe-harbors, it does not require a violation of the AKS and, as such, it is doubtful that the creation of such relationship could violate the AKS.  It cannot therefore lead to a knowing violation of the FCA.  The difference between a healthcare provider and a salesman is too clear to require explanation.  Commissions paid to a salesman, whose obvious job is to market products or services, are not kickbacks.  Nothing in the text or the history of the AKS makes it clear that it was intended to outlaw truthful marketing campaigns for medical products and services.

The Government, however, argues at length that the statute, its regulations, and HHS guidance clearly show that an independent contractor marketing relationship violates the AKS

because it does not fit within a safe-harbor.  Govt App. at 5-15.  The Government's lengthy

argument fails to recognize that a business arrangement can both not violate the AKS and not fit

within a safe-harbor.  And none of the OIG opinions the Government cites say that commission

arrangements are per se violations of the AKS:

- Advisory Opinion No. 98-1 at p.6:  "Because compliance with a safe harbor is not mandatory, the fact that the Arrangement does not fit within a safe harbor does not mean the Arrangement is unlawful."

- Advisory Opinion 98-10:  Holding that an independent contractor arrangement based on commission was outside of a safe harbor, but not violative of the AKS.

- Advisory Opinion 99-3 at p.6: Noting that a sales agreement with independent contractor only "potentially" violates the AKS.

- Advisory Opinion 10-23 at p.7:  Holding that an commission arrangement "potentially" violates the violates the AKS, but a "definitive conclusion regarding the existence of an anti-kickback violation requires a determination of the parties' intent . . ."

And the Government fails to cite a statute, regulation, or HHS bulletin that expressly outlaws an

arrangement like BlueWave and HDL's.  Rather, the Government's arguments reveal the

ambiguity that surround business arrangements that fall within the legal grey area outside of the

reach of the AKS and the protection of its safe-harbors. The Government in this case is

advocating very ambitious interpretations of the ambiguous AKS and, by extension, the FCA.

Whether or not the Court eventually accepts the Government's interpretations, it is

fundamentally unfair for any defendant to be held liable under the FCA for the ambiguities

surrounding the status of such commission agreements, and further inequitable to have such

interpretations applied retroactively.

        The Government cannot show a probable validity to its claim to debt because there is no

debt.  To the extent the FDCPA can apply to a mere cause of action, the Government wholly fails

to show any evidence that BlueWave, Dent, or Johnson had the requisite criminal intent to

violate the AKS and, similarly, it fails to show an unambiguous legal expression that outlaws BlueWave's contractual relationships with HDL and Singulex.  Both failures mean that the Government's claim is probably not valid, and, at a minimum, is in dispute.

     B.    <u>The Government failed to comply with the FDCPA's statutory requirements.</u>

This Court should quash its order granting prejudgment remedies because the Government failed to comply with the FDCPA's statutory requirements. The FDCPA's statutory requirements for acquiring prejudgment remedies are three-fold.  <u>See</u> 28 U.S.C. § 3101(e).  First, the Government must file an application under oath with the court "in conjunction with the complaint or at any time after the filing of a civil action on a claim for a debt."  28 U.S.C. § 3101(a).  Second, the Government must show "reasonable cause to believe that" the debtor, <u>inter alia</u>, "has or is about to assign, dispose, remove, conceal, ill-treat, waste, or destroy property . . . [or] convert the debtor's property into money, securities, or evidence or debt in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States."  28 U.S.C. § 3101(b)(1)(B)-(C).[7]  Finally, the Government must attach an Declaration that "specifically" identifies the amount of debt, interest, and costs the Government seeks, the reasons why the Government has reason to believe the debtors are undertaking efforts that would hinder their recovery, and the specific statutory requirements for the various forms of prejudgment relief.  28 U.S.C. § 3101(c).  For the reasons below, the Government has failed to meet these statutory requirements in various ways.

---

[7] The Government's application limits its rationale to acquire prejudgment remedies to sections 3101(b)(1)(B) & (C).

