**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | |
|---|---|
| The United States of America and the States of North Carolina, California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, New Jersey, New York, Tennessee, Texas, Virginia and Wisconsin, *ex rel.* Scarlett Lutz, Kayla Webster, Dr. Michael Mayes and Chris Reidel,<br><br>                    Plaintiffs,<br><br>vs.<br><br>Berkeley Heartlab, Inc., BlueWave Healthcare Consultants, Inc., Latonya Mallory, Floyd Calhoun Dent, III and Robert Bradford Johnson,<br><br>                    Defendants. | **CA No.: 9:14-cv-00230-RMG**<br>(Consolidated with 9:11-cv-1593-RMG and 9:15-cv-2485-RMG)<br><br>***AMENDED*** **MEMORANDUM IN SUPPORT OF MOTION TO DISSOLVE PREJUDGMENT ATTACHMENTS REGARDING PROPERTY OWNED BY NON-PARTIES CHRISTINA M. DENT, LAKELIN PINES, LLC, AND TRINI "D" ISLAND, LLC** |

Non-party-interested person and entities, Christina M. Dent, Lakelin Pines, LLC, and Trini "D" Island, LLC (collectively, these "Non-party Property Owners" or "NPPO"), respectfully submit this memorandum in support of their motion requesting the Court dissolve prejudgment writs of attachment regarding real property they own.

## INTRODUCTION

On February 10, 2016, this Court issued an Order granting the United States of America's ("the Government") application for prejudgment remedies under the Federal Debt Collection Procedures Act of 1990 ("FDCPA"), 28 U.S.C. §§ 3001 to 3308. (Dkt. No. 178.) That Order, which authorized the issuance of prejudgment writs of attachment, affects properties rightfully owned by the Non-party Property Owners.

1

Attached hereto as **Exhibit A** is a list of the real property, as the property is described in the issued writs, owned by the Non-party Property Owners. **Exhibit B**, attached hereto, contains Lexington County tax maps of these properties, which are all in close proximity to each other.

For the reasons set forth herein, this Court should dissolve the writs of attachment issued against the real property owned by the Non-party Property Owners.

## THE PROPERTIES

The ten properties set forth in Exhibit A (collectively, "the Properties") consist of six properties having a Panorama Point street address, two properties having Dent Drive addresses, one property having a West Circle Drive address, and a property referred to as an island.

The Panorama Point properties have been combined into one tract, with a street address of 631 Panorama Point. Non-party Property Owner Christina M. Dent owns the 631 Panorama Point property. Ms. Dent, her husband, Floyd Calhoun Dent, III, and their five-year-old son, Lakelin, reside in their home located on this property.

Ms. Dent's mother-in-law and father-in-law, Floyd and Joanne Dent, live in a home located on the 151 West Circle Drive property, in which they have a life estate interest. The remainder interest in this property is owned by Lakelin Pines, LLC, a limited liability company. Ms. Dent is the sole member of Lakelin Pines, LLC.

Ms. Dent's father and step-mother, Joseph and Sherry Bradley, live in a home located on the 437 Dent Drive property, in which they have a life estate interest. The remainder interest is owned by Lakelin Pines, LLC.[1]

---

[1] Lakelin Pines, LLC owns an undeveloped agricultural tract consisting of 13.42 acres

## **THE DENTS**

Ms. Dent is a native South Carolinian. (**Ex. C**, Decl. of Christina M. Dent ¶ 5.) While she was growing up, her father served in the United States Army. (Id. ¶ 5.) Her family returned to Irmo, South Carolina before she entered the fifth grade. (Id.)

The Dents first met in November 2003, through a mutual friend. (Id. ¶ 6.) At the time they met, each was going through a hard time—Ms. Dent had recently lost her mother in a car accident and Mr. Dent was in the midst of a five-year-long custody battle, in which he was fighting for custody of his two young children from a previous marriage. (Id.) Mr. and Ms. Dent had an instant connection, and soon after they met, Mr. Dent won primary physical custody of his children. (Id.) They started attending church together at the Spirit of Calvary Church of the Living God, where Mr. Dent served as the volunteer youth minister. (Id.) Much like Ms. Dent's father, Mr. Dent comes from a military background—he served as an officer in the United States Navy after graduating from the U.S. Naval Academy. (Id. ¶ 7.) As they got to know each other, they realized that they had a deep connection and a dedication to God and family. (Id. ¶ 6.)

