IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | |
|---|---|
| The United States of America and the States of North Carolina, California, Illinois, *ex rel.* Scarlett Lutz, Kayla Webster, Dr. Michael Mayes and Chris Riedel, <br><br> Plaintiffs, <br><br> vs. <br><br> Berkeley Heartlab, Inc., BlueWave Healthcare Consultants, Inc., Quest Diagnostics Incorporated, Latonya Mallory, Floyd Calhoun Dent, III and Robert Bradford Johnson, <br><br> Defendants. | **CA No.: 9:14-cv-00230-RMG** <br> (Consolidated with 9:11-cv-1593-RMG and 9:15-cv-2485-RMG ) <br><br><br><br><br><br> **ORDER** |

This matter is before the Court on three motions: (1) Defendants BlueWave, Dent, and Johnson's Motion to Quash FDCPA Prejudgment Remedies (Dkt. No. 277); (2) a Motion to Quash by Blue Eagle Farming, LLC, Eagle Ray Investments, LLC, Forse Investments, LLC, and War-Horse Properties, LLLP (collectively, the "Johnson-related Entities") (Dkt. No. 274); and (3) a Motion to Dissolve Prejudgment Attachments by Christina M. Dent, Lakelin Pines, LLC, and Trini "D" Island, LLC (collectively, the "Dent-related Entities") (Dkt. No. 278). For the reasons discussed below, the Court **DENIES** the motions.

### I. Background

The United States intervened in this consolidated *qui tam* action against Defendants, alleging False Claims Act and common law claims related to four alleged schemes involving

1

laboratory blood testing. (Dkt. No. 75 (Government's complaint in intervention)).[1] On February 5, 2016, the Government filed an application for prejudgment remedies under the Federal Debt Collection Procedures Act (FDCPA), 28 U.S.C. § 3001 *et seq.* (Dkt. No. 173). The application was accompanied by affidavits from Kendrick Bailey, an investigator with the U.S. Department of Justice-Civil Division (Dkt. No. 173-3 (Ex. 18)), and Su Kim, a special agent for the U.S. Department of Health and Human Services, Office of Investigations (Dkt. No. 173-2 (Ex. 6)).[2] Kim's affidavit provided facts supporting the probable validity of the United States' claim for debt (*i.e.*, damages and penalties for FCA violations), identified the amount of debt claimed by the United States, and outlined facts suggesting that Defendants had transferred property with the effect of hindering, delaying, or defrauding the United States. Bailey's affidavit offered additional facts suggesting that Defendants were transferring property with the effect of hindering, delaying, or defrauding the United States.

After reviewing the application and accompanying affidavits, the Court granted the application in part and denied it in part, (Dkt. No. 178), and the Clerk of Court issued writs of attachment and notices of prejudgment attachment and garnishment, (Dkt. Nos. 180–193).

On April 4, 2016, Defendants BlueWave, Dent, and Johnson filed a motion to quash the order granting the Government's application for FDCPA prejudgment remedies. On April 1, 2016, the Johnson-related Entities filed a motion to quash 47 prejudgment writs issued against individual parcels of property owned by these various entities. On that same day, Christina Dent and the Dent-related Entities filed a motion to dissolve prejudgment attachments as to 10 properties. The Johnson-related Entities, the Dent-related Entities, and Christina Dent are not

---

[1] For a detailed discussion of Defendants' alleged schemes, see Dkt. No. 268.
[2] Although Su Kim's affidavit is identified as a declaration rather than an affidavit in the government's filings, it satisfies the requirements of an affidavit pursuant to 28 U.S.C. § 1746.

2

parties to the underlying litigation. The Court heard oral argument on each of these motions on May 5, 2016.

## II. FDCPA Framework

The FDCPA provides the "exclusive civil procedures for the United States" to obtain a prejudgment remedy in connection with a "claim for a debt." 28 U.S.C. § 3001. Subchapter B governs prejudgment remedies in general, and Subchapter D addresses remedies in the context of fraudulent transfers involving debts. The Government applied for prejudgment remedies under both subchapters. (Dkt. No. 173 at 6).

The Government is entitled to prejudgment remedies under Subchapter B where it establishes (1) the probable validity of the claim for a debt; (2) the amount of the debt claimed; (3) that the debtor has or is about to assign, dispose, remove, conceal, ill-treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States; (4) that it has satisfied all other statutory requirements; and (5) that the debtor has a substantial nonexempt interest in the property against which a remedy is sought. *See* 28 U.S.C. §§ 3101–3105.

