# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### BEAUFORT DIVISION

| | |
|---|---|
| The United States of America and the States of North Carolina, California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, New Jersey, New York, Tennessee, Texas, Virginia and Wisconsin, *ex rel*. Scarlett Lutz, Kayla Webster, Dr. Michael Mayes and Chris Reidel,<br><br>     Plaintiffs,<br><br>  vs.<br><br>Berkeley Heartlab, Inc., BlueWave Healthcare Consultants, Inc., Latonya Mallory, Floyd Calhoun Dent, III and Robert Bradford Johnson,<br><br>     Defendants. | **CA No.: 9:14-cv-00230-RMG**<br>(Consolidated with 9:11-cv-1593-RMG and 9:15-cv-2485-RMG) |

## UNITED STATES' OPPOSITION TO DEFENDANTS' MOTIONS
## FOR JUDGMENT AS A MATTER OF LAW AND/OR NEW TRIAL

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 1

ARGUMENT ........................................................................................................ 1

I.      Juror No. 118's Facebook Posts Did Not Prejudice Defendants ....................................... 1

II.      The Court Should Deny Defendants' Requests to Reconsider Various Rulings ............... 5

     A.      The AKS Is Violated If One Purpose of the Payment Was to Induce Referrals .... 5

     B.      AKS Compliance and Medical Necessity Are Material to Payment ..................... 6

     C.      The AKS Is Not Void for Vagueness ..................................................... 6

     D.      Defendants Waived Any Safe Harbor Defense ................................................. 8

     E.      Payment or Receipt of Commissions Can Violate the AKS .................................. 9

     F.      The Court Properly Excluded Certain Proffered Expert Testimony ..................... 10

III.      A Reasonable Jury Could Find that Defendants Violated the FCA................................. 11

     A.      A Reasonable Jury Could Find that Defendants Knowingly Caused Claims Resulting from AKS Violations to Be Submitted to Medicare and TRICARE.... 11

     B.      A Reasonable Jury Could Find that Defendants Knowingly Caused Claims for Medically Unnecessary Services to Be Submitted to Medicare and TRICARE .. 16

     C.      A Reasonable Jury Could Find that the United States Proved the Amount of Damages by a Preponderance of Evidence ........................................................... 19

IV.      Because the Verdict Is Not "Contrary to the Clear Weight of the Evidence" or a "Miscarriage of Justice," the Court Should Not Grant a New Trial ................................ 21

     A.      Defendants Have Identified No Evidentiary Error that Rendered the Entire Trial Unfair ......................................................................................................... 22

     B.      Defendants Cannot Show Harmful Error from the Court's Jury Instructions ...... 24

     C.      The Jury's Unanimous Verdict Was Not Inconsistent.......................................... 28

     D.      Defendants Have Identified No "Discovery Abuse" or Miscarriage of Justice in Discovery ...................................................................................... 30

V.      Defendants Have Misstated the Law on Set Offs .......................................................... 31

VI.      Common Law Claims ................................................................................................... 34

     A.      The United States May Pursue Common Law Remedies...................................... 34

     B.      The United States May Recover for Payment By Mistake and Unjust Enrichment ....................................................................................... 34

CONCLUSION..................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................11

*Atlas Food Sys. & Servs., Inc. v. Crane Nat. Vendors, Inc.*,
  99 F.3d 587 (4th Cir. 1996) ...................................................29

*Austin v. Paramount Parks, Inc.*,
  195 F.3d 715 (4th Cir. 1999) ..................................................28

*Bigelow v. RKO Radio Pictures*,
  327 U.S. 251 (1946).................................................................19

*Bresler v. Wilmington Trust Co.*,
  855 F.3d 178 (4th Cir. 2017) ..................................................19

*Campbell v. Boston Sci. Corp.*,
  882 F.3d 70 (4th Cir. 2018) ....................................................11

*Crowley v. L.L. Bean, Inc.*,
  303 F.3d 387 (1st Cir. 2002).....................................................5

*EEOC v. Consol. Energy, Inc.*,
  860 F.3d 131 (4th Cir. 2017) ..................................................22

*Fox v. Gen. Motors Corp.*,
  247 F.3d 169 (4th Cir. 2001) ..................................................19

*Ganias v. United States*,
  137 S. Ct. 569 (2016)................................................................4

*Gregg v. Ham*,
  678 F.3d 333 (4th Cir. 2012) ..................................................19

*Harrison v. Westinghouse Savannah River Co.*,
  176 F.3d 776 (4th Cir. 1999) ..................................................21

*Hill v. Braxton*,
  277 F.3d 701 (4th Cir. 2002) ...............................................5, 10

*Huskey v. Ethicon, Inc.*,
  848 F.3d 151 (4th Cir. 2017) ...........................11, 16, 21, 22, 27

*LiButti v. United States,*
    107 F.3d 110 (2d Cir. 1997)..................................................................26

*LTV Educ. Sys. Inc. v. Bell,*
    862 F.2d 1168 (5th Cir. 1989) ...........................................................35

*Maisha v. Univ. of N.C.,*
    641 F. App'x 246 (4th Cir. 2016) ......................................................35

*Mills v. GAF Corp.,*
    20 F.3d 678 (6th Cir. 1994) ..............................................................33

*Noel v. Artson,*
    641 F.3d 580 (4th Cir. 2011) ......................................................25, 27

*Pa. Nat'l Mut. Cas. Ins. Co. v. Pine Bluff,*
    354 F.3d 945 (8th Cir. 2004) ............................................................34

*Powell v. United States,*
    680 F.3d 350 (4th Cir. 2012) ............................................................27

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133 (2000)...........................................................................11

*Singer v. Olympia Brewing Co.,*
    878 F.2d 596 (2d Cir. 1989).............................................................31

*Spell v. McDaniel,*
    824 F.2d 1380 (4th Cir. 1987) ..........................................................25

*United States v. Anchor Mortg. Corp.,*
    711 F.3d 745 (7th Cir. 2013) ......................................................33, 34

*United States ex rel. Baker v. Cmty. Health Sys., Inc.,*
    Civ. A. No. 05-279, 2014 WL 12634306 (D.N.M. June 24, 2014) ............................34

*United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.,*
    874 F.2d 20 (1st Cir. 1989)...............................................................12

*United States v. Birkart Globistics GMbH & Co.,*
    No. 1:02-cv-1168, 2011 WL 5005313 (E.D. Va. Oct. 19, 2011) ...............................21

*United States v. Bornstein,*
    423 U.S. 303 (1976)...............................................................32, 33, 34

*United States v. Butler,*
    211 F.3d 826 (4th Cir. 2000) ............................................................27

*United States ex rel. Drakeford v. Tuomey*,
  792 F.3d 364 (4th Cir. 2015) ............................................................22, 25

*United States v. Feng Li*,
  630 F. App'x 29 (2d Cir. 2015) ...................................................................5

*United States v. Feng Ling Liu*,
  69 F. Supp. 3d 374 (S.D.N.Y. 2014).........................................................5

*United States v. Fumo*,
  655 F.3d 288 (3d Cir. 2011).................................................................3, 4

*United States v. Ganias*,
  755 F.3d 125 (2d Cir. 2014).......................................................................4

*United States v. Ganias*,
  791 F.3d 290 (2d Cir. 2015).......................................................................4

*United States v. Greber*,
  760 F.2d 68 (3rd Cir. 1985) .....................................................................12

*United States ex rel. Groat v. Boston Heart Diagnostics Corp.*,
  Civ. A. No. 15-487, 2017 WL 6327540 (D.D.C. Dec. 11, 2017) ................17

*United States ex rel. Health Dimensions Rehab., Inc. v. RehabCare Group, Inc.*,
  No. 4:12CV00848, 2013 WL 4666338 (E.D. Mo. 2013) ...........................12

*United States v. Joshua*,
  648 F.3d 547 (7th Cir. 2011) ...................................................................27

*United States ex rel. Lutz v. Berkeley Heartlab, Inc.*,
  225 F. Supp. 3d 487 (D.S.C. 2016)..........................................................17

*United States v. Mead*,
  426 F.2d 118 (9th Cir. 1970) ...................................................................35

*United States v. Miles*,
  360 F.3d 472 (5th Cir. 2004) .....................................................................9

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
  501 F. Supp. 2d 51 (D.D.C. 2007)......................................................32, 33

*United States v. Powell*,
  568 U.S. 922 (2012)..................................................................................27

*United States ex rel. Roberts v. Aging Care Home Health, Inc.*,
  474 F. Supp. 2d 810 (W.D. La. 2007).......................................................35

*United States v. Vernon,*
   723 F.3d 1234 (11th Cir. 2013) ...........................................................9

*United States v. Williams,*
   218 F. Supp. 3d 730 (N.D. Ill. 2016) ...............................................7

*United States v. Wurts,*
   303 U.S. 414 (1938) ...........................................................................34

*White v. Celotex Corp.,*
   878 F.2d 144 (4th Cir. 1989) ...........................................................28

## STATUTES

31 U.S.C. § 3729 ...........................................................................1, 25, 26

31 U.S.C. § 3731 .........................................................................................26

42 U.S.C. § 1320a-7b ........................................................................ passim

## REGULATION

42 C.F.R. § 1001.952 ..............................................................8, 9, 10, 12

## RULES

Fed. R. Civ. P. 49 ......................................................................................28

Fed. R. Civ. P. 50 ...............................................................................11, 16

Fed. R. Civ. P. 51 ......................................................................................29

Fed. R. Civ. P. 59 ......................................................................................21

Fed. R. Evid. 401 .......................................................................................24

Fed. R. Evid. 402 .......................................................................................24

Fed. R. Evid. 403 .......................................................................................24

Fed. R. Evid. 606 .........................................................................................2

Fed. R. Evid. 801 .......................................................................................24

Plaintiff United States of America respectfully requests that the Court deny the motions by Defendants Floyd Calhoun Dent, III, Robert Bradford Johnson, and Latonya Mallory (collectively, "defendants") for judgment as a matter of law and/or a new trial. (Dkt. Nos. 878-1, 880.) To avoid undue repetition, and because defendants have adopted each other's arguments (Dkt. Nos. 879, 881), the United States responds collectively to defendants' arguments without separately addressing which particular defendant first raised the argument.