1.    THE GOVERNMENT'S DECLARATIONS DO NOT SPECIFICALLY IDENTIFY THE AMOUNT OF THE DEBT CLAIMED OR ANY INTEREST OR COSTS ATTRIBUTABLE TO SUCH DEBT.

The Government's Declarations do not specifically identify the amount of debt claimed, interest, or costs attributable to such (alleged) debt. Section 3101(c)(2)(A) requires that "the Declaration shall state . . . specifically the amount of the debt claimed by the United States and any interest or costs attributable to such debt." 28 U.S.C. § 3101(c)(2)(A). Further, the FDCPA requires strict compliance with the statutory requirements for Government Declarations. 28 U.S.C. § 3006.

Here, the Government's Declarations repeat the allegations in its complaints. However, the Government offers no evidence that federal healthcare programs paid for every lab test performed by HDL or Singulex. By simply identifying BlueWave, Dent, and Johnson's gross revenue from HDL and Singulex, the Government fails to state "specifically" the amount the Government alleges BlueWave received from federal healthcare programs. This is insufficient for purposes of Section 3101(c)(2)(A) and, therefore, this Court should quash its order granting the Government pre-judgment remedies.

2.    THE GOVERNMENT'S DECLARATIONS DO NOT MEET THE REQUIREMENTS OF 28 U.S.C. § 3102(b).

The Government's Declarations fail to satisfy the requirements of Section 3102(b) because they do not identify an action against BlueWave, Johnson, or Dent that qualifies for a writ of attachment. Section 3101(c)(2)(B) requires that the government's attached "Declaration shall state . . . the requirements of section 3102(b)." 28 U.S.C. § 3101(c)(2)(B). Section 3102(b) describes, inter alia, the availability of prejudgment writs of attachment under the FDCPA. 28 U.S.C. § 3102. Section 3102(b) limits such writs to certain types of claims for a pre-existing debt. 28 U.S.C. § 3102(b). Relevant to this action, it allows writs for claims for debt "in an

action against the debtor for damages in tort" and "in an action to recover a fine, penalty, or tax." 28 U.S.C. § 3102(b)(2) & (4).

Here, the Government's Declarations cannot meet this standard because BlueWave, Dent, and Johnson are not "debtors" and the Government has brought no tort action against BlueWave, Dent, or Johnson.  Similarly, the Government's causes of action do not seek solely to "recover" a fine, penalty, or tax; rather, the Government seeks to prove their entitlement to damages for allegedly false claims and, possibly, penalties on top of those damages.  This case presents no scenarios described by section 3102 and, therefore, the Government's Declarations cannot meet their statutory requirements.

> C.    There is no reasonable cause to believe that BlueWave, Dent, or Johnson have taken any improper steps that would hinder the Government in any future collections efforts.

This Court should quash its order granting prejudgment remedies because there is no cause to believe that BlueWave, Dent, or Johnson have taken any steps that would hinder the Government from a post-judgment collection.  The Government has the burden to show "reasonable cause to believe that":

> (1) the debtor—
>
> > (B) has or is about to assign, dispose, remove, conceal, ill treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States;
> >
> > (C) has or is about to convert the debtor's property into money, securities, or evidence of debt in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States . . . .

28 U.S.C. §3101(b).  These subsections require a showing of a post-application or (at a minimum) post-suit "pattern of selling [] property [or] attempting to liquidate [] assets." U.S. ex rel. deCastro v. Jacquet Const. Serv's, LLC, No. 07-3584, 2012 WL 2049489, at *6 (E.D. La.

Jun. 6, 2012) (denying an FDCPA application for prejudgment remedies).  Further, business transactions and costs, such as attorney's fees, should not be considered "waste."  See Cap Quality, 400 F. Supp. at 298-300.

The Government identifies only three transactions involving property that Johnson owned and only three transactions that Dent owned.  The transactions comprising the Government's evidence of reasonable cause are rebutted in turn below.