Ms. Dent was twenty-four years' old when she and Mr. Dent were married on March 5, 2005. (Id. ¶ 8.) This is Ms. Dent's only marriage. (Id. ¶ 8.) Mr. Dent and his two children were living in his home located at 3318 Blossom Street (in the Shandon neighborhood), and when the Dents were married, Ms. Dent gave up her career, moved into the Blossom Street home, and began caring for Mr. Dent's children. (Id. ¶¶ 9–12,

---

located adjacent and to the south of the Bradley home and adjacent to and west of the home of Floyd and Joanne Dent. This property has an address of 2 Panorama Point according to the Lexington County real property tax records. (*See* **Ex. B**.)

20.) Although Ms. Dent did not relish living in a busy area of downtown Columbia, the Dent family remained in the Blossom Street home for nine more years in order to provide Mr. Dent's children with the consistency and stability that they did not receive when they had lived with Mr. Dent's ex-wife. (Id. ¶¶ 11–12.)

In the meantime, the Dents began looking for a larger house in the Lake Murray area. (Id. ¶ 13.) Ultimately, they decided to build their own home, so they began looking for suitable lots upon which to construct their family home. (Id. ¶ 13.)

In May 2010, the Dents' son, Lakelin Harbour Dent was born. (Id. ¶ 14.) Raising three children in the brick bungalow on Blossom Street was a challenge; accordingly, the Dents accelerated their efforts to get a larger house. (Id. ¶ 15.) In April 2011, the Dents purchased a lot at 631 Panorama Point on Lake Murray, and soon thereafter, they found an architect to prepare plans for a home they planned to build on the lot. (Id. ¶ 15.) Between April 2011 and September 2012, the Dents purchased several lots adjoining their 631 Panorama Point property, and in September 2012, their real estate lawyer had those lots combined into one single tract, consisting of approximately 2 acres. (Id. ¶¶ 16, 18.) The combined lot has one house on it—the Dents' family home. (Id. ¶ 18.) In April 2012, the Dents began construction on their house, and construction was completed in May 2014. (Id.¶¶ 17, 21.) The Dents moved out of Mr. Dent's Blossom Street bungalow and into their newly-constructed family home in the summer of 2014.

In the same year that the Dents moved into their family home at 631 Panorama Point, their parents relocated to the 151 West Circle Drive and 437 Dent Drive properties, where there were existing houses. (Id.¶ 23.) Ms. Dent's father is a blind,

4

disabled veteran. (Id. ¶ 22.) Ms. Dent has looked after her father and step-mother as they age, and having them live in close proximity to the Dent family home makes looking after them easier for Ms. Dent. (Id. ¶¶ 22–23.) The Dent family after looks after Mr. Dent's parents, who are in their 70s. (Id. ¶¶ 23, 25, 26.) Also importantly, the Dents five-year-old son has both sets of grandparents within walking distance of his home. (Id. ¶ 26.)

For Ms. Dent's thirty-first birthday, on November 13, 2011, Mr. Dent surprised her with a .81-acre island located directly off the shoreline of the Dent family residence. (Id. ¶ 28.) The island, which the family calls Trini "D" Island, is an uninhabited, undeveloped island that does not have any electricity. (Id. ¶ 28.) On February 20, 2014, the island was deeded into Ms. Dent's name, and in an effort to limit her liability for personal injuries, Ms. Dent had a limited liability company formed, Trini "D" Island, LLC, and she transferred the island to the newly formed LLC on that same day. (Id. ¶ 28.) Ms. Dent is the sole member of Trini "D" Island, LLC. (Id. ¶ 28.)

It was always the intent of the Dents that Ms. Dent own the Panorama Point properties. (Id. ¶ 19.) Owning the Properties, which include her home, provides Ms. Dent with a measure of personal financial security, Ms. Dent having ceased working outside the home following her marriage in 2005. (Id. ¶¶ 19, 20.) The use of single-purpose entities to own the undeveloped Trini "D" Island, the 13.42 acre tract, as well as the remainder interests in the properties where her parents and parents-in-law live is to shield Ms. Dent from personal liability, which would not be the case if these properties were owned by her individually. (Id. ¶¶ 27–29.) This also contributes to her sense of personal financial security for her and her minor son. (Id. ¶ 19.)