Under Subchapter D, the Government must establish that a transfer is fraudulent within the meaning of 28 U.S.C. § 3304. Once it has met this burden, the Government may rely on "applicable principles of equity" to avoid the transfer, use a remedy against "the asset transferred or other property of the transferee," or seek "any other relief the circumstances may require." *Id.* at § 3306(a).

The Court addresses the applicability of both subchapters below.

3

### III. Prejudgment Remedies Under Subchapter B

#### 1. Whether the Government established the probable validity of the debt

To seek prejudgment relief under Subchapter B, the FDCPA requires "an affidavit establishing with particularity to the court's satisfaction facts supporting the probable validity of the claim for a debt and the right of the United States to recover what is demanded in the application." 28 U.S.C. § 3101(c)(1). The FDCPA defines "debt," in relevant part, as "an amount that is owing to the United States on account of . . . overpayment, fine, . . . penalty, . . . damages, . . . or other source of indebtedness to the United States." *Id.* § 3002(3)(B).

The Government seeks penalties on each claim for payment Defendants presented or caused to be presented to Medicare and TRICARE, as well as treble damages under the FCA. (*See* Dkt. No. 75 at 43–46). Further, the Government's common law claims effectively seek to recover overpayments from Defendants for "certain sums of money to which they were not entitled." (*Id.* at 46–47). To support the validity of these claims, Su Kim's affidavit (Dkt. No. 173-3) makes the following assertions:

- Defendants BlueWave, Dent, and Johnson contracted for commission-based payments from two client laboratories in exchange for promoting lab tests that were reimbursed by federal healthcare programs, in violation of the Anti-Kickback Statute (AKS) and the FCA. (*Id.* at ¶ 5)

- BlueWave encouraged physicians to order tests from its laboratory clients by promoting the processing and handling fees paid by the laboratories as additional revenue for the physicians. BlueWave also marketed the waiver of patients' coinsurance and deductibles by the laboratories. BlueWave received a percentage of the laboratories' collections from these sales. (*Id.* at ¶¶ 11–12).

- BlueWave and others systematically presented or caused false claims to be presented to Medicare and TRICARE for payment. (*Id.* at ¶ 13).

- Johnson and Dent coached BlueWave sales representatives to market the processing and handling fees. (*Id.* at ¶ 14).

4

- BlueWave, Johnson, and Dent negotiated agreements with BlueWave's independent sales contractors that involved paying the contractors a portion of the kickbacks it received from the laboratories in violation of the AKS. (*Id.* at ¶¶ 16–24).

- BlueWave, Johnson, and Dent were directly involved in the kickback scheme involving processing and handling fees and the submission of medically unnecessary tests. (*Id.* at ¶ 27).

To reach these conclusions Kim personally investigated Johnson, Dent, and BlueWave for payments from client laboratories involving medically unnecessary testing and involving illegal kickbacks in the form of processing and handling fees. Kim and other special agents interviewed BlueWave employees and independent contractors, physicians, physicians' staff, and phlebotomists. In addition, Kim reviewed many documents responsive to subpoenas and administrative investigative demands. (*Id.* at ¶ 3).

At a post-deprivation hearing, the Government and the debtor defendants generally engage in a burden-shifting exercise where the debtor bears the initial burden of putting forward evidence that places the Government's showing of the probable validity of the debt in dispute. This may be done, for example, through the cross-examination of the Government's affiants or challenging the reliability of sources of information. But where the affidavit is particularized and the affiant's sources of information are reliable because they have personal knowledge of the events to which they provided information, the debtor must come forward with "some substantive evidence at the hearing." *U.S. ex rel Doe v. DeGregorio*, 510 F. Supp. 2d 877, 885 (M.D. Fla. 2007) (quoting and citing *United States v. Teeven*, 862 F.Supp. 1200, 1218 n. 24 (D. Del. 1992)). Defendant debtors did not come forward with such substantive evidence in the May 5, 2016 post-deprivation hearing.

Instead of using the post-deprivation hearing and associated briefing to put the validity of the claim for debt in dispute by providing factual evidence, Defendants and the Defendant-

5

related entities made several legal arguments about why the debt is invalid.[3] The Court addresses each argument below.