## PRELIMINARY STATEMENT

On January 31, 2018, a twelve-member jury returned a unanimous verdict, finding that defendants violated the False Claims Act (FCA), 31 U.S.C. §§ 3729–33. (Dkt. No. 870.) The jury found defendants responsible for 35,074 false claims for services by Health Diagnostics Laboratories (HDL), for which Medicare and TRICARE paid $16,601,591. (*Id.* at 1–2.) The jury also found Dent and Johnson responsible for 3,813 false claims for services by Singulex, for which Medicare and TRICARE paid $467,935. (*Id.* at 2–3.) During the twelve-day trial, 28 witnesses testified, 27 live and one additional witness by deposition. The United States offered over 120 exhibits into evidence. (Dkt. No. 863.) Because there was substantial evidence from which a reasonable jury could return the verdict it did, defendants' motions for judgment as a matter of law should be denied. Further, because the jury's verdict was neither against the weight of evidence nor a miscarriage of justice, a new trial or remittitur is not warranted.

## STATEMENT OF FACTS

The relevant facts are set forth in the Argument section below.

## ARGUMENT

## I. Juror No. 118's Facebook Posts Did Not Prejudice Defendants

Defendants claim that certain posts on the social media site Facebook "mandate[] a new trial." (Dent-Johnson Br., Dkt. No. 880 at 33 n.16; Dkt. No. 879 (Mallory joining Dent-

Johnson's brief.)  Defendants attach as Exhibit A printouts of five redacted Facebook posts allegedly by Juror No. 118; one post before jury selection and four during the first week of trial. (Dkt. No. 880-2.)  Defendants claim that the posts show the juror's "distaste for wealth" and "negatively impacted" the defendants.  (Dent-Johnson Br. at 32, 33 n.16.)

First, defendants overstate the significance of the posts.  No post mentions any party.  No post describes any juror's assessment of the evidence.  No post describes in any way the jury's deliberations; indeed, all are dated more than ten days before deliberations began.  No one else commented on any of the posts about the trial.  No post suggests that any "extraneous prejudicial information was improperly brought to the jury's attention" or any "outside influence was improperly brought to bear on any juror."  Fed. R. Evid. 606(b)(2)(A)–(B).  The Facebook posts neither provided nor solicited any substantive information about the trial.  Instead, the posts reference, in vague terms, a type of "comic relief" of little-to-no evidentiary value:  (1) on January 16, "I chuckled numerous times" (no explanation of why); (2) on January 17, an attorney "did a faceplant" (no mention of the witness or the document handed to the witness); (3) on January 18, a witness did not recognize the examining lawyer because "all Lawyers look alike" (no mention of the substance of the witness' testimony); and (4) on January 19 (in a post on the 20th), a witness and a lawyer said it was their "first time" testifying and eliciting testimony, respectively, and the lawyer made an objection, although he was "not sure why," which was overruled (no mention of the witness' testimony about the case).

Second, defendants misconstrue the posts about counsel's clothing.  The first such post, on the first day of trial, describes being "entertained for about 6 hours, by a bunch of people wearing really expensive clothes."  (Dkt. No. 880-2 at 2.)  On that day, two counsel for the United States (Messrs. Leventis and Shaheen) and three counsel for defendants (Messrs. Cooke,

Griffith, and Ashmore) stood up before the jury for opening statements, examination, and/or cross-examination. These five attorneys were the "bunch of people" whose clothes the post described as "really expensive." Rather than showing "disdain" or "distaste" for counsel because of their clothes (Dent-Johnson Br. at 3, 32), the author of the posts was "entertained" by counsel, extolled the benefits of jury duty—adding a smiley face emoji for emphasis—and concluded that it was a "mistake[]" to have "dreaded" jury duty. (Dkt. No. 880-2 at 2.) The later posts follow the same pattern, referring to counsel and the Court by their clothes, not their profession.

Third, the posts do not show any actual bias by a juror. Defendants rely most heavily on a post on the second day of trial. (Dkt. No. 880-2 at 3.) On that day, an attorney for Dent and Johnson tripped and fell, which the post describes as a "Chevy Chase impression" (*id.*), a reference to the actor famous for his slapstick physical comedy, including "The Fall of the Week" on Saturday Night Live. The post notes "I don't know why" such falls by "rich people" are "so funny" but claims that "at least 100 people, in that room" found it funny. (*Id.*) The post does not drip with disdain for the wealthy, as defendants suggest (Dent-Johnson Br. at 3, 32); it is an exaggerated story of how a Chevy Chase impression of a "rich guy" "fall[ing] down" entertained observers at trial. Even defense counsel made light of the fall, joking about workers' compensation, saying "[m]y neck is a little sore." (Day 2 Tr. at 498:14–18.)

Lastly, defendants have cited no case in which a new trial was granted based on four innocuous social media posts by a juror in the first week of a multi-week trial. Despite seeking leave to file a 50-page brief, none of the 50 pages in Dent and Johnson's brief cites any case of juror misconduct, much less any case that applies here. As the Court has noted, "'it does not follow that every failure by a juror to abide by that prohibition [against social media posts] will result in a new trial.'" (Dkt. No. 882 at 1 (quoting *United States v. Fumo*, 655 F.3d 288, 305 (3d

3

Cir. 2011).) In *Fumo*, a juror repeatedly posted on Facebook and Twitter about the case; that juror learned from the television news "while jury deliberations were ongoing" that "the media and public were paying [attention] to his comments"; and before the verdict, "all of the jurors had heard media reports" about that juror's social media use. 655 F.3d at 298–99, 306. Despite the posts and the jurors' knowledge of the news media's coverage of the posts before the verdict, the trial court and appellate court found that "there is simply no plausible theory for how [defendant] suffered any prejudice, let alone substantial prejudice, from [the juror's] Facebook and Twitter comments." *Id.* at 306. The same is true here. Indeed, this is an easier case than *Fumo*. The juror in *Fumo* posted twice as much during trial (eight posts vs. four here); twice received—and responded to—comments about the trial (no such comments in the posts here); and posted four times about jury deliberations (none here). *Id.* at 298. Moreover, before the verdict each member of the *Fumo* jury had learned extraneous information about the case; there is no allegation that that happened here. In sum, there is no plausible theory that defendants suffered substantial prejudice from the juror's Facebook posts.

Numerous other courts have dealt with similar issues. In *United States v. Ganias*, after being selected for jury duty in a criminal case, a juror joked on Facebook, "I may get 2 hang someone . . . can't wait." 755 F.3d 125, 130 (2d Cir. 2014), *reh'g en banc on other grounds*, 791 F.3d 290 (2d Cir. 2015), *cert. denied*, 137 S. Ct. 569 (2016). The juror received comments from online "friends" in support of such punishment, including "gettem while the're young !!! lol" and "Torcher first, then hang! Lol." *Id.* The juror continued posting on Facebook about and during the trial, with posts on various days at 1:41 p.m., 2:07 p.m., and 3:34 p.m. *Id.* Despite the juror's posts during trial—and receipt of comments in support of criminal punishment—the trial court concluded that the juror had "deliberated impartially and in good faith," and thus that there

was no basis for a new trial, a conclusion affirmed by the appellate court. *Id.* at 132.

Likewise, in *United States v. Feng Ling Liu*, a juror tweeted dozens of times about the trial, including that she wanted to talk with "the FBI guys, judge, and AUSAs" after trial. 69 F. Supp. 3d 374, 380 (S.D.N.Y. 2014). Despite arguments that the tweets showed bias against the defendants and their attorneys (to whom the juror did not say she wanted to talk), the trial court found that the juror's interest in talking to only those on one side did not show she was biased in deciding the case. *Id.* at 384 (citing *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387 (1st Cir. 2002) (in sex discrimination case, defendants' claim that juror's "interest in women's issues naturally correlates to" bias against employers and male defendants was "unfounded")). The trial court denied the new trial motion, *id.* at 386, and the decision was affirmed on appeal. *United States v. Feng Li*, 630 F. App'x 29, 33 (2d Cir. 2015). In sum, defendants have shown neither actual bias nor substantial prejudice, and their motion for a new trial should be denied.

## II. The Court Should Deny Defendants' Requests to Reconsider Various Rulings

At least six times, defendants used their post-trial briefs to "ask the Court to reconsider" legal issues already ruled upon. (Dent-Johnson Br. at 2.) Defendants have failed to show any "intervening change in controlling law"; "new evidence not available at trial"; or "clear error of law" or "manifest injustice" in the Court's rulings. *Hill v. Braxton*, 277 F.3d 701, 708 (4th Cir. 2002). As discussed below, defendants "reargue[] issues that the parties previously briefed and that this Court has already considered" (Dkt. No. 575 at 2), and should be denied.

### A. The AKS Is Violated If One Purpose of the Payment Was to Induce Referrals

Defendants claim, again, that the one purpose test should not apply to the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b). (Dent-Johnson Br. at 23–25; Mallory Br., Dkt. No. 878-1 at 15.) As the Court noted in its opinion deciding the parties' summary judgment motions, "[t]his Court has already ruled that the AKS is violated if one purpose of the payment was to

induce or reward referrals." (Dkt. No. 693 at 23.) In its summary judgment opinion, the Court cited its prior rulings on that issue, specifically, the Court's rulings on defendants' motion to dismiss (Dkt. No. 268 at 10 n.3) and motion to quash (Dkt. No. 310 at 10). Despite these three pretrial rulings, defendants continued to argue at trial that the one purpose test should not apply (Dkt. No. 703 at 8), and the Court rejected this argument for a fourth time when it determined the jury instructions (Day 11 Tr. at 2721:18–20, 2750:1–2; Day 12 Tr. at 2949:4–7). For the reasons the Court previously articulated, and for those the United States previously identified (*e.g.*, Dkt. No. 109 at 31–32; Dkt. No. 560 at 8–9; Dkt. No. 755 at 28), the Court should reject defendants' argument for a fifth time.