*Johnson*

The Government claims that Johnson engaged in at least three post-2013 transactions to conceal or convert property to hinder any later collections efforts.  First, the Government identifies the April 2013 sale of 1294 Adams Road as such a transaction.  Govt App. Ex. 18 ¶14.  Johnson sold 1294 Adams Road—his homestead—to buy a new home for him and his new wife in 2013.  Johnson bought 1294 Adams Road in approximately 2009 and lived in it as his primary place of residence.  Johnson then got engaged.  He and his future wife planned to move into a new house in 2013.  So, Johnson sold the property in anticipation of his subsequent marriage.  Johnson Dec. ¶ 42.

Such sale is not reasonable cause to believe that Johnson has or will conceal or convert his properties with the effect of hindering any Governmental collection efforts.  This sale was an arm's length transaction in the normal course of business.  It did not in any way conceal Johnson's assets.  Further, because this property was his homestead, it would be exempt from any collection efforts in the future.  Because the property was exempt at the time it was sold, if anything, the transaction only improved the Government's position regarding potential collections efforts.

Next, the Government claims the 2015 sale of 106 View Point Circle constitutes reasonable cause to believe Johnson is concealing or converting properties. Govt App. Ex. 18 ¶ 16. Johnson and his wife moved into this property in 2013 and used it as their primary residence. The couple then decided to host three foster children. The property at 106 View Point Circle, however, did not meet the requirements of the Alabama Department of Human Resources. So, in June 2015, the couple sold it to purchase a new property that would allow them to host foster children. Johnson Dec. ¶ 43.

Such sale is not reasonable cause to believe that Johnson has or will conceal or convert his properties with the effect of hindering any Governmental collection efforts. This sale was an arm's length transaction in the normal course of business. It did not in any way conceal Johnson's assets. Further, because this property was his homestead, it would be exempt from any collection efforts in the future. Because the property was exempt at the time it was sold, if anything, the transaction only improved the Government's position regarding potential collections efforts.

Finally, the Government identifies the 2014 transfer of 307 Commercial Street to Royal Blue as reasonable cause that Johnson has or will conceal or convert assets and hinder any governmental collection efforts. Govt App. Ex. 18 ¶ 18. This address serves as Johnson's corporate office. It is, therefore, associated with several of his businesses. However, Royal Blue paid the rent for the facility. And the 2014 transaction was part of Johnson's overarching re-organization to limit personal liability and organize his corporate entities. The transaction was actually an effort to respect the corporate structures of Johnson's various companies. Johnson Dec. ¶ 44.

27

Such transaction is not reasonable cause to believe Johnson sought to conceal or convert assets and hinder any governmental collections efforts.  First, Johnson still lists this address as the corporate headquarters for a handful of companies.  It is his home-office and there is no indication he intends to abandon it.  Rather, transferring it to Royal Blue, if anything, solidifies Johnson's connection to the property.  Second, Royal Blue is a separate, ongoing entity and remains at that address.  Thus, this transaction did not have the effect of hindering any identification or later collections efforts.

To conclude, Johnson personally transferred three real properties since 2013.   Two of the transfers were for personal reasons, and both include properties exempt as homesteads.  The third transaction was part of Johnson's overall corporate reorganization.  There exists no reasonable cause to believe Johnson has or will conceal or convert his assets and hinder any governmental collections efforts.

*Dent*

The Government alleges that Dent engaged in at least three transactions that constitute reasonable cause to believe he has or will conceal or convert real properties and hinder any future collections efforts.  First, the Government identifies the 2014 transfer of 3318 Blossom Street to CAE Properties.  Govt App. Ex. 18 ¶ 12.  Dent bought 3318 Blossom Street in 2002.  He used it as his primary residence until 2013, when he moved and began using it as a rental property.  Thus, at that time, he transferred it to CAE Properties, LLC, a Dent family owned property management company.  CAE Properties continues to manage it as a rental property today.  Dent. Dec. ¶ 33.