5

It was also Ms. Dent's wish to have her parents and her in-laws live close by, which is the reason each has a life estate in their respective homes. (Id. ¶ 23.)

Title to the Properties, and the chain of title to each tract, are matters of public record, and are easily found and retrieved from the Lexington County Register of Deeds and Treasurer's Offices. The same is true of the corporate records concerning Lakelin Pines, LLC and Trini "D" Island, LLC—those records are public and easily found and retrievable from the South Carolina Secretary of State's Office.

Ms. Dent did nothing, and nothing was done to hide or conceal the transfers, ownership or ownership history of the Properties. (Id. ¶¶ 31–32, 38.) Further, Ms. Dent learned that the Government was suing her husband and his business in 2015, well after any of the real property transactions involving these Non-party Property Owners that are the subject of the Government's Application for prejudgment remedies took place. (Id. ¶¶ 30, 33–34.)

## **ARGUMENT**

The Government's application requesting the issuance of prejudgment levies against the Properties asserted it was entitled to the levies under Subchapter B of the FDCPA under a nominee or alter-ego theory. (Gov't. App. at 28, Dkt. No. 173.) Alternatively, the Government's application sought to avoid the conveyances of the Properties to the Non-party Property Owners, under Subchapter D of the FDCPA alleging the conveyances were fraudulent. (*Id.*)

This Court should dissolve the writs of attachment issued against the Properties owned by the Non-party Property Owners because (1) the Government's nominee/alter ego theory of prejudgment seizure is not supported by the plain language of the FDCPA

and is, in any event, procedurally deficient; and, (2) the Government cannot by motion under Subchapter B of the FDCPA, set aside or avoid real property transfers or conveyances under Subchapter D of the FDCPA.

### A.     Overview of the FDCPA

The FDCPA was enacted in 1990, in an effort "to create uniform procedures for the nationwide collection of debts owed to the United States in Federal courts."[2]

The FDCPA is the exclusive civil procedure for the United States "to obtain, before judgment on a claim for a debt, a remedy in connection with such claim."  28 U.S.C. § 3001.

The FDCPA is organized in the following manner:

**Title 28—Judiciary and Judicial Procedure**

   **Chapter 176—Federal Debt Collection Procedure**

| Subchapter | | Sec. |
|---|---|---|
| A. | Definitions and General Provisions | 3001 |
| B. | Prejudgment Remedies | 3101 |
| C. | Postjudgment Remedies | 3201 |
| D. | Fraudulent Transfers Involving Debts | 3301 |

28 U.S.C. §§ 3001 to 3308.

Subchapter B of the FDCPA gives the Government a procedural mechanism to seek certain prejudgment remedies against an asserted Government debtor once the Government files "a civil action on a claim for a debt."  These prejudgment remedies are confined to attachment, receivership, garnishment, and sequestration.  *See* 28 U.S.C. § 3002(11) (defining "prejudgment remedy" as "attachment, receivership, garnishment

---

[2] *Federal Debt Collection Procedures:  Hearing Before the Subcomm. on Econ. and Commercial Law of the H. Comm. on the Judiciary*, 101st Cong. 1 (1990) (opening statement of Rep. Jack Brooks, Chairman, Subcomm. on Econ. and Commercial Law).

or sequestration . . . to be granted before judgment on the merits of a claim for a debt.").

Subchapter D, on the other hand, separately addresses an "action" or "proceeding" brought by the Government seeking to avoid a transfer or conveyance of property.

The procedures relevant to the Government's efforts to obtain prejudgment remedies are quite detailed.  For instance, the FDCPA specifies: (1) what must be included in the Government's application for prejudgment remedies; (2) the grounds upon which a prejudgment remedy may be granted; (3) what the Government must include in supporting affidavits; (4) when a debtor may move to quash an order granting prejudgment remedies; (5) the type of property that is subject to a writ of attachment; (6) when a writ of attachment may be issued; (7) the information that must be included in a writ of attachment; (8) the duties of the United States marshal in levying upon property specified for attachment; (9) how a debtor may move for dissolution of an attachment; and (10) the procedures following the Court's entry of a judgment for or against the debtor.  28 U.S.C. §§ 3101 to 3102.