### a. *Argument #1: The debt is invalid because it is not preexisting*

Defendants first argue that the Government has not demonstrated the probable validity of the debt because it cannot show a "claim for a debt" within the meaning of § 3101(c)(1). In making this argument, Defendants rely on three canons of statutory construction. These arguments are unavailing, both independently and in the aggregate.

First, Defendants argue that because the FDCPA defines "debt" as "an amount that is owing," the present tense definition requires a "preexisting debt" instead of a "potential, inchoate debt that may someday be owed." (Dkt. No. 277-1 at 15). To support this interpretation, Defendants cite *United States v. Cap Quality Care, Inc.*, 400 F. Supp. 2d 295, 299 (D. Me. at 2005). In *Cap Quality Care, Inc.*, however, the court held that assertions that the Government paid defendants for services that violated the rules for reimbursement under a federal health program constituted a sum that "is owing on account of . . . overpayment" under § 3002(3)(B). Here, the same interpretation holds true.

---

[3] This post-deprivation hearing was somewhat unusual in that the moving parties declined to call any live witnesses. (*See* Dkt. No. 298 (letter from all of the hearing participants)). The United States was prepared to offer live testimony to provide additional support for its application or rebut arguments to quash the order granting prejudgment remedies, but the Court issued a text order declining to allow such testimony. (Dkt. No. 299). The statutory text of the FDCPA appears to require all of the necessary information presented by the Government in support of prejudgment remedies to appear in the application and affidavit, even if the practical effect of granting a motion on this ground is often simply a brief delay in upholding the prejudgment remedies. *See, e.g., United States v. Teeven*, 862 F. Supp. 1200 (D. Del. 1992) (upholding previously quashed prejudgment remedies that were reinstituted following the amendment of an application accompanied by a deficient affidavit). Absent direct testimony from live witnesses on behalf of the movants, the Court saw no need for the Government to have live-testimony rebuttal witnesses.

6

Kim's affidavit clearly articulates allegations that Medicare and TRICARE payments were made for services that violated the AKS. If true, these payments are overpayments like the ones in *Cap Quality Care, Inc.* Further, courts have held that "a party that violates the FCA incurs a debt to the government as soon as the government pays the fraudulent claim. Thus by alleging that the defendants submitted false claims and made false statements under the FCA, the government sufficiently alleges the existence of a debt under the FDCPA." *United States v. First Choice Armor & Equip., Inc.*, 808 F. Supp. 2d 68, 79 (D.D.C. 2011) (internal citation omitted); *see also* U.S. ex rel Doe v. DeGregorio, 510 F. Supp. 2d 877, 884 (M.D. Fla. 2007) ("Treble damages under the False Claims Act likewise constitutes 'debt.'"); *cf. United States v. Lighthouse Disaster Relief*, No. 06-161-D-M2, 2006 U.S. Dist. LEXIS 96195, at *9 (discussing FDCPA in context of FEMA contract, court held that "there is no need for the 'debt' to be liquidated or otherwise preexisting"). In short, the Government's claims are for a debt that is presently owing.

Defendants next argue that the FDCPA's structure supports the textual argument that the debt must be preexisting. The thrust of this argument is that the FDCPA allows prejudgment remedies on a *claim* for a debt, 28 U.S.C. § 3001(a)(2), but this language appears in Subchapter A of the FDCPA. The FDCPA does not define "claim" until Subchapter D. And although the definition contained in Subchapter D would encompass the Government's interpretation of the statute—"'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," *id.* § 3301(3)—the Court must construe the earlier use of claim to mean something more narrow because not doing so would render the definition superfluous. (Dkt. No. 277-1 at 16–17).

7

The Court is unpersuaded by this argument, and Defendants have failed to provide a plausible alternative definition for the word "claim." Even if the Court were to use Black's Law Dictionary's definitions of the word "claim" instead of the statutory definition, the essence of the word is that a claim is a "statement of something yet to be proved is true." The Government has not yet proven the existence of the debt, but the underlying actions that gave rise to the alleged debt have already occurred, hence the need to make a claim.

Finally, Defendants point to the FDCPA's legislative history to support an alternative interpretation of the statute. (Dkt. No. 277-1 at 17–18). Absent some statutory ambiguity not shown here, the Court finds no need to conduct an inquiry into the statute's legislative history and declines to do so. *See Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.").