### B. AKS Compliance and Medical Necessity Are Material to Payment

The Court ruled before trial that both AKS compliance and the medical necessity of laboratory services are material to payment decisions. (Dkt. No. 795 at 3–5.) At trial, the Court reiterated its ruling during argument about jury instructions. (Day 11 Tr. at 2728:15–2729:6, 2749:23–25.) Defendants again ask the Court to reconsider its ruling on materiality. (Dent-Johnson Br. at 20–23; Mallory Br. at 7–13.) Defendants have presented no reason for the Court to reconsider its ruling. For the reasons the Court previously articulated, and for those the United States previously identified (*e.g.*, Dkt. No. 522 at 21–24; Dkt. No. 560 at 11–16; Dkt. No. 755 at 17–18), the Court should again reject defendants' argument.

### C. The AKS Is Not Void for Vagueness

Despite the fact that the AKS cannot be violated without "knowing[] and willful[]" conduct, § 1320a-7b(b), defendants again assert their argument that the AKS is void for vagueness. (Dent-Johnson Br. at 12–17; Mallory Br. at 13–14.) Dent and Johnson had previously raised this argument as their tenth affirmative defense. (Dkt. No. 267 ¶¶ 254–57.) The United States moved for summary judgment on this defense (Dkt. No. 501-1 at 34–35),

6

which the Court granted (Dkt. No. 693 at 22). The Court explained that it "is not aware of any decision by a federal court finding that the AKS is void for vagueness, and federal courts have consistently rejected such vagueness challenges to the AKS." (Dkt. No. 693 at 22.) Defendants have not disputed this holding. They have not tried to distinguish the many cases rejecting vagueness challenges to the AKS or those cases' holdings that "the requirement of willfulness—knowledge that the act is unlawful—mitigates any vagueness concerns." *United States v. Williams*, 218 F. Supp. 3d 730, 740–41 (N.D. Ill. 2016) (collecting cases). Nor have defendants construed—or even cited particular provisions of—the plain text of the AKS to show why it is purportedly vague. (Dent-Johnson Br. at 12–17; Mallory Br. at 13–14.)

Instead, defendants rely on evidence extrinsic to the lawmaking process—including statements by themselves and their own counsel—that are irrelevant to determining whether a statute passed by Congress is void for vagueness. For example, they cite a Mallory email purporting to summarize Ropes & Gray's summary of a conversation with Elizabeth Strawn. (Dent-Johnson Br. at 12 (citing BlueWave Ex. 123).) As used by defendants, the email is hearsay, offered to show the truth of the matter, not defendants' state of mind. Moreover, an email from Mallory about her understanding of Ropes & Gray's understanding of what Ms. Strawn said about an OIG publication has no bearing on the AKS's constitutionality. Nor do statements by defense or other parties' counsel or OIG testimony about regulatory safe harbors or the advisory opinion process (Dent-Johnson Br. at 13–16; Mallory Br. at 14) have any bearing on the constitutionality of the statute. In sum, defendants have presented no reason for the Court to reconsider its ruling that the AKS is not void for vagueness. For the reasons the Court previously articulated, and for those the United States previously identified (*e.g.*, Dkt. No. 501-1 at 34–35; Dkt. No. 522 at 43–44), the Court should reject defendants' argument again.

### D.    Defendants Waived Any Safe Harbor Defense

Defendants repeatedly disclaimed reliance on any AKS safe harbor.  In pretrial briefs, they represented to the Court that:  (1) they "do[] not seek protection under a regulatory Safe Harbor" (Dkt. No. 587 at 4); (2) they "do[] not seek to prove that [their conduct] qualifies for a regulatory Safe Harbor" (*id.* at 5); (3) "there is no affirmative defense of complying with the personal services AKS safe harbor by the defendants" (Dkt. No. 448 at 6, 15); and (4) "the personal services AKS safe harbor has not been pleaded, and is not in any way a part of this case" (*id.*).  (*See also* Dkt. No. 449 (Mallory joining BlueWave's motion); Dkt. No. 586 at 9 (same).)  Indeed, defendants have described the safe harbor as "the irrelevant AKS personal services safe harbor" (Dkt. No. 448 at 20 n.9) and "irrelevant to any issue in this case" (Dkt. No. 587 at 5).  At the pretrial conference, counsel for Dent and Johnson represented to the Court: "Your Honor, we're not claiming an affirmative defense that we meet the safe harbor."  (Dkt. No. 831 at 9:18–19.)  Defendants cannot now claim that their P&H arrangements meet the safe harbor.  (Dent-Johnson Br. at 23; Mallory Br. at 14–15.)  As the Court ruled, "neither party asserted an affirmative defense of safe harbor."  (Day 11 Tr. at 2696:20–21, 2752:10–14.)

Even if defendants had not (repeatedly and explicitly) waived the personal services safe harbor defense, their P&H arrangements fail to qualify for the safe harbor as a matter of law. P&H fees were paid "per specimen."  (PTX 1063 at 1; Day 3 Tr. at 650:22–651:10; Day 5 at 1163:17–24.)  As a physician sent more specimens to HDL or Singulex, the physician would receive more P&H fees.  (*Id.*; Day 2 Tr. at 485:18–23, 504:25–505:5.)  Thus, the "aggregate" compensation paid to physicians over the "term" of the agreement (at least one year) was not "set in advance," as required by the safe harbor.  42 C.F.R. § 1001.952(d)(4)–(5).  Second, because physicians would receive more P&H fees if they referred more Medicare beneficiaries to HDL and/or Singulex, the aggregate compensation over the term of the agreement was "determined in

a manner that takes into account the volume . . . of any referrals" for which payment may be made by Medicare, which is prohibited by the safe harbor. § 1001.952(d)(5). Third, because physicians would receive P&H fees only if they ordered more than one test (PTX 1063 at 1; Day 8 Tr. at 2032:24–2033:4), the aggregate compensation over the term of the agreement was "determined in a manner that takes into account the . . . value of any referrals" for which payment may be made by Medicare, which violates the safe harbor. *Id.* As the Court has held, defendants' conduct "doesn't meet the standard" for the safe harbor; "the law does not support it." (Day 11 Tr. at 2752:10–14.) There is no reason for the Court to reconsider its ruling.

### E. Payment or Receipt of Commissions Can Violate the AKS

Defendants rehash their prior arguments that the commission payments they received were not kickbacks. (Dent-Johnson Br. at 18–20.) As the Court ruled on summary judgment, "a reasonable juror could conclude that defendants' communications with outside counsel about another federal kickback case based on illegal commission-based payments reflects knowledge that their own practice may have been illegal." (Dkt. No. 693 at 9–10; *see also* Dkt. No. 522 at 18–21; *accord* 42 U.S.C. § 1320a-7b(b)(1)–(2). The United States presented the same evidence at trial, including emails with outside counsel Lauren DeMoss of Maynard, Cooper & Gale PC about *United States v. Vernon*, 723 F.3d 1234 (11th Cir. 2013), in which the appellate court upheld verdicts that commission-based payments by various executives of MedfusionRX, LLC violated the AKS. (PTX 1002; Day 6 Tr. at 1403:15–25; Day 10 Tr. at 2654:18–2656:23).

The AKS prohibits "the payment of any funds or benefits designed to encourage an individual to refer another party to a Medicare provider for services to be paid for by the Medicare program." *United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004). The commission payments to the defendants were just that. The AKS does not apply to "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for

employment in the provision of covered items or services." § 1320a-7b(b)(3)(B). But it is undisputed that this exception, and a related safe harbor, 42 C.F.R. § 1001.952(i), does not apply to Dent and Johnson because they were not employees of HDL or Singulex.

Defendants also misconstrue the law and evidence concerning whether the actions of BlueWave's independent contractors can be imputed to Dent and Johnson. Defendants claim that "none of [the contractors] actions or knowledge can be imputed to Dent or Johnson." (Dkt. No. 880-1 at 18.) As the Court explained in its jury instructions, "the defendants in this case are not automatically liable for the conduct of the BlueWave independent contractors." (Day 12 Tr. at 2955:24–2956:1.) However, if the jury found that a conspiracy existed between a contractor and a defendant, the jury could impute the conduct of the contractor to any defendant who was part of the conspiracy. (*Id.* at 2956:2–6.) Further, if the jury found that a contractor engaged in conduct that violated the FCA, the jury could impute that unlawful conduct to any defendant who directed, participated in, adopted, and/or ratified that unlawful conduct. (*Id.* at 2956:7–11.) There was sufficient evidence from which a jury could conclude that a conspiracy existed between any one of the contractors and each of the defendants. And if such a conspiracy existed, the law allows the jury to impute the actions of those contractors to each of the defendants.

### F. The Court Properly Excluded Certain Proffered Expert Testimony

Despite filing *seriatim* requests to reconsider the Court's orders excluding testimony by four witnesses proffered as experts by Dent and Johnson (Dkt. Nos. 518, 525, 551, 558)—all of which were denied (Dkt. Nos. 572–75)—Dent and Johnson again seek reconsideration of the Court's orders. (Dent-Johnson Br. at 47–49.) Defendants have presented no reason for the Court to reconsider its rulings. They have cited no "intervening change in controlling law"; no "new evidence not available at trial"; and no "clear error of law" or "manifest injustice" in the Court's rulings. *Hill*, 277 F.3d at 708. Defendants' request for reconsideration should be denied.