Such transaction is not reasonable cause to believe Dent has or will conceal or convert assets and hinder any governmental collections efforts.  Since the transaction, the property

28

continues to be a rental, and there is no indication that CAE (or Dent) intends to or has intended to conceal or convert it. Thus, there is no risk that this transaction will hinder any collection efforts by the Government.

Next the Government identifies the Dent's 2013 transfers of 151 West Circle Drive and 2 Panorama Point Drive to his wife as reasonable cause to believe he has or will conceal or convert his properties and hinder any governmental collection efforts. Govt App. Ex. 18 ¶¶ 6, 7. It was always the Dents' intent to put these properties in Dent's wife's name. However, at the time of the purchases, she was taking care of the couple's toddler son, and for her convenience, their real estate attorney had Cal purchase the properties and then transfer them immediately to her. This would preclude her from needing to leave their son to attend a real estate closing. These properties are adjacent to the Dent's home on Lake Murray in Lexington, South Carolina. In 2014, the couple decided to renovate the extant homes on the properties and, today, the couples' respective parents live in the homes. Dent. Dec. ¶ 43.

Neither transaction is reasonable cause to believe that Dent intended to conceal or convert assets and hinder governmental collections efforts. It was happenstance that Dent's name was ever put on these properties. Rather than selling them, the Dents improved them and their parents live in them. These transactions to his wife do not hinder or conceal the true ownership of the properties, and it certainly does not hinder any collection efforts for such properties.

D.    The Government has other adequate remedies.

Finally, this Court should quash its order granting prejudgment remedies because the Government failed to even allege the inadequacy of alternative remedies to protect its interests. See 28 U.S.C. § 3101(d)(2)(D).

CONCLUSION

For these reasons, this Court should quash its order granting the Government's

application for prejudgment remedies.

April 4, 2016                          Respectfully submitted,

                                       Joseph P. Griffith, Jr., Esquire (Fed.I.D. # 2473)
                                       Joe Griffith Law Firm, LLC
                                       Seven State Street
                                       Charleston, South Carolina  29401
                                       (843) 225-5563 (tel)
                                       (843) 722-6254 (fax)
                                       joegriffithjr@hotmail.com
                                       www.joegriffith.com


                                       s/Bradley B. Banias
                                       Bradley B. Banias, Esquire (Fed.I.D. # 11585bb)
                                       M. Dawes Cooke, Esquire (Fed.I.D. # 288)
                                       Christopher Kovach
                                       Barnwell Whaley Patterson & Helms, L.L.C.
                                       288 Meeting St., Ste 200 (29401)
                                       Post Office Drawer H
                                       Charleston, South Carolina 29402
                                       (843) 577-7700 (tel)
                                       (843) 577-7708 (fax)
                                       mdc@barnwell-whaley.com
                                       bbanias@barnwell-whaley.com
                                       ckovach@barnwell-whaley.com
                                       www.barnwell-whaley.com


                                       Attorneys for Defendants BlueWave, Dent and Johnson

Certificate of Service

I declare that I filed the foregoing on the court's electronic filing system, which

forwarded an electronic copy to Plaintiffs' counsel.

April 4, 2016                          Respectfully Submitted,

                                        s/Bradley B. Banias
                                        Bradley B. Banias, Esquire (Fed.I.D. # 11585bb)
                                        M. Dawes Cooke, Esquire (Fed.I.D. # 288)
                                        Barnwell Whaley Patterson & Helms, L.L.C.
                                        288 Meeting St., Ste 200 (29401)
                                        Post Office Drawer H
                                        Charleston, South Carolina 29402
                                        (843) 577-7700 (tel)
                                        (843) 577-7708 (fax)
                                        mdc@barnwell-whaley.com
                                        bbanias@barnwell-whaley.com
                                        www.barnwell-whaley.com

                                        Attorneys for Defendants BlueWave, Dent and Johnson

31