In contrast, Subchapter D's provisions addressing fraudulent transfers do not provide similar, detailed procedural devices.  Instead, the language of Subchapter D—particularly § 3306—indicates that Congress intended for claims for relief brought by the Government pursuant to Subchapter D to be pursued in a separate "action or proceeding." 28 U.S.C. § 3306(a).

Section 3306 expressly refers to "an **action** or **proceeding** under this subchapter" and it sets forth limitations periods for bringing "**a claim for relief** . . . under

this subchapter." This language, which is exclusive to Subchapter D of the FDCPA, indicates that the Government may only set aside a purported fraudulent conveyance by either (1) bringing an independent "action" or (2) in a separate "proceeding" in the action forming the basis for the Government's claims against the debtor.

### B. Government's use of the "nominee" or "alter-ego" theories in seeking prejudgment writs of attachment against the Properties is an impermissible attempt to circumvent the requirements of Subchapter D.

The Government's application argues the Court should issue prejudgment writs of attachment against the Properties under a "nominee" or "alter-ego" theory, asserting defendant F. Calhoun Dent, III is the true owner of the Properties. (Gov't. App. at pp. 29–30, 36–39.) However, nothing in the FDCPA, which contains the Government's "exclusive civil procedures" for the nationwide collection of debts, provides for the prejudgment use of a nominee or alter-ego theory to levy on property not owned by an alleged FDCPA debtor.

The cases cited by the Government in support of the use of either of these two theories are inapposite because they concern either post-judgment collection efforts under the FDCPA or tax collection proceedings under the Internal Revenue Code ("IRC").

In *Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd.,* 609 F.3d 111 (2d Cir. 2010), the first case cited by the Government, (Gov't App. at 28), the Government was granted summary judgment on its breach of contract, breach of promissory notes, and breach of guarantee claims against the defendants. After the judgment was entered and affirmed, the Government sought to collect on its judgments under Subchapter C of the FDCPA, which applies to post-judgment writs. In

9

considering the applicability of the FDCPA post-judgment remedies, the court stated its analysis was to be "much like the analysis of the federal tax lien statute, 26 U.S.C. § 6321" because that statute, "like the FDCPA, creates no property rights but merely attaches consequences . . . to rights created under state law . . . ." *Id.* at 117. *Ex-Im Bank* does not state nor does it stand for the Government's sweeping assertion that "the tax lien framework" is "related" to the FDCPA such that the pre- and post-judgment distinction is not determinative. (Gov't App. at 28.)

*United States v. Meux,* 597 F.3d 835 (7th Cir. 2010), the second case relied upon by the Government, (Gov't App. at 28), also addressed post-judgment remedies. In *Meux,* the Government sought to collect by garnishment mandatory restitution ordered in a criminal case—which is, again, a post-judgment event. The court did not rule that tax lien law is applicable in the FDCPA context. Instead, the court simply mentioned that the particular debt in that case (a post-judgment restitution debt) is a debt that is treated like a tax lien "so that they are effective against every interest in property accorded a taxpayer by state law." *Id.* at 838 (internal quotations, alterations, and citations omitted). The court's statement has no bearing on whether this Court should allow the prejudgment writs of attachment under the FDCPA as to the Properties owned by the Non-party Property Owners.

Next, in the unreported case out of Idaho, *United States v. Fed. Res. Corp.,* No. 1:11-cv-00127 (D. Idaho Oct. 9, 2015), another case upon which the Government relies, (Gov't App. at 29), the Government filed, in Florida, an abstract of a judgment entered in the Idaho District Court. In response and in the District Court in Idaho, the judgment debtor, under section 3014 of the FDCPA, sought to exempt the Florida property from

10

the Government's collection efforts. The Idaho District Court, in the order cited by the Government, rejected, as premature, the judgment debtor's claim for exemption, concluding the judgment lien was not an "action or proceeding" under the FDCPA.