Defendant's attempt to claim that the alleged debt is not preexisting is an oversimplification of both the statute and the Government's assertions. The FDCPA expressly allows prejudgment remedies, which, by definition, means that debts have not yet been conclusively reduced to specific, finite amounts by the court. In addition, the Government must do much more than say, "We believe Defendants might owe us some money for something someday." Instead, the Government must articulate and aver a set of facts that, if proven to be true, would establish that Defendants owe the Government a debt in a form recognized in § 3002(3)(B). The Government has done so here. In other words, the Government's claim *is* for a preexisting debt, and the reason that it is a claim is because the debt's factual existence has not yet been proven and reduced to a judgment.

8

*b. Argument #2: The FDCPA's "probable validity" standard presents a Due Process issue*

In the alternative, Defendants make a Fifth Amendment Due Process argument regarding the FDCPA and governmental deprivations of life, liberty, or property. (Dkt. No. 277-1 at 18–21). Relying on *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), they propose that the standard by which the Court should review the government's application for prejudgment remedies is "likelihood of success" instead of "probable validity." This constitutional challenge is unwarranted.

First, courts regularly apply the FDCPA in prejudgment remedy situations without concern for the statute's constitutionality. *See, e.g., U.S. ex rel Doe v. DeGregorio*, 510 F. Supp. 2d 877, 880 (M.D. Fla. 2007); *United States v. Teeven*, 862 F. Supp. 1200, 1207 (D. Del. 1992). Second, *Mathews* provides no support for Defendants' position. The Court in *Matthews* held that the administrative procedures in question fully comported with due process, 424 U.S. at 349, and courts that have considered due process challenges to the FDCPA have favored the statute's constitutionality, *see, e.g., NLRB v. E.D.P. Med. Comput. Sys., Inc.*, 6 F.3d 951, 956 (2d Cir. 1993). Third, the statutory safeguards in place—that is, the mechanisms by which Defendants requested the hearing in this matter and seek to quash the motion granting the writs—ensure that there is sufficient due process.

*c. Argument #3: Defendants had no intent to violate the AKS and there was no "knowing violation"*

Defendants next argue that the probable validity of the Government's claim for debt is "in dispute" because (1) there is no evidence of Defendants' criminal intent to support an AKS violation, and (2) there can be no "knowing" violation where the controlling law is unclear. (Dkt. No. 277-1 at 21–27). Neither of these arguments has merit.

9

First, "criminal intent" to violate the AKS is not the applicable standard. Instead, the AKS punishes "knowing and willful" violations. 42 U.S.C. § 1320a-7a(h) ("[A] person need not have actual knowledge of this section or specific intent to commit a violation of this section . . . ."). The defendants need only have acted with a wrongful purpose. *See United States v. Jain*, 93 F.3d 436, 441 (8th Cir. 1996). Moreover, in FCA cases involving AKS violations, courts have found scienter where one purpose of the remuneration was to induce referrals. *See Feldstein v. Nash Cmty. Health Servs.*, Inc., 51 F. Supp. 2d 673, 681 (E.D.N.C. 1999); *cf. U.S. ex rel. Sharp v. E. Oklahoma Orthopedic Ctr.*, No. 05-CV-572-TCK-TLW, 2009 WL 499375, at *25 (N.D. Okla. Feb. 27, 2009) (holding that test for whether copay waiver constituted remuneration is whether one purpose was to induce patient referrals).

Here, Su Kim's affidavit (¶¶ 11, 12, 14, 24, 25, 28), the application (Dkt. No. 173 at 20–26), and the declarations of Defendants Dent (Dkt. No. 277-2 at ¶ 4, 5, 7, 9, 11) and Johnson (Dkt. No. 277-3 at ¶ 3, 4, 6, 7, 8, 13) themselves support the conclusion that one of the purposes of the sales agreements at issue was to create referrals. This satisfies the scienter requirement for our present procedural purposes.

### d. Argument #4: Defendants acted in good faith on advice of counsel

In addition to directly attacking the probable validity of the claim, § 3101(d)(2)(A) permits parties challenging prejudgment remedies to address any defenses that may be available. Defendants assert an advice-of-counsel defense.

To establish an advice-of-counsel defense, Defendants "must show the (a) full disclosure of all pertinent facts to counsel, and (b) good faith reliance on counsel's advice." *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 381 (4th Cir. 2015) (internal quotation marks and alterations omitted). Unwritten but understood is the assumption that counsel's advice will have

10

in some way related to the underlying actions or activities at issue. Here, Defendant's attorney provided no such advice.