**III.      A Reasonable Jury Could Find that Defendants Violated the FCA**

Pursuant to Rule 50, a court "may grant judgment as a matter of law only if, viewing the evidence in a light most favorable to the non-moving party and drawing every legitimate inference in that party's favor, . . . the only conclusion a reasonable jury could have reached is one in favor of the moving party." *Huskey v. Ethicon, Inc.*, 848 F.3d 151, 156 (4th Cir. 2017). Because "'[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions,'" a court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Here, because the United States' P&H kickback, commission kickback, and medical necessity counts provided three alternative bases to recover FCA damages, "overturning the verdicts on only one of these counts would not affect the damages awards themselves or necessitate a new trial." *Campbell v. Boston Sci. Corp.*, 882 F.3d 70, 79 (4th Cir. 2018).

**A.      A Reasonable Jury Could Find that Defendants Knowingly Caused Claims Resulting from AKS Violations to Be Submitted to Medicare and TRICARE**

The AKS prohibits a person from knowingly and willfully offering or paying, or soliciting or receiving, any remuneration, in cash or in kind, to induce a referral to a federal healthcare program. 42 U.S.C. § 1320a-7b(b)(1)–(2).

**1.      Defendants Offered, Paid, Solicited, and/or Received Remuneration**

Defendants offered and paid to physicians and physician practices remuneration in the form of P&H fees. (*See, e.g.*, Day 1 Tr. at 111:4–9, 112:1–10, 171:21–172:7 (Eric Hines:  HDL and Singulex paid physicians more than $52.6 million in P&H fees); Day 3 Tr. at 650:21–651:10 (Mallory:  HDL paid P&H on a per specimen basis)).)  In addition, Mallory offered and paid to Dent and Johnson remuneration in the form of commissions. (PTX 2008, 2009, 2972; Day 1 Tr.

at 181:15–20; Day 5 Tr. at 1148:4–7.)  Dent and Johnson solicited and received commission remuneration from HDL and Singulex, and offered and paid commission remuneration to the BlueWave contractors.  (*Id.*; Day 1 Tr. at 188:11–190:18; Day 5 Tr. at 1136:7–1137:13, 1148:4–11, 1149:13–1150:7.)

As used in the AKS, the term "remuneration" is broad.  "Remunerate" means "to pay an equivalent for service."  *United States v. Greber*, 760 F.2d 68, 71 (3rd Cir. 1985).  The AKS also includes "any kickback, bribe, or rebate," § 1320a-7b(b), that is, "situations where no service is performed."  *Greber*, 760 F.2d at 71.  Congress intended "to cover the transferring of anything of value in any form or manner whatsoever."  56 Fed. Reg. 35952–01 (Jul. 29, 1991).  "If the payments were intended to induce the physician . . . the statute was violated, even if the payments were also intended to compensate for professional services."  *Greber*, 760 F.2d at 72.

The AKS does not require the United States to prove the lack of fair market value (FMV).  *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 29–30 (1st Cir. 1989) (rejecting argument that government "had to prove that the payments received were not reasonable for the actual work done"); *accord United States ex rel. Health Dimensions Rehab., Inc. v. RehabCare Group, Inc.*, No. 4:12CV00848, 2013 WL 4666338, at *5 (E.D. Mo. 2013) ("Lack of fair market value, per se, is not an element the Government must provide."). While the AKS does not "exclude reasonable payments for actual work done," HHS has promulgated regulatory safe harbors exempting particular arrangements that do not present a substantial risk for fraud and abuse.  *Bay State*, 874 F.2d at 31.  While certain safe harbors require payments to be at "fair market value," *e.g.*, 42 C.F.R. § 1001.952(b)–(d), those safe harbors include many other requirements that must be met, causing "only a small subset of [FMV] transactions" to be exempt from the AKS.  *Bay State*, 874 F.2d at 31 ("Congress did not

explicitly change the statute to exclude [from AKS liability] reasonable payments for actual work done.").  Contrary to defendants' claims, FMV alone is not a defense to the AKS.

Here, the evidence at trial was sufficient to show that one purpose of the remuneration was to induce referrals.  *See* Sections III.A.2.–3., *infra*.  Moreover, a reasonable jury could conclude that P&H fees exceeded any compensatory purpose.  Dr. Michael Mayes, for example, testified that after receiving P&H fees each month, his practice subtracted the costs associated with the blood draws and processing.  (Day 2 Tr. at 480:13–481:6.)  "The remaining amounts were considered to be profit and were distributed back to the physicians who had ordered those tests based upon the number they had ordered per month."  (*Id.* at 481:7–9.)  Likewise, Dr. Taqueer Alam testified that he used the P&H fees to offset all of his practice costs, including services that were unrelated to blood processing and handling.  (Day 9 Tr. at 2220:15–25, 2224:17–2225:12.)  He admitted that "[t]here is some amount of profit, but not a whole lot of profit" from the P&H fees.  (*Id.* at 2225:13–14.)  All of those profits were retained by Dr. Alam, as the sole owner of the practice.  (*Id.* at 2221:1–16.)  Similarly, Dr. William Hollins, II explained that after the P&H fees were applied to the general expenses of the practice, any remainder was distributed to the partners in the form of a "bonus."  (*Id.* at 2307:17–2308:19.)

In addition, the evidence showed that P&H fees were double payments because physicians are compensated for P&H tasks through their office visit reimbursement.  (*E.g.*, Day 2 Tr. at 467:7–468:5; *id.* at 548:3–549:3; Day 4 Tr. at 1075:3–10746:9.)  Despite defendants' *post hoc* protestations that physicians should not have billed for an office visit if they were receiving P&H fees, the evidence at trial showed that defendants not only knew that physicians were billing for office visits, but that they exploited this fact by touting the revenue that physicians could receive from both P&H fees and office visit payments.  (*E.g.*, PTX 7009 (Anna McKean

report); PTX 1004, 1035, 1099, 1158 (pro formas).)  As Dent admitted, "absolutely physicians bill for office visits.  That's how they get reimbursed for the services they perform."  (Day 7 Tr. at 1686:13–19.)  As Johnson admitted, "lipid clinic revenue is based on follow up visits.  If you get more information about a patient, you're going to have to do the follow up.  (Day 10 Tr. at 2621:15–2622:2.)  Further, defendants were warned in April 2011 that such double payments "would be considered to be a kickback," yet they kept offering such kickbacks for over three more years.  (PTX 1191; Day 7 Tr. at 1724:4–11.)

### 2.  Defendants Used Remuneration to Induce Referrals

Defendants used commissions and P&H fees to induce referrals.  HDL and Singulex agreed to pay Dent and Johnson commissions on a percentage of collected revenue to sell lab tests to physicians.  (PTX 2008, 2009.)  Before their scheme was implemented, defendants agreed that P&H fees would be offered to physicians because "P&H is a critical door opener." (PTX 1288.)  Indeed, BlueWave sales representatives testified that they used P&H in this manner, as a door opener to induce referrals.  Boomer Cornwell testified that he was trained by Dent and Johnson to use P&H fees as a selling point when marketing HDL and Singulex tests (Day 2 Tr. at 353:12–358:8), and admitted that he had touted P&H fees in his sales pitch as "tremendous" and "lucrative."  (*Id.* at 458:13–17).  Leonard Blasko touted P&H fees in his sales pitch as an "economic thing" and a reason to order the tests.  (*Id.* at 304:7–306:19.)  Kyle Martel asserted the Fifth Amendment to refuse to answer questions about how he used P&H to sell HDL and Singulex tests.  (Day 4 Tr. at 1045:21–1052:4; PTX 1162.)  Further, defendants and their co-conspirators drafted and sent numerous pro formas to potential clients touting the profits and revenue that doctors could generate from P&H fees.  (*E.g.*, PTX 1004, 1035, 1099, 1158.)

### 3.  Defendants Acted Knowingly and Willfully Under the AKS

The evidence at trial showed that defendants continued to offer and pay P&H fees despite

receiving numerous clear warnings that this conduct violated the law.  On December 13, 2010, attorney Lester Perling told defendants that P&H was "as blatantly illegal as anything I have ever seen in a long time.  It would be a criminal violation of the federal and state kickback laws." (PTX 1266.)  On April 29, 2011, another attorney told defendants that "the $17 that the laboratory is paying would be considered to be a kickback."  (PTX 1117.)  On March 27, 2012, a lawyer representing another laboratory told defendants that "paying physicians to collect samples would potentially place the laboratory and the physicians in violation of the Federal Anti-Kickback Statute."  (PTX 1122.)  On January 8, 2013, an attorney representing one of Dent's clients warned defendants that "the $20 'draw fee' is illegal."  (PTX 7011.)  Defendants' own attorneys also advised them to stop paying P&H fees because it was wrong.  (*E.g.*, PTX 1034 (Ropes & Gray attorneys telling defendants that "the Government is not going to go away and that they do not buy HDL's theory of why it's okay to pay P&H fees."); PTX 1002 (BlueWave lawyer instructing that P&H fees are "prohibited.").)  Finally, Dent and Johnson tried to silence those who warned against paying P&H.  (*E.g.*, Day 5 Tr. at 1339:5–19 (Dent and Johnson terminated Emily Barron's sales contract after her attorney warned that P&H fees violated AKS); Day 4 Tr. at 896:1–898:7 (Dent "screamed" and "got very red-faced and angry" at Ropes & Gray attorney who told defendants to stop paying P&H).

The evidence also showed that defendants were warned that paying commissions to induce referrals violated the AKS, yet they continued to do so.  (PTX 1244 at 3; Day 4 Tr. at 885:22–886:5, 921:11–922:1; Day 5 Tr. at 1333:11–1334:4, 1356:24–1357:4; Day 6 Tr. at 1482:13–22; Day 7 Tr. at 1749:18–1750:9, 1815:15–1816:1.)  Based on such evidence, the jury reasonably concluded that defendants knowingly and willfully violated the law.