The Government also relies on *Mama's Enterprises, LLC v. United States,* 883 F. Supp. 2d 1128 (N.D. Ala. 2012) and the unreported case of *United States v. Vito,* No. 99-0630-RV-s (S.D. Ala. July 13, 2000) (Gov't App. at 29), which are federal tax lien cases—not an actions or proceedings under the FDCPA. Tax lien cases are completely inapposite in determining whether to impose prejudgment remedies, particularly writs of attachment establishing liens on properties owned by non-parties. Liens in favor of the Government for unpaid taxes arise as a matter of law on all real and personal property belonging to the debtor at the time of assessment for unpaid taxes, whereas that is not the case with pre-judgment requests for remedies under the FDCPA. *Compare* 26 U.S.C. §§ 6321–22 *with* 28 U.S.C. §§ 3101–05, 3201.

Importantly, there is no provision for the use of a nominee or alter-ego theory for collection of general debts allegedly owing the Government under the FDCPA. Further, while there is no statutory provision for tax collection under the nominee or alter-ego theories, the Supreme Court of the United States has authorized the Internal Revenue Service's (IRS) use of these theories in its tax collection efforts. *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 350–51 (1977). The Supreme Court decided *G.M. Leasing Corp.* in 1977, and the FDCPA was enacted thirteen years later. If Congress intended either the alter-ego or nominee theories to be included in the "exclusive civil procedures" provided by the FDCPA, in particular its prejudgment remedies, it could

11

have easily done so. Congress did not. Neither theory is applicable here. The Government's assertion to the contrary is without merit.

Even if the FDCPA could be read to allow pre-judgment collection efforts under a nominee or alter-ego theory, as is more fully set forth below, the Government's application is procedurally deficient as it ignores the plain language of Subchapter D. The Government suggests the use of these theories without even the procedural safeguards afforded to the targets of nominee and alter-ego IRS collection efforts. *See e.g.* Internal Rev. Serv. Reg. § 301.6320-1(b)(2). The Government's position is wholly without support under the FDCPA or relevant case law.

### C. Government's application for prejudgment remedies regarding the Properties is procedurally deficient.

The Government's allegations regarding fraudulent transfers involving the Non-party Property Owners must be resolved under the process dictated by the Federal Rules of Civil Procedure, as mandated by the FDCPA. 28 U.S.C § 3306(a). The Government's pursuit of relief under Subsection D against the Properties rightfully owned by the Non-party Property Owners by the mere submission of an application for relief filed pursuant to Subchapter B of the FDCPA is procedurally deficient and it is in contravention of the plain language of the FDCPA and the Federal Rules of Civil Procedure.

The Government's improper attempt to convert its application for prejudgment remedies, which can only be brought against debtors pursuant to Subchapter B of the FDCPA, into a claim for relief brought against non-parties pursuant to Subchapter D of the FDCPA, directly conflicts with the Congress's express intent that claims brought under Subchapter D be afforded the procedural safeguards set forth in Subchapter D

12

and the Federal Rules of Civil Procedure. Proceeding via the summary and expedited process adopted in Subchapter B against non-parties in an attempt to avoid allegedly fraudulent transfers—whether under a "nominee" theory or a fraudulent transfer theory—fails to take into account the fact that Congress dealt with fraudulent transfers in a <u>separate</u> subchapter of the FDCPA.

The language of section 3306, which references limitations periods, a "claim for relief," and an "action," further indicates that when the Government seeks relief under Subchapter D, the fraudulent-transfer action must begin with a summons and complaint—not an application for prejudgment remedies brought pursuant to Subchapter B. The FDCPA requires any "action or proceeding" to set aside a fraudulent transfer be initiated by the filing of a complaint, service of process on the debtor and transferee, and the filing of an answer or motion to dismiss. 28 U.S.C. § 3306.

Section 3304 sets forth what the Government must prove to set aside a transfer or conveyance, depending on when the debt arose—either prior to the alleged fraudulent conveyance, or before or after the subject transfer or conveyance. In either case, however, this section provides explicitly what the Government must prove, in a separate action or proceeding, in order to prevail in its request to set aside a conveyance.

Section 3306(a) says a conveyance may be attacked as fraudulent in an "action or proceeding under this *subchapter* for relief against a transfer . . . subject to . . . applicable principles of equity and in accordance with the Federal Rules of Civil Procedure . . . ." 28 U.S.C. § 3306(a) (emphasis added). By providing that an alleged

13

fraudulent conveyance can be set aside in "an action or proceeding" the FDCPA suggests some equivalence between the two, but couples both with the admonition they be brought under the *subchapter* of the FDCPA pertaining to alleged fraudulent transfers involving debts—Subchapter D.