Gene Sellers was the attorney who reviewed BlueWave's sales agreements with HDL and Singulex and advised BlueWave, Johnson, and Dent. (Dkt. No. 277-4 at 2). In Sellers' own words, "[his] involvement was to make sure the agreement complied with the terms negotiated between the parties and complied with the business plan of [his] clients. In other words, it was [Sellers'] understanding, based on what [he] had been told, that [BlueWave's agreements with HDL and Singulex] [were] compliant with all health care laws, and [he] recommended to BlueWave, Johnson, and Dent to execute [the agreements.]" (Dkt. No. 277-4 at ¶ 5). Sellers expressly did not advise on health care law compliance: "It was [Sellers'] understanding that HDL and HDL attorneys would make sure the terms of the agreement complied with health care laws." (*Id.*). Sellers also notes that he "became aware" of a legal opinion by Mike Ruggio which "opined that [processing and handling] fees paid by labs to physicians at fair market value were lawful." (*Id.* at ¶ 7).

Sellers simply did not provide any advice regarding the legality of the agreements vis-à-vis the healthcare laws. Furthermore, the Ruggio legal opinion was written *two years after* BlueWave, Dent, and Johnson entered into the agreements with HDL and Singulex, so it could not have formed the basis for Sellers' advice. Finally, the compliance audit Defendants participated in and their cooperation with the Government's investigation are irrelevant with respect to the advice-of-counsel defense. For these reasons, Defendants' attempted assertion of the advice-of-counsel defense does not place the validity of the Government's claim for debt in dispute.

11

In sum, the Kim affidavit sets forth sufficient facts with enough particularity to satisfy the Court as to the probable validity of the Government's claim for debt, and Defendants have not presented any evidence that puts the Government's particularized assertions in dispute. Defendants' statutory and constitutional FDCPA arguments are unavailing, as are their arguments regarding scienter for FCA claims predicated on AKS violations. Finally, the advice-of-counsel defense does not affect the writs because Defendants have not established the necessary elements. Accordingly, the Court finds that the Government has established the probable validity of the debt and that Defendants BlueWave, Dent, and Johnson are debtors within the meaning of the FDCPA.

### 2. Whether the Government's affidavit states the amount of debt claimed

Defendants next argue that the affidavit accompanying the Government's application does not meet the FDCPA's statutory requirements because it failed to "state specifically the amount of the debt claimed by the United States and any interest or costs attributable to such debt," as required by 28 U.S.C. § 3101(c)(2)(A). (Dkt. No. 177-1 at 28). During oral argument, Defendants made it clear that they take issue with the fact that the Government has not specified the exact amount the Government believes BlueWave received from federal healthcare programs. This argument is a nonstarter.

Under a heading titled "Amount of Debt Claimed by the United States – 28 U.S.C. § 3101(c)(2)(A)," Kim's declaration states that BlueWave received over $220 million from HDL and more than $24 million from Singulex, and that Defendants Johnson and Dent received over $58 million each from BlueWave from 2010–2014. (Dkt. No. 173-3 at ¶¶ 29–30). Based on the heading—and allegations contained in the complaint and averments contained in the application and affidavits—it is clear that the Government's position is that the entirety of the funds derived

12

from BlueWave's relationships with HDL and Singulex are subject to recovery if its FCA or common law claims are meritorious. In its complaint, the Government seeks treble damages and civil penalties for the FCA claims. To the extent that those claims are ultimately meritorious, Defendants' debt to the Government would exceed the amounts identified. Nothing in the statute requires an itemized accounting of the debt; the affidavit need only "state specifically the amount of debt claimed by the United States." The Court finds that the affidavit satisfies this statutory requirement.

### 3. Whether Defendants disposed of property with the effect of hindering the United States

To secure prejudgment remedies, the Government bears the burden to show that there is reasonable cause to believe that "the debtor . . . has or is about to assign, dispose, remove, conceal, ill treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States." 28 U.S.C. § 3101(b)(1)(B). Defendants argue that they have not taken any steps that would hinder the Government's post-judgement collection. In light of the facts, however, the Court reaches the opposite conclusion.