Defendants do not acknowledge any of this evidence in their brief.  Instead, they cherry-

pick certain evidence they believe is favorable to their arguments. This, of course, is contrary to the Rule 50 standard, which requires a reviewing court to "view[] the evidence in a light most favorable to the non-moving party and draw[] every legitimate inference in that party's favor." *Huskey*, 848 F.3d at 156. Moreover, the evidence defendants highlight is not so favorable to them. For example, defendants cite Greg Root's December 27, 2007 memorandum to Berkeley Heartlab (Dent-Johnson Br. at 10), but gloss over the fact that HDL and defendants offered and paid twice the amount of P&H fees addressed in that memorandum. Defendants further ignore that Root assumed that physicians were not getting paid by Medicare for the same services, and that he warned of the risks associated with paying P&H fees, including that the government might find such fees illegal. (Mallory Ex. 42.) In sum, the Root memorandum put defendants on notice that paying P&H was a legally risky endeavor—a peril that defendants ignored.

Similarly, defendants cite various Singulex and HDL attorneys for support, but: (1) there is no evidence that defendants disclosed to these lawyers that P&H fees were being used to induce referrals; (2) many of the attorneys, including Dennis Ryan, Mary Mullany, Douglas Sbertoli, and Gene Sellers had little to no experience with healthcare law (Day 4 Tr. at 845:15–846:7, 852:7–14; Day 7 Tr. at 1797:3–9; Day 8 Tr. at 2104:3–2105:1); and (3) defendants continued paying P&H even when experienced healthcare attorneys advised them to stop paying P&H fees because they were a red flag and prohibited (*e.g.*, PTX 1002, 1034, 1217, 1244, 1510, 1522). In any event, the evidence that defendants cite was presented to the jury, and defense counsel had ample opportunity to argue to the jury about that evidence. The jurors weighed all of the evidence at trial and reasonably found that defendants had acted knowingly and willfully.

### B. A Reasonable Jury Could Find that Defendants Knowingly Caused Claims for Medically Unnecessary Services to Be Submitted to Medicare and TRICARE

First, defendants argue that the United States "abandoned" its medical necessity claims.

(Dent-Johnson Br. at 25; Mallory Br. at 15.)  This claim is baseless; the United States presented direct- and cross-examination testimony of fact and expert testimony on the issue, as discussed below, and the jury was instructed thereon.  (Day 12 Tr. at 2946:11–24, 2953:19–2954:5.)

Second, defendants argue that they cannot be held liable for medically unnecessary tests because laboratories are "permitted to rely on the ordering physician's determination that the laboratory tests billed to Medicare are medically necessary."  (Dent-Johnson Br. at 27; Mallory Br. at 15–16.)  However, there was much more to defendants' scheme than simply relying on physicians.  Here, as in the case they rely on, defendants "engaged in a scheme to encourage non-cardiology physicians to order medically unnecessary tests through a false marketing campaign and pre-printed test requisition forms," which is a knowing violation of the FCA. *United States ex rel. Groat v. Boston Heart Diagnostics Corp.*, Civ. A. No. 15-487, 2017 WL 6327540, at *8 (D.D.C. Dec. 11, 2017) (citing *United States ex rel. Lutz v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 499–500 (D.S.C. 2016)).  Indeed, defendants multiplied the effectiveness of—and the harm caused by—their scheme by offering per-specimen kickbacks to corrupt physicians' medical decision-making.  (*See* Section III.A., *supra*.)

Third, a reasonable jury could conclude, based on the evidence of defendants' scheme and the lack of medical necessity of the tests, that defendants knowingly caused the submission to Medicare and TRICARE of claims for medically unnecessary services.  For example, expert Dr. Jeffrey Trost testified that each test in HDL's baseline assessment and follow-up panels were medically unnecessary, except for the traditional lipid panel, when they are ordered for routine use in a routine clinical setting.  (Day 4 Tr. at 987:16–988:13.)  He also testified that the tests CYP3C19, Factor V Leiden, prothrombin mutation, NT Pro-BNP, and Galectin-3—each of which was in HDL's standard panel—were not medically necessary for the evaluation of patients

in a routine clinical setting. (*Id.* at 989:11–997:10.) Dr. Trost similarly testified that the Singulex panel marketed by BlueWave contained one test, Cardiac troponin-I, which is not appropriate as an outpatient screening test, and two tests, Interleukin-6 and Interleukin-17A, which are medically unnecessary and lack any clinical utility. (*Id.* at 998:1–999:24.)

Dr. Trost also reviewed the medical records of a patient who had received both HDL and Singulex baseline and follow-up panels every four to six months over the course of six years. (Day 4 Tr. at 1003:20–1008:1.) Dr. Trost testified that the records showed that, before any lab tests, the patient was obviously at very high risk of a cardiac event, and that "diagnostic" testing by HDL and Singulex testing was unnecessary to identify that very high risk and, moreover, nothing in the records showed that the tests informed any medical decision. (*Id.*)

The testimony of Dent and Johnson's own expert, Dr. Robert Fishberg, supported Dr. Trost's opinions. Dr. Fishberg agreed that CYP2C19 is only appropriate for patients with specific conditions for which they may need the drug Plavix, not for every patient. (Day 8 Tr. at 1965:22–1966:11.) Dr. Fishberg further explained that he would order the Factor V Leiden and prothrombin mutation tests only for patients with certain family histories, which are present in only 5% of the population. (*Id.* at 1967:19–1968:14.) Remarkably, when Dent and Johnson asked their own expert whether HDL's tests could be medically necessary, Dr. Fishberg responded: "That's a very difficult question for me. Medical necessity is different than what I'm necessarily looking at." (*Id.* at 1957:4–23.)

In addition, the jury heard evidence of specific physicians who, because of defendants' fraudulent scheme, ordered medically unnecessary tests from HDL and Singulex. Dr. Mayes testified that the other doctors in his practice ordered HDL and Singulex testing on more patients, and with greater frequency, when HDL and Singulex paid them P&H fees, and stopped ordering

after no longer receiving P&H payments.  (Day 2 Tr. at 482:1–7, 483:11–484:11, 501:15–21.)

Dent and Johnson's own witness, Dr. Tauqueer Alam, who also received between $2,000 and

$2,500 per month from HDL, testified that some of the tests on the HDL panel he ordered were

unnecessary because his own in-house laboratory was running the same tests.  (Day 9 Tr. at

2222:8–2224:5.)  In sum, it was reasonable for the jury to conclude, based on the evidence, that

defendants knowingly caused the submission of claims for medically unnecessary lab tests.

### C.  A Reasonable Jury Could Find that the United States Proved the Amount of Damages by a Preponderance of Evidence

While a jury "may not render a verdict based on speculation or guesswork," a jury is

"allowed to act upon probable and inferential, as well as direct and positive proof" and "may

make a just and reasonable estimate of the damage based on relevant data."  *Bigelow v. RKO

Radio Pictures*, 327 U.S. 251, 264–66 (1946); *accord Bresler v. Wilmington Trust Co.*, 855 F.3d

178, 201 (4th Cir. 2017) ("[E]stimates that lack mathematical certainty are permissible so long as

the [factfinder] has a basis to make a responsible estimate of damages.").  "A district court

abuses its discretion by upholding an award of damages only when the jury's verdict is against

the weight of the evidence or based on evidence which is false."  *Gregg v. Ham*, 678 F.3d 333,

343 (4th Cir. 2012).  "A jury's award of damages stands unless it is grossly excessive or

shocking to the conscience."  *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 180 (4th Cir. 2001).

Here, the jury had a reasonable basis to find Dent and Johnson liable for $17,069,526 in

damages on 38,887 false claims, and Mallory liable for $16,601,591 in single damages on 35,074

false claims.  The jury had ample evidence to reach these just and reasonable estimates of

damages.  The jury heard evidence from forensic accounting expert Eric Hines regarding:  (a) the

total and quarterly number and value of the claims HDL and Singulex submitted between 2010

and 2014 related to the P&H kickback scheme (Day 1 Tr. at 166:1–170:12; 198:10–15; 2674:15–

2675:4); (b) the total and quarterly number and value of the claims HDL and Singulex submitted between 2010 and 2014 related to the P&H and commission kickback schemes (Day 1 Tr. at 193:13–197:13, 197:14–198:9, 198:16–23; Day 10 Tr. at 2675:5–2676:2); (c) the percentage of the tainted claims HDL submitted versus the tainted claims Singulex submitted related to the P&H kickback scheme (Day 10 Tr. at 2674:8–2677:7) and related to the P&H and commission kickback schemes (*id.*); (d) the tests that experts from both parties agreed were medically unnecessary (Day 8 Tr. at 1957:4–9, 1962:9–1963:22, 1965:10–1966:11, 1967:5–1968:14, 1969:13–1971:13); (e) the percentage of orders of the HDL "standard panel" (Day 8 Tr. at 2049:2–20 ("between 15 to 20 percent")); and (f) the percentage decline in orders once defendants stopped offering P&H fees (Day 1 Tr. at 176:17–180:7 ("approximately 40 percent"); Day 2 Tr. at 402:12–15 ("15 to 20 percent decline" in Texas); Day 3 Tr. at 612:4–14 ("a drop-off of maybe 10 percent"); Day 6 Tr. at 1636 ("11 percent drop" was the highest); Day 8 Tr. at 2036:20–20376 ("about 10 percent")).