Section 3306(b) provides limitations periods for actions or proceedings involving alleged fraudulent conveyances and speaks in terms of a "claim for relief" and an "action." The phrase "claim for relief" and the word "action" indicate that an attack on a conveyance as fraudulent must begin, like any other action or proceeding, with a summons and complaint. This conclusion is buttressed by the FDCPA's explicit provision that the "action or proceeding" by which a fraudulent conveyance may be set aside be conducted "in accordance with the Federal Rules of Civil Procedure."

Section 3307 sets out affirmative defenses to any government assertion of a fraudulent conveyance, and section 3308 provides "the principals of law and equity . . . shall apply to *actions and proceedings under this subchapter.*" 28 U.S.C. § 3307 (emphasis added).

Finally, section 3308, says "the principals of law and equity . . . apply to actions and proceedings under [Subchapter D]."

Here, the Government's Application regarding the Properties is not tethered to any procedural device available under the Federal Rules of Civil Procedure. In fact, the Government's Application does not reference any of the Federal Rules of Civil Procedure.

The Government cannot obtain the avoidance of a transfer of property by filing a motion under the FDCPA. The Government's motion is not a summons or any other

14

type of process joining the Non-party Property Owners to this action, all of whom clearly have a stake in outcome of any action or proceeding attempting to deprive them of ownership interests in the Properties. There has been no answer, discovery, motion practice or trial to determine if the Government can establish a basis for setting aside the transfers of the Properties to these Non-party Property Owners. These Non-party Property Owners, though having appeared as "interested parties," are <u>not</u> parties to this action. In addition, two properties subject to the Government's notices of levy are subject to life estates in favor of four individuals who are not parties and have not appeared at all in this action.

Accordingly, because the Government's Application is procedurally deficient as to the Properties owned by the Non-party Property Owners, this Court should dissolve the writs of attachment issued against the Properties.

### D.  Joinder with portions of motion of Defendants, BlueWave HealthCare Consultants, Inc., Robert Bradford Johnson, and Floyd Calhoun Dent, III.

These Non-party Property Owners respectfully join in the following portions of Defendants BlueWave Healthcare Consultants, Inc., Robert Bradford Johnson, and Floyd Calhoun Dent, III, Motion to Quash Order Granting Prejudgment Remedies: (1) Section I(A)—entitled "The Government fails to show the probable validity of any claim for debt against BlueWave, Dent or Johnson"; (2) Section I(B)—entitled "The Government failed to comply with the FDCPA's statutory requirements"; and (3) Section I(C)—entitled "There is no reasonable cause that BlueWave, Dent, or Johnson have taken any steps that would hinder the Government in any further collection efforts."

## **CONCLUSION**

The nominee or alter-ego theories of tax collection do not apply under Subchapter D of the FDCPA.

Subchapter D provides significant and important procedural and due process safeguards in any Government attempt to set aside transfers or conveyances of real property to non-FDCPA alleged debtors such as these Non-party Property Owners. The Government has failed to follow the dictates of Subchapter D. The levies issued concerning the Properties are, therefore, invalid and must be dissolved.[3]

        Respectfully submitted,

        s/Nekki Shutt, Esq.
        Nekki Shutt, Esq. (Fed.ID No. 6530)
        Louis H. Lang, Esq. (Fed.ID No. 240)
        Jacqueline M. Pavlicek, Esq. (Fed.ID No. 11890)
        CALLISON TIGHE & ROBINSON, LLC
        1812 Lincoln St., Suites 100 & 200
        PO Box 1390
        Columbia SC  29202-1390
        Tel.:  (803) 404-6900
        NekkiShutt@CallisonTighe.com
        LouisLang@CallisonTighe.com
        Pavlicek@CallisonTighe.com

        **ATTORNEYS FOR NON-PARTY PROPERTY OWNERS CHRISTINA M. DENT, LAKELIN PINES, LLC, AND TRINI "D" ISLAND, LLC**

April 4, 2016

Columbia, South Carolina

---

[3] Without waiving any of the arguments set forth above, the real property located at 631 Panorama Drive is exempt from levy to the extent provided by section 15-41-30(A)(1) of the South Carolina Code.