In its application for prejudgment remedies, the Government identified several property transactions Defendants Dent and Johnson undertook after the issuance of a HHS OIG subpoena to Defendant BlueWave in January 2013:

Defendant Dent

- On May 1, 2013, Dent purchased real property for approximately $1.6 million, and he sold it to his wife for $5 that same day. (151 West Circle Drive, Lexington, SC)

- On August 21, 2013, he sold a parcel of land that he had purchased for $2.75 million to his wife for $5. (2 Panorama Point Drive, Lexington, SC)

- On February 20, 2014, Dent sold an additional six properties to his wife for $5. He also sold an island to one of his wife's newly formed corporate entities for $5. (Lake Murray)

13

- On July 19, 2014, Defendant Dent sold a property in Columbia, South Carolina, held in his own name to CAE Properties for $5. Dent's father is the listed agent for CAE Properties. (3318 Blossom Street, Columbia, SC)

(Dkt. No. 173 at 27–28).

### Defendant Johnson

- On April 5, 2013, Johnson sold a single-family home for $390,000. (1294 Adams Road, Blountsville, AL)

- On June 23, 2014, Johnson changed the ownership of his home from sole ownership to joint ownership with right of survivorship with his wife for $1. On June 30, 2015, Johnson sold this property for $562,000. (106 View Point Circle, Hanceville, AL)

(Dkt. No. 173 at 28–29).

The application and affidavits also assert that BlueWave's cash-on-hand is regularly dissipated. (Dkt. No. 173 at 30). BlueWave reported $74 million in gross income in 2013. In November 2014, BlueWave's bank account listed that it had $181,840 in available cash. And since 2013, BlueWave has deposited $5.4 million into Cobalt's account (a medical marketing company started by Johnson that operates in the same space that BlueWave formerly occupied).

Defendants do not dispute that these transactions took place. Instead they argue that there was no intent to conceal or convert assets or to hinder any post-judgement collection efforts. But § 3101(b) "contains no 'intent' requirement." *United States v. Teeven*, No. CIV. A. 92-418 LON, 1992 WL 683683, at *7 (D. Del. Aug. 14, 1992). Debtors need only "assign, dispose, remove, conceal, ill-treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States." § 3101(b)(1)(B). Here, all of the Defendants have disposed of property. Defendants Dent and Johnson disposed of real properties via sale, and "[t]he sale of the properties, *inter alia*, would surely have the effect of hindering the recovery of the debt by the United States." *United States v. Teeven*, No. CIV. A. 92-418 LON, 1992 WL 683683, at *8 (D. Del. Aug. 14, 1992). Defendant BlueWave has disposed of funds (*i.e.*,

14

personal property) by making transfers into other accounts; "[l]iquid assets are easily hidden." *Id.* Thus, Defendants disposed of property with the effect of hindering the United States, and attachment is proper to the extent the Government meets other statutory requirements and Defendants have a substantial nonexempt interest in the property the Government seeks to attach.

### 4. Whether the Government satisfied 28 U.S.C. § 3102(b)'s requirements

In relevant part, § 3102(b) provides that

> a court shall issue a writ authorizing the United States to attach property in which the debtor has a substantial nonexempt interest, as security for such judgment (and interest and costs) as the United States may recover on a claim for a debt . . . in an action against the debtor for damages in tort [or] . . . in an action to recover a fine, penalty, or tax.

Defendants argue that they are not debtors, the Government has brought no tort action, and that the Government's causes of action do not seek solely to recover a fine, penalty, or tax. (Dkt. no. 277-1 at 28–29).

For the reasons discussed above pertaining to the probable validity of the Government's claim for debt, the Court rejects Defendants' argument that they are not debtors within the meaning of the FDCPA. Further, because FCA claims sound in tort, *U.S. ex rel. Westmoreland v. Amgen, Inc.*, 738 F. Supp. 2d 267, 271–72 (D. Mass. 2010), and carry the possibility of civil penalties, the Court disregards Defendants' arguments that the present action does not meet the statutory requirements remaining requirements.