Relying on this evidence, the jury reasonably calculated damages on the HDL and Singulex false claims, based on the defendants' specific conduct relating to those claims. Rather than acknowledge the substantial evidence from which the jury could reasonably estimate damages, Mallory speculates about the calculations the jury "seemingly" performed. (Mallory Br. at 3.) In her brief, Mallory performs her own calculations—calculations that neither she nor any other witness made at trial—to argue that the damages for false HDL claims were not sufficiently precise. (*Id.*) Even if the jury had attached significance to a purported "triggering date of November 14, 2013" (*id.* at 6), by that point Mallory had received ample attorney advice that paying P&H fees was wrong, and a jury reasonably could find her liable for the damages caused by the resulting false claims. (*E.g.*, PTX 1217 (HDL's outside counsel: U.S. views P&H

fees as "blatant kickbacks"); PTX 1244 (HDL's General Counsel:  Terminate P&H fees; U.S.

believed similar P&H arrangement was illegal); PTX 1510 (HDL's General Counsel:  Ropes &

Gray advised against P&H); Day 4 Tr. at 880:23–881:24 (Nicholas Pace:  Ropes & Gray advised

Mallory to stop paying P&H because it could be deemed to violate AKS); Day 3 Tr. at 718:8–

720:8 (Mallory:  Lawyers warned me about risks associated with paying P&H).)

Further, the cases Mallory cites do not support her position.  For example, *Harrison v.*

*Westinghouse Savannah River Co.*, has nothing to do with a jury verdict; the case reviewed a

pretrial order granting a motion to dismiss.  176 F.3d 776, 780 (4th Cir. 1999).  *Harrison*

provides no support for Mallory's argument that damages must be established "in a specific sum

certain."  (Mallory Br. at 2 (emphasis omitted).)  Another case cited by Mallory, *United States v.*

*Birkart Globistics GMbH & Co.*, is distinguishable because the United States there was found to

have "ignore[d] completely its own burden to show . . . how many claims filed and paid were

false."  No. 1:02-cv-1168, 2011 WL 5005313, at *12 (E.D. Va. Oct. 19, 2011).  By stark

contrast, the jury in this case considered days of testimony, numerous witnesses, and dozens of

exhibits to reach reasonable estimates of the damages for false HDL and Singulex claims.  The

jury awards were not against the weight of the evidence, based on false evidence, grossly

excessive, or shocking to the conscience.

## IV.  Because the Verdict Is Not "Contrary to the Clear Weight of the Evidence" or a "Miscarriage of Justice," the Court Should Not Grant a New Trial

Pursuant to Rule 59, a court may grant a new trial only if "the verdict is contrary to the

clear weight of the evidence, rests upon false evidence, or will cause a miscarriage of justice."

*Huskey*, 848 F.3d at 158.  For the reasons noted herein, none of those factors are present here.

Further, as discussed below, none of the defendants' arguments about:  (a) the evidence at trial;

(b) the jury instructions; (c) the verdict; or (d) pretrial discovery, warrant a new trial.

### A. Defendants Have Identified No Evidentiary Error that Rendered the Entire Trial Unfair

An evidentiary error "warrants a new trial only if it results in 'a high probability that the error . . . affect[ed] the judgment.'" *Huskey*, 848 F.3d at 160 (quoting *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 375 (4th Cir. 2015)). That is, when "a new trial is sought based on purported evidentiary errors by the district court, a verdict may be set aside only if an error is so grievous as to have rendered the entire trial unfair." *EEOC v. Consol. Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2017).

### 1. The Court Properly Admitted Evidence of Commissions Received by Dent and Johnson

Defendants argue that "the Court's decision to allow testimony of the defendants' earnings and the government's misuse of that evidence inflamed the jury in an improper way and led to a miscarriage of justice." (Dent-Johnson Br. at 34.) First, the Court correctly ruled that "evidence of profits and earnings is relevant here" because: (a) "[e]vidence that the BlueWave Defendants received commission payments is relevant to whether they did, in fact, receive 'remuneration,' a required element to prove an AKS violation"; and (b) "evidence that a defendant personally benefitted from an allegedly illegal business practice is circumstantial evidence from which a juror could infer that the defendant was motivated by profit to participate in the illegal activity despite his knowledge that the conduct may have been illegal." (Dkt. No. 727 at 11.) The cases that Dent and Johnson cite about "the wealth of a party" (Dent-Johnson Br. at 33) are irrelevant here; the United States neither introduced evidence of, nor argued about, Dent and Johnson's wealth. In any event, their claims of a "miscarriage of justice" ring hollow when Dent and Johnson's counsel repeatedly referenced their wealth, warning against a verdict that "might ruin somebody, might destroy somebody's life, might take everything that they could ever hope to earn"; would "take everything they own"; and would "wipe them out." (Day 11 Tr.

at 2828:14–16; 2897:2–3, 14, 24; 2898:1.)

Second, the United States did not "misuse" evidence "for purely inflammatory and improper purposes." (Dent-Johnson Br. at 34.) Evidence of defendants' earnings was relevant to "remuneration" under the AKS and defendants' motive, and the United States used the evidence for those purposes and no improper purpose. Although defendants now complain about the term "blood money" (Dent-Johnson Br. at 30–31), they did not object when the term was used at trial. Instead, defendants made a strategic decision to use the term themselves, including during witness examination. (*E.g.*, Day 1 Tr. at 66:10–11, 206:9–10.) Indeed, any objection would have been meritless because the term simply summarizes defendants' undisputed conduct: They paid <u>money</u> (P&H fees) "to get the <u>blood</u> to their facility." (*E.g.*, Day 1 Tr. at 71:5–10 (Dent-Johnson's opening statement); Day 1 Tr. at 93:11–13 (Mallory's opening statement).) The United States' reference to "blood money" was proper and did not cause a miscarriage of justice.

## 2. The Court Properly Admitted Certain Work Product of Defendants' Attorneys

Dent and Johnson devote more than 2.5 pages of their brief to arguing that the admission of "uncommunicated" attorney work product led to "a miscarriage of justice." (Dent-Johnson Br. at 41–43.) About 80% of that section is devoted to arguing that the United States erred in seeking this information directly from Dent, Johnson, and BlueWave, and not simultaneously from the law firm that drafted the materials in question. (*Id.*) However, as the Court held, "[f]or discovery purposes, a party is generally considered to have possession and control over documents in the possession of its current or formal legal counsel" (Dkt. No. 410 at 4), and thus the Court ordered Dent and Johnson to produce the responsive documents, including uncommunicated work product, "currently in the possession of their former counsel." (*Id.* at 9.)

Dent and Johnson then argue (without citing any authority) that the admission into

evidence of a memorandum by attorney Linda Flippo (PTX 1034) regarding a joint meeting of the defendants was erroneous, "highly prejudicial," and "led to a miscarriage of justice." (Dent-Johnson Br. at 43.) First, the exhibit and associated testimony were admissible. The evidence was relevant; it described communications from attorneys to each of the defendants: (1) about the risks associated with paying P&H; (2) about what the United States had conveyed to defendants' counsel about P&H; and (3) to stop paying P&H. (Day 5 Tr. at 1219:11–1224:16.) Fed. R. Evid. 401, 402. The evidence was not hearsay; it was offered not for the truth of the matter, but for defendants' state of mind, that they received and refused to follow advice from their attorneys. Fed. R. Evid. 801(c)(2). The evidence was "prejudicial" in the sense of being damning, but it did not have "an undue tendency to suggest decision on an improper basis." Fed. R. Evid. 403 & cmte note (defining "unfair prejudice"). Defendants have cited no reason or authority showing that admission of such evidence was a miscarriage of justice.

### 3. The Court Properly Admitted Evidence of a No Balance Billing Policy

Defendants argue that the Court erred in admitting evidence of their no balance billing policy; specifically, that defendants sold HDL and Singulex tests by promising to waive patients' copayments and deductibles. (Dent-Johnson Br. at 25–26.) As the Court held, evidence of such conduct is relevant to defendants' state of mind. (Day 6 Tr. at 1428:19–1429:1.) Despite being warned that the no balance billing policy raised "numerous legal issues," including "civil and/or criminal penalties under the federal anti-kickback law" (PTX 1112; Day 3 Tr. at 732:1–5; Day 7 Tr. at 1718:8–1719:21), defendants continued to use the policy as one of the "variety of devices" they used "in a scheme to induce doctors to act." (Day 6 Tr. at 1428:21–23.)

### B. Defendants Cannot Show Harmful Error from the Court's Jury Instructions

Defendants challenge seven of the Court's jury instructions. In reviewing such instructions for error, the instructions are "'construed as a whole, and in light of the whole

record.'"  *Tuomey*, 792 F.3d at 382 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1395 (4th Cir. 1987)).  Here, a new trial would be warranted only if the defendants had requested an instruction that:  "'(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired that party's ability to make its case.'"  *Id.* (quoting *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011)).  As described below, defendants cannot make this showing.

First, defendants argue that "[f]rom the instructions, it is unclear what conduct specifically constitutes a violation of the FCA under False Statement theory."  (Dent-Johnson Br. at 35.)  In fact, "the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles."  *Noel*, 641 F.3d at 587–88.  The jury was instructed as to the relevant question they had to decide (whether "defendants violated the False Claims Act by presenting or causing to be presented false or fraudulent claims or false records"), and the applicable legal standard, including falsity, knowledge, causation, conspiracy, and damages.  (Day 12 Tr. at 2946:11–15, 2953:4–2963:15.)  The instructions repeatedly referenced false records and statements (*id.*), consistent with 31 U.S.C. § 3729(a)(1)(B).  Defendants' complaint that "[t]he Court never separates out the two claims under the FCA" (Dent-Johnson Br. at 35) is misguided; it "overlooks the fact that the charge in its totality was what the jury heard," and while "[i]t is easy enough to pick at words, phrases, and sentences in a charge," a jury verdict "represents a good deal of work on the part of a good many people, and the instructions undergirding that collective effort should not succumb lightly to semantic fencing."  *Noel*, 641 F.3d at 586.  No defendant has shown that the instructions regarding false records and statements "seriously impaired [its] ability to make its case."  *Id.*

Second, defendants again challenge the applicable burden of proof.  (Dent-Johnson Br. at

35–36.)  This argument ignores the explicit text of the FCA, 31 U.S.C. § 3731(d), and is wrong

for the reasons previously cited.  (*E.g.*, Dkt. No. 755 at 3.)