### 5. Whether Defendants Johnson and Dent have a substantial nonexempt interest in property owned by the Johnson- and Dent-related Entities

The Johnson- and Dent-related Entities and Christina Dent seek to quash 57 prejudgment writs issued against real property they hold. (Dkt. Nos. 274, 278). Ms. Dent and these entities are not parties to the underlying litigation, and the application and affidavits have not established that they are debtors within the meaning of the FDCPA. However, § 3102(b) provides that "a

15

court shall issue a writ authorizing the United States to attach property in which the debtor has a *substantial nonexempt interest.*" (emphasis added). As discussed above, Defendants Dent and Johnson are debtors within the context of the FDCPA. Accordingly, to the extent that Defendants Dent or Johnson has a substantial nonexempt interest in the property at issue, that property is subject to attachment. *See* 28 U.S.C. § 3102(a)(1) (FDCPA permits attachment on any property "in the possession, custody, or control of the debtor and in which the debtor has a substantial nonexempt interest").

To determine whether a substantial nonexempt property interest exists under the FDCPA, the Court looks to state law, which is the source of property rights. *See Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, 609 F.3d 111, 117 (2d Cir. 2010) (noting that the FDCPA "creates no property rights but merely attaches consequences, federally defined, to rights created under state law") quoting *United States v. Craft*, 535 U.S. 274, 278 (2002); *see also Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*, 560 U.S. 702, 707 (2010) ("Generally speaking, state law defines property interests . . . ."). The Government has asserted an alter ego theory of liability against the Johnson-related Entities and a nominee theory of liability against Christina Dent and the Dent-related Entities. All but one of the Johnson-related Entities are Alabama limited liability companies, and the real property associated with the writs at issue is all located in Alabama. The Dent-related Entities are South Carolina limited liability companies, Christina Dent is a South Carolina resident, and the property associated with the writs at issue is located in South Carolina. Accordingly, the Court looks to Alabama and South Carolina state law, respectively, to determine whether the law recognizes such property interests.

Alabama recognizes property rights created pursuant to alter ego theories. *See Mama's Enters., LLC v. United States*, 883 F. Supp 2d 1128, 1135 (N.D. Ala. 2012) (declining to lift tax

16

liens on alter egos); *United States v. Vito*, No. 99-0630-RV-S, 200 U.S. Dist. LEXIS 11258, at *2–3 (S.D. Ala. July 13, 2000) (imposing federal tax liens on property held in name of defendant's alter ego and/or nominee corporation). Under Alabama law, the Government must show three factors to impose liability under an alter-ego theory:

> 1) The dominant party must have complete control and domination of the subservient corporation's finances, policy and business practices so that[,] at the time of the attacked transaction[,] the subservient corporation had no separate mind, will, or existence of its own;
>
> 2) The control must have been misused by the dominant party. Although fraud or the violation of a statutory or other positive legal duty is misuse of control, when it is necessary to prevent injustice or inequitable circumstances, misuse of control will be presumed;
>
> 3) The misuse of this control must proximately cause the harm or unjust loss complained of.

*Messick v. Moring*, 514 So.2d 892 (Ala. 1987). For the purposes of the FDCPA, the Government has established all of these factors with respect to the Johnson-related Entities.

Defendant Johnson, by his own admission, exercised control over the Johnson-related Entities. (*See* Dkt. No. 274-17 (Johnson's declaration outlining his involvement with the formation and direction of the Johnson-related Entities)). Johnson registered all of the entities, lists himself as having a principal role in all of them, operated all but Forse Investments out of the same location, recently changed many of their registered agents to his accountant, and moved properties between and among them with little to no consideration. (Dkt. No. 173 at 30–35). The Court does not find that fraud has occurred, but the Court presumes misuse of control for the purpose of avoiding the inequitable circumstance in which the Government is unable to collect its debt. Finally, the misuse of control—that is, the transfer of properties and funds to the Johnson-related Entities—is the proximate cause of the "hindrance" the Government complains

17

of. Accordingly, Defendant Johnson has a substantial interest in the Johnson-related Entities, and under the alter-ego theory, the FDCPA permits attachment of the 47 properties at issue.[4]

Turning to Christina Dent and the Dent-related Entities, the Court finds that the Government has not cited South Carolina precedent in briefing or oral argument that stands for the proposition that a party can have a beneficial interest in property pursuant to a nominee theory of liability.[5] Furthermore, although South Carolina recognizes alter ego claims, *see Drury Dev. Corp. v. Found. Ins. Co.*, 668 S.E.2d 798, 799 (2008), the Government has failed to establish that the Dent-related Entities are alter egos of Defendant Dent. The Court therefore finds that the Government has not demonstrated that Defendant Dent has a substantial nonexempt interest in the property within the meaning of Subchapter B of the FDCPA. Accordingly, prejudgment remedies under Subchapter B are improper insofar as they relate to the 10 writs challenged by Christina Dent and the Dent-related Entities.