Third, defendants challenge the adverse inference instruction.  (Dent-Johnson Br. at 36–

37.)  The instruction correctly stated the law (Day 12 Tr. at 2960:23–2961:15), as previously

noted.  (*E.g.*, Dkt. No. 755 at 20.)  In light of the FCA conspiracy claim, 31 U.S.C.

§ 3729(a)(1)(C), the jury did not need to apply the test in *LiButti v. United States*, 107 F.3d 110

(2d Cir. 1997), a case which did not include a conspiracy claim.  Finally, defendants are wrong

that "conspiracy was not submitted to the jury for a verdict" (Dent-Johnson Br. at 37).  (Day 12

Tr. at 2956:12–2961:20.)

Fourth, defendants' arguments about materiality are wrong for the reasons discussed in

Section II.B., *supra*.

Fifth, defendants claim (without citing any authority) that the Court should have

instructed that good faith is a defense to the FCA.  (Johnson-Dent Br. at 38.)  However, while

good faith can show a lack of "willful" conduct, there is no "willful" element of an FCA

violation.  31 U.S.C. § 3729(a)(1)(A)–(C).  Here, the Court correctly instructed on "knowledge"

under the FCA, including actual knowledge, deliberate ignorance, and reckless disregard.  (Day

12 Tr. at 2954:6–2955:21.)  Defendants have identified no error in these instructions.

Sixth, defendants claim that "the Court improperly disallowed" defendants "to present a

reliance on counsel defense."  (Dent-Johnson Br. at 38; Mallory Br. at 18.)  In fact, the Court

allowed each defendant to rely on legal advice.  The Court instructed that, "[i]n determining

whether a defendant acted in good faith," the jury "must consider" "all of the legal opinions and

advice received by or known to the defendant, regardless of the source."  (Day 12 Tr. at

2951:12–16.)  This instruction allowed defendants to assert an advice of counsel defense—which

they did at length during trial and in closing—without requiring them to satisfy any elements of the defense.  (Dkt. No. 693 at 16–17; Dkt. No. 755 at 33–34.)

Although the Court's instruction regarding "legal opinions and advice" was in error (Day 11 Tr. at 2713:9-2714:22, 2717:22-2718:8), this error inured to defendants' benefit and thus provides no basis for a new trial.  Defendants used legal opinions and advice "to show that they acted in good faith" and thus not willfully, which "is exactly what the advice-of-counsel defense does."  *United States v. Joshua*, 648 F.3d 547, 554–55 (7th Cir. 2011).  If defendants had established an evidentiary foundation for the advice of counsel defense, then the jury should have been instructed on the elements of that defense.  (Dkt. No. 755 at 33–34.)  In contrast, if defendants "failed to establish an evidentiary foundation" for the advice of counsel defense—as the Court found as a matter of law (Day 10 Tr. at 2680:23–2682:4; Day 11 Tr. at 2715:9–10)— then the Court should not have allowed the jury to rely on legal opinions and advice as evidence of lack of willfulness.  *See United States v. Powell*, 680 F.3d 350, 356–57 (4th Cir. 2012), *cert. denied*, 568 U.S. 922 (2012); *United States v. Butler*, 211 F.3d 826, 833 (4th Cir. 2000).  Although in error, the Court's instruction on legal opinions and advice improved and did not "seriously impair[]" defendants' "ability to make [their] case."  *Noel*, 641 F.3d at 586.  Because an advice of counsel instruction "would not likely have provided [any defendant] with a more favorable outcome," defendants' new trial motion should be denied.  *Huskey*, 848 F.3d at 159.

Lastly, defendants claim (without citing any authority) that "the Court misled the jury by refusing to instruct them on the trebling of damages or the implementation of penalties."  (Dent-Johnson Br. at 39.)  As the Court previously held, and for the reasons the United States cited (Dkt. No. 588 at 3; Dkt. No. 651 at 1–2), "[t]estimony about treble damages or [FCA] penalties is not relevant to the jury's determination of liability or damages."  (Dkt. No. 736 at 2–4.)

### C.    The Jury's Unanimous Verdict Was Not Inconsistent

Dent and Johnson seek a new trial because the jury found that Dent and Johnson but not their company, BlueWave, violated the FCA.  (Dent-Johnson Br. at 4, 40–41.)  Dent and Johnson argue that there is "no way" to find them liable without also finding BlueWave liable.  (*Id*.)

First, Rule 49(b) imposes "an obligation upon trial counsel to object to any asserted inconsistencies in the response to jury interrogatories prior to the discharge of the jury."  *White v. Celotex Corp.*, 878 F.2d 144, 146 (4th Cir. 1989).  "The purpose of such a Rule is plain, to promote the efficiency of trials by allowing the original deliberating body to reconcile inconsistencies without the need for another presentation of the evidence to a new body."  *Id.*  "[A] litigant's failure to raise an inconsistency before the jury is discharged renders Rule 49(b) inapplicable and thus precludes that litigant from relying upon the inconsistency to challenge an adverse disposition."  *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 726 (4th Cir. 1999).  If a litigant objects to the inconsistency of a verdict "after the jury was excused"—even if the objection is made on the same day as, or "shortly after[]," the verdict—then the litigant has waived the argument and its motion for a new trial or judgment as a matter of law must be denied.  *White*, 878 F.2d at 145–46 (objection made on same day as verdict); *Austin*, 195 F.3d at 724 (alleged inconsistency noted shortly after verdict).  Here, Dent and Johnson have waived the objection; although they objected shortly after the verdict, they did so only after the jury was discharged, during discussions about trebling the verdict.  (Day 12 Tr. at 2972:18–2973:24.)

In any event, there is no inconsistency in the verdict.  Dent and Johnson argue that because they "were the owners, officers, and representatives of BlueWave," then "[e]ither all three were liable or none were."  (Dent-Johnson Br. at 40.)  This is not the law.  As Dent and Johnson proposed in their instructions, "each [party] should be given the same fair treatment" by the jury.  (Dkt. No. 703 at 1.)  Dent and Johnson never requested an instruction that they could

be found liable only if BlueWave was liable.  *See* Fed. R. Civ. P. 51(d) (plain error review applies to failure to give instruction that was not "properly requested" and objected).  Nor did they object to the Court's instruction that the verdict "should be based solely upon the evidence or lack of evidence as to each of the[se] defendants in accordance with [the Court's] instructions and without regard to whether any other person is or is not liable."  (Day 12 Tr. at 2939:21–14.)

Further, the verdict is reconcilable.  Dent and Johnson cite only one case regarding alleged inconsistent verdicts.  *Atlas Food Sys. & Servs., Inc. v. Crane Nat. Vendors, Inc.*, 99 F.3d 587 (4th Cir. 1996).  As the Fourth Circuit held in *Atlas*, a reviewing court must sustain a jury verdict "on any reasonable theory" and "harmonize seemingly inconsistent verdicts if there is any reasonable way to do so."  *Id.* at 599.  Here, the jury was instructed without objection that, "a corporation is liable for a conspiracy committed by its officers, employees, or agents if the conspiracy is committed at least in part for the benefit of the corporation."  (Day 12 Tr. at 2960:14–17.)  Applying that instruction, the jury may have found that Dent and Johnson acted solely for their own personal benefit and not "for the benefit of the corporation," BlueWave. (*Id.*)  Such a finding would be consistent with the verdict if the jury found that Dent and Johnson are liable for all false claims caused by the acts of a conspiracy of which they, but not BlueWave, were members.  (Day 12 Tr. at 2956:2–11 (instructing jury to impute conduct of BlueWave contractors to any defendant who was part of conspiracy or who "directed, participated in, adopted, and/or ratified that unlawful conduct").)  Alternatively, the jury may have found that Dent and Johnson trained and directed BlueWave contractors to offer kickbacks, and thus that they, not the corporation BlueWave, knowingly caused false claims to be presented to the United States, and such conduct "was a substantial factor in causing the United States to suffer damages."  (Day 12 Tr. at 2951:17–24; 2962:15–21.)  Indeed, there are many reasonable theories

to support the jury's verdict.  Thus, defendants' motion for a new trial should be denied.

> **D.** **Defendants Have Identified No "Discovery Abuse" or Miscarriage of Justice in Discovery**

Defendants claim the United States committed "disturbing discovery abuse" that "systematically deprived [defendants] of the necessary discovery."  (Dent-Johnson Br. at 47.)  In so arguing, defendants misrepresent the parties' productions and the discovery in this case.

By close of discovery on June 2, 2017, the United States had produced 2,935,885 Bates-numbered pages and electronic documents constituting almost all existing, responsive, and non-privileged documents in its possession, custody or control that were not subject to Mallory's then-pending motion to compel (Dkt. No. 406) or listed on the August 30, 2017 privilege log. The only exceptions were four interview memoranda identified and immediately produced on June 30, 2017; nine documents that had been marked as privileged but de-designated and produced on July 28, 2017; and an HHS-OIG memorandum that was inadvertently omitted from a prior production and produced on September 21, 2017.  After June 2, 2017, the United States produced an additional 62,458 Bates-numbered pages and electronic documents, or about 2% of the total, because:  (1) the Court had resolved a discovery dispute and ordered certain documents produced (*e.g.*, Dkt. Nos. 494, 789); (2) the United States produced certain documents, either by Order or by agreement, from the August 30, 2017 privilege log (*e.g.*, Dkt. No. 653); and (3) the United States acquired certain additional documents, such as a post-June 2017 settlement agreement between HHS-OIG and a physician.  In sum, the United States invested significant resources to respond to the broad scope of defendants' discovery requests, diligently produced millions of pages of documents to defendants, and promptly supplemented its productions.