---

[4] The Johnson-related Entities argue that the Government's application and affidavits should be disregarded because they contain several incorrect and misleading statements. (*See* Dkt. No. 274 at 2–14). In litigation as complex and document-heavy as this, it is not beyond the pale that the litigation within the litigation—that is, these FDCPA prejudgment filings and proceedings—will contain errors such as incorrect dates or duplicative documents. The Government has either corrected or walked back from these statements, and the Court does not find these examples to be so egregious as to render the application and affidavits unreliable. The fact of matter is that the Government need not rely on any of these statements to establish that there is reasonable cause to believe that Defendants have disposed of property with the effect of hindering the United States. *See supra* discussion regarding disposal of property.

[5] Although South Carolina state law does not yet appear to recognize nominee theory, it is among states that recognize that a party may hold title in trust for a beneficial owner through theories such as resulting or constructive trusts. *See Holman v. United States*, 505 F.3d 1060, 1067–68 (10th Cir. 2007) (noting resulting and constructive trust theories can support a nominee lien). Because the Government has not briefed or argued whether such trusts give rise to a property interest under South Carolina law, the Court declines to find that such an interest exists.

### IV.     Prejudgment Remedies Under Subchapter D

The Government also applied for prejudgment remedies against property held by Christina Dent and the Dent-related Entities pursuant to Subchapter D of the FDCPA. Under Subchapter D, a transfer is fraudulent

> if the debtor makes the transfer . . . (A) with actual intent to hinder, delay or defraud a creditor; or (B) without receiving a reasonably equivalent value in exchange for the transfer or obligation if the debtor . . . reasonably should have believed that he would incur[] debts beyond his ability to pay as they became due.

28 U.S.C. § 3304(b)(1). Once a fraudulent transfer is established, the Government may seek "any . . . relief the circumstances may require." *Id.* § 3306(a)(3).

Defendant Dent received the HHS OIG subpoena in January 2013. On May 1, 2013, Dent purchased real property for approximately $1.6 million, and he sold it to his wife for $5 that same day (151 West Circle Drive, Lexington, SC). On August 21, 2013, he sold a parcel of land that he had purchased for $2.75 million to his wife for $5 (2 Panorama Point Drive, Lexington, SC). On February 20, 2014, Dent sold an additional six properties to his wife for $5 (631 Panorama Point). He also sold an island to one of his wife's newly formed corporate entities for $5 (Lake Murray). This fact pattern clearly establishes fraudulent transfers that satisfy the definitions found in §§ 3304(b)(1)(A) and (B).

The Court finds the fact that the transfers were to an insider (*i.e.*, Dent's wife or one of her newly formed corporate entities), the timing of the transfers, and the fact that Dent did not receive an amount reasonably equivalent of the transferred assets to be probative of Defendant Dent's intent to hinder the Government's collection. *See id.* § 3304(b)(2). In addition, the subpoena put Defendant Dent on notice regarding the debt to the Government. Although he may not have known the precise contours of the Government's claims, he should have known that they existed and potentially subjected him to liability. And because § 3306(a) authorizes

19

equitable relief against the fraudulently transferred property, the transferee, or as required by the circumstances, the Court finds that the writs of attachment are appropriate.

Christina Dent briefly argues that South Carolina's homestead exemption, S.C. Code Ann. § 15-41-30, should apply to the property at 631 Panorama Point. (Dkt. No. 278-1 at 16 n.3). However, the homestead exemption does not apply here because the exemption is not available when the transfer is fraudulent. *See In re Lafferty*, 469 B.R. 234, 245–46 (Bankr. D.S.C. 2012).

## V. Conclusion

For the abovementioned reasons, the Court **DENIES** Defendants BlueWave, Dent, and Johnson's Motion to Quash FDCPA Prejudgment Remedies (Dkt. No. 277); the Johnson-related Entities' Motion to Quash (Dkt. No. 274); and the Dent-related Entities' Motion to Dissolve Prejudgment Attachments (Dkt. No. 278). The Court **GRANTS** Government's motion to amend/correct writ issued. (Dkt. No. 194).

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Court Judge

May 12, 2016
Charleston, South Carolina