The issues raised by defendants have been the subject of extensive motion practice before the Court, and rather than rehash these issues, the United States relies herein on the Court's

orders (Dkt. Nos. 428, 432, 494, 604, 665, 709, 713, 716, 724, and 789) and the United States'
prior briefings thereon. In sum, defendants have shown no "discovery abuse," much less any
deficiency in the United States' discovery responses that resulted in "a miscarriage of justice."
Notably, Dent and Johnson ignore their own discovery responses. Over a quarter of Dent and
Johnson's documents were produced after the close of fact discovery, including many documents
whose production was not delayed by or subject to a discovery dispute. They also withheld a
key document, only to spring it on the United States by surprise during the cross-examination of
Boomer Cornwell, in violation of their obligation under the Federal Rules to produce responsive
documents. (Day 2 Tr. at 442:12–444:24; Day 4 Tr. at 1093:18–1095:16.)

## V.    Defendants Have Misstated the Law on Set Offs

Dent and Johnson ask the Court to "setoff $98.5 million dollars from the jury's actual
damages verdict" based on the United States' settlements with HDL and Singulex. (Dent-
Johnson Br. at 50.) Mallory asks the Court to set off $59,355,147.50 based on the HDL
settlement. (Mallory Br. at 21.) That is, defendants seek to pay $0 in damages, despite being
found liable for over 35,000 false claims to the United States. There is no basis for such set off.

First, as defendants admit, only "common damages" may be set off. (Dent-Johnson Br. at
49 (quoting *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir. 1989)).) Here, neither
HDL nor Singulex was a defendant in the United States' case. (Dkt. No. 75.) HDL settled
allegations of broader misconduct than the United States alleged against defendants, including
offering and paying kickbacks in "speaker programs; advisory boards; consulting arrangements;
goods and services; and gifts" and submitting claims for payment for tests "that were not
appropriately coded." (Dkt. No. 588-1 ¶¶ (D)(1), (3); *see also* Ex. A (describing miscoding
allegations).) Singulex also settled allegations of broader misconduct than the United States

alleged against defendants, including offering and paying kickbacks in "speaker and other consulting fees." (Dkt. No. 588-2 ¶ (D)(1).) In addition to settling a broader scope of conduct, HDL and Singulex settled significantly more claims than those for which defendants were found liable. Of 289,818 alleged false HDL claims, defendants were found liable for 35,074 (12%); of 38,138 alleged false Singulex claims, Dent and Johnson were found liable for 3,813 (10%). (Day 10 Tr. at 2675:13–22.) Thus, even aside from the above differences between the HDL and Singulex settlements and the verdict, no more than 12% of HDL's settlement payments and 10% of Singulex's settlement payments are "common damages" to the verdict award.

Second, only amounts "previously received" by the United States may be set off. *United States v. Bornstein*, 423 U.S. 303, 316 (1976); *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 501 F. Supp. 2d 51, 53 (D.D.C. 2007). Here, the United States has received $6,355,147.48 from HDL and $972,984.41 from Singulex pursuant to their settlements of FCA allegations. (Ex. B, Decl. of Gretchen D'Costa ¶¶ 4, 7.) Thus, no set off against the FCA judgment could exceed 12% of the amount received from HDL (*i.e.*, $762,617.70) for the HDL claims and 10% of the amount received from Singulex (*i.e.*, $97,298.44) for the Singulex claims.

To seek a larger set off, defendants cite a prepetition claim (Dent-Johnson Br. at 50) and waiver agreement (Mallory Br. at 21). Neither document provided the United States with any value to settle FCA claims; instead, they referenced a claim in bankruptcy to potential future payments by the HDL Estate and a waiver of HDL's privilege over information Mallory sought to use for her advice of counsel defense. Defendants also cite other purported settlements. But they cite no physician or physician practice who settled FCA claims (rather than administrative claims) relating to P&H fees from HDL or Singulex. (Mallory Br. at 22.) Nor have defendants identified any settlement by the United States with HDL's former owners. (*Id.*) Nor is there any

basis for "an equitable lien."  (*Id.*)  Mallory cites *Mills v. GAF Corp.*, but the Ohio statute in

*Mills* does not apply here; even if it did, she could not receive a lien until she pays "the full

amount of the verdict," which no defendant has done here.  20 F.3d 678, 682 (6th Cir. 1994).

Third, the set off must be against treble damages.  As the Supreme Court has held, "in

computing the [multiple] damages authorized by the [FCA], the Government's actual damages

are to be [multiplied] before any subtractions are made for compensatory payments previously

received by the Government from any source."  *Bornstein*, 423 U.S. at 316–17.  Although

*Bornstein* was decided before the increase from double to treble damages under the FCA, this

methodology "applies with equal force to actions brought under the newer treble damages

provision in the FCA."  *Bill Harbert*, 501 F. Supp. 2d at 54 n.4.  This approach, *Bornstein* held,

"best comports in our view with the language and purpose of the Act."  423 U.S. at 317.

Specifically, the Act speaks of a multiple of "damages," not of "uncompensated damages" or

"net damages."  *Id.* at 314 n.10.  Further, multiple damages "are necessary to compensate the

Government completely for the costs, delays, and inconveniences occasioned by fraudulent

claims" and allowing a defendant "to avoid the Act's [multiple]-damages provision by tendering

the amount of the [unmultiplied] damages at any time prior to judgment . . . would make the

[multiple]-damages provision meaningless."  *Id.* at 315–16.

The Seventh Circuit case cited by defendants (Dent-Johnson Br. at 49) is not to the

contrary; it concerns the determination of "actual damages," not "whether third-party payments

should be subtracted before [multiplying damages]."  *United States v. Anchor Mortg. Corp.*, 711

F.3d 745, 750 (7th Cir. 2013) (relying on *Bornstein*, 423 U.S. at 316 n.13, to determine "whether

the market price should be subtracted from the contract price before doubling").  Thus, while

both *Bornstein* and *Anchor Mortgage* "support the premise that actual damages are calculated

first, and then they are trebled," *Bornstein* states "the correct method of damages calculation under the FCA in the context of third-party compensation," and *Anchor Mortgage* does not "involve or address payments from a third party." *United States ex rel. Baker v. Cmty. Health Sys., Inc.*, Civ. A. No. 05-279, 2014 WL 12634306, at *4 n.4 (D.N.M. June 24, 2014).

## VI. Common Law Claims

### A. The United States May Pursue Common Law Remedies

As this Court previously decided, "[b]ecause the FCA did not expressly abrogate the Government's ability to bring actions such as payment by mistake and unjust enrichment, the Government may bring equitable or common law claims in the alternative." (Dkt. No. 268 at 16; Dkt. No. 693 at 21–22.) The Court should again reject defendants' arguments to the contrary. (Dent-Johnson Br. at 28; Mallory Br. at 16.) "[P]ursuit of consistent remedies, even to final adjudication" is permitted, "so long as the plaintiff receives but one satisfaction." *Pa. Nat'l Mut. Cas. Ins. Co. v. Pine Bluff*, 354 F.3d 945, 950–51 (8th Cir. 2004). After trial, there remain claims for which the United States has not recovered damages. (Dkt. No. 877 at 2–3.) As more fully described in its motion for judgment, the United States respectfully requests that the Court sever and hold in abeyance the common law causes of action of payment by mistake and unjust enrichment. (*Id.* at 2–4.) If the Court declines to do so, then the United States requests that the Court schedule such post-trial evidentiary proceedings as the Court deems necessary to reach a verdict on the common law counts. (*Id.* at 4.)

### B. The United States May Recover for Payment By Mistake and Unjust Enrichment

"The government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid." *United States v. Wurts*, 303 U.S. 414, 415 (1938); *accord* Dkt. No. 693 at 14; Dkt. No. 707 at 12. To prevail on a claim for payment by mistake of

fact, the government must show that a federal health care program made "payments under an erroneous belief which was material to the decision to pay." *United States ex rel. Roberts v. Aging Care Home Health, Inc.*, 474 F. Supp. 2d 810, 819 (W.D. La. 2007) (quoting *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970)). Likewise, "[a] claim for unjust enrichment 'may be maintained as a general rule whenever the defendant has money in his hands which belongs to the plaintiff, and which in equity and good conscience he ought to pay to the plaintiff.'" (Dkt. No. 693 at 14 (quoting *Maisha v. Univ. of N.C.*, 641 F. App'x 246, 251–52 (4th Cir. 2016))); *accord* Dkt. No. 707 at 12.

At trial, the evidence showed that the United States paid the claims at issue under the beliefs that: (a) defendants had not tainted the claims with kickbacks; and (b) the claims were for medically necessary tests. (*E.g.*, Day 2 Tr. at 537:21–538:22 (Medicare); Day 4 Tr. at 1072:14–24, 1081:19–1082:16 (TRICARE).) These beliefs were erroneous: The HDL and Singulex claims were both: (a) tainted by kickbacks; and (b) for medically unnecessary services. *See* Sections III.A.–B., *supra*. Moreover, the beliefs were material to the United States' decision to pay the claims. *See* Section II.B., *supra*. The mistaken payments flowed into defendants' hands, unjustly enriching them. (Day 1 Tr. at 187:5–13; PTX 2972.) The United States may obtain repayment from the defendants, as they "participated in and benefitted from the tainted transaction[s]." *LTV Educ. Sys. Inc. v. Bell*, 862 F.2d 1168, 1175 (5th Cir. 1989); *accord Mead*, 426 F.2d at 124–25.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court deny defendants' motions for judgment as a matter of law and a new trial.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

LANCE CRICK
Acting United States Attorney
First Assistant United States Attorney

By:     s/James C. Leventis, Jr.
JAMES C. LEVENTIS, JR. (#9406)
JENNIFER J. ALDRICH (#6035)
Assistant United States Attorneys
1441 Main Street, Suite 500
Columbia, S.C. 29201
Telephone (803) 929-3000
James.Leventis@usdoj.gov

MICHAEL D. GRANSTON
PATRICIA L. HANOWER
ELIZABETH STRAWN
MICHAEL EDMUND SHAHEEN
CHRISTOPHER TERRANOVA
MICHAEL KASS
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, DC  20044

March 14, 2018