# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA
# BEAUFORT DIVISION

| | |
|---|---|
| United States of America, *et al.*, | Civil Action No. 9:14-cv-00230-RMG |
| Plaintiffs, | (Consolidated with 9:11-cv-1593-RMG and 9:15-cv-2458-RMG) |
| *ex rel.* Scarlett Lutz, *et al.*, | |
| Plaintiffs-Relators, | |
| v. | |
| BlueWave Healthcare Consultants, Inc., Floyd Calhoun Dent, III, Robert Bradford Johnson, and Latonya Mallory, | |
| Defendants. | |

This matter is before the Court on the motion filed by Defendants, Floyd Calhoun Dent, III and Robert Bradford Johnson, for judgment as a matter of law under Rule 50 or, in the alternative, for a new trial under Rule 59. (Dkt. Nos. 880, 880-1.) For the reasons set forth below, the motion is denied.

## I. Background

On January 31, 2018, a twelve-member jury returned a unanimous verdict, finding that defendants violated the False Claims Act (FCA), 31 U.S.C. §§ 3729–33. (Dkt. No. 870.) The jury found defendants responsible for 35,074 false claims for services by Health Diagnostics Laboratories ("HDL"), for which Medicare and TRICARE paid $16,601,591. (*Id.* at 1–2.) The jury also found Dent and Johnson responsible for 3,813 false claims for services by Singulex, for which Medicare and TRICARE paid $467,935. (*Id.* at 2–3.)

## II. Legal Standards

The Court must grant a Rule 50(b) motion for judgment as a matter of law if, "viewing the evidence in a light most favorable to the non-moving party (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party." *Pitrolo v. Cnty. of Buncombe*, 407 F. App'x 657, 659 (4th Cir. 2011) (quoting *Int'l Ground Transp. v. Mayor & City Council of Ocean City*, 475 F.3d 214, 218–19 (4th Cir. 2007)). If reasonable minds could differ, the court must affirm the jury's verdict. *See Dennis v. Columbia Colleton Med. Cntr., Inc.*, 290 F.3d 638, 645 (4th Cir. 2002). The "movant is entitled to judgment as a matter of law if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof." *Singer v. Dungan*, 45 F.3d 823, 827 (4th Cir. 1995) (internal quotation marks omitted); *Bilenky v. Ryobi Techs., Inc.*, 115 F. Supp. 3d 661, 668 (E.D. Va. 2015).

Under Rule 59(a), a district court may grant a new trial if the verdict (1) "is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Atlas Food Sys. & Servs., Inc. v. Crain Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996); *U.S. ex rel. Drakeford v. Tuomey*, 976 F. Supp. 2d 776, 789 (D.S.C. 2013). A new trial may also be appropriate to correct an inconsistent verdict. *Atlas Food*, 99 F.3d at 598. In determining whether to grant a new trial, the court may weigh the evidence and consider witness credibility. *See Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998); *King v. McMillan*, 594 F.3d 301, 314 (4th Cir. 2010).

### III. Discussion

#### A. Reconsideration of this Court's Prior Orders

Dent and Johnson have asked this Court to reconsider (1) its prior order finding that Anti-Kickback Statute ("AKS") violations are material to the Government's decision to pay a claim (Dkt. No. 880-1 at 20–23, previously ruled on at Dkt. No. 795 at 3–5); (2) its prior orders rejecting the primary purpose test in favor of the any/one purpose test for whether payments were made to induce referrals (Dkt. No. 880-1 at 23–25, previously ruled on at Dkt. Nos. 693 at 23; 310 at 10; 268 at 10 n.3); (3) its order on a motion in limine ruling that evidence of Johnson's and Dent's earnings from the alleged conduct was admissible[1] (Dkt. No. 880-1 at 30–34, previously ruled on at Dkt. No. 727 at 10–12); and (4) its order concluding that the AKS is not void for vagueness (Dkt. No. 880-1 at 12–17, previously ruled on at Dkt. No. 693 at 22). Because Defendants have asked the Court to consider these prior rulings without identifying any "intervening change in controlling law," "new evidence not available at trial," or "clear error of law" or "manifest injustice" in the Court's rulings, their renewed motions for reconsideration are denied. *See Hill v. Braxton*, 277 F.3d 701, 708 (4th Cir. 2002). Dent and Johnson also ask the Court to reconsider its prior orders excluding three of their expert witnesses: Daniel Mulholland, Jennifer Schmor, and Curtis Udell. (Dkt. No. 880-1 at 47-49.) The Court has already denied motions to reconsider the exclusion of these three experts. (Dkt. Nos. 507, 509, 527, 573, 574, 575.)

Additionally, in an about face, Dent and Johnson argue in their post-trial motion that the Processing and Handling ("P&H") fees at issue here fall under the personal services safe harbor. 42 C.F.R. § 1001.952(d). (Dkt. No. 880-1 at 23). Defendants have consistently and explicitly

---

[1] Defendants tied this argument to their motion for a new trial based on juror misconduct, which the Court has ruled on in a previous order. (Dkt. No. 896.)

represented to the Court that they did not assert that their conduct fell under the protection of the personal services safe harbor. They have told the Court that (1) they "do[] not seek protection under a regulatory Safe Harbor" (Dkt. No. 587 at 4); (2) they "do[] not seek to prove that [their conduct] qualifies for a regulatory Safe Harbor" (*id.* at 5); (3) "there is no affirmative defense of complying with the personal services AKS safe harbor by the defendants" (Dkt. No. 448 at 6, 15); and (4) "the personal services AKS safe harbor has not been pleaded, and is not in any way a part of this case" (*id.*). Defendants have described the safe harbor as "the irrelevant AKS personal services safe harbor" (Dkt. No. 448 at 20 n. 9) and "irrelevant to any issue in this case" (Dkt. No. 587 at 5). At the pretrial conference, counsel for Dent and Johnson informed the Court that Dent and Johnson were "not claiming an affirmative defense that we meet the safe harbor." (Dkt. No. 831 at 9:18–19.)

In any event, the evidence at trial does not support Dent and Johnson's new assertion that the P&H fee arrangements qualify for the personal services safe harbor. As a physician sent more specimens to HDL or Singulex, the physician received more P&H fees. (Dkt. No. 837 at 485:18–23, 504:25–505:5; Dkt. No. 838 at 650:22–651:10; Dkt. No. 854 at 1163:17–24.) The "aggregate" compensation paid to physicians over the "term" of the agreement (at least one year) was not "set in advance," as required by the safe harbor. 42 C.F.R. § 1001.952(d)(4)–(5). Because physicians received more P&H fees if they referred more Medicare beneficiaries to HDL and/or Singulex, the aggregate compensation over the term of the agreement was "determined in a manner that takes into account the volume . . . of any referrals" for which payment may be made by Medicare, which is prohibited by the safe harbor. § 1001.952(d)(5). Additionally, physicians received P&H fees only if they ordered more than one test, an arrangement that violated of the safe harbor because the safe harbor requires that the

compensation not take into account the volume of referrals. *See* Government's Trial Exhibit ("GTX") 1063 at 1 (HDL Processing and Handling Agreement providing that "This fee is not applicable in the case where a single sample type is collected or a single test is ordered"); Dkt. No. 857 at 2032:24–2033:4 (statement by witness Joe Anastasia that no P&H fee was paid if only a single test was ordered).

### B.    Rule 50(b) - Judgment as a Matter of Law

Dent and Johnson argue that they are entitled to judgment as a matter of law on the Government's FCA claims. The United States' P&H kickback, commission kickback, and medical necessity counts provided three alternative bases to recover FCA damages, and "overturning the verdicts on only one of these counts would not affect the damages awards themselves or necessitate a new trial." *Campbell v. Boston Sci. Corp.*, 882 F.3d 70, 79 (4th Cir. 2018).

Following a trial, this Court may issue judgment as a matter of law if, "viewing the evidence in a light most favorable to the non-moving party (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party." *Pitrolo v. Cnty. of Buncombe*, 407 F. App'x 657, 659 (4th Cir. 2011) (quoting *Int'l Ground Transp. v. Mayor & City Council of Ocean City*, 475 F.3d 214, 218–19 (4th Cir. 2007)). If reasonable minds could differ, the court must affirm the jury's verdict. *See Dennis v. Columbia Colleton Med. Cntr., Inc.*, 290 F.3d 638, 645 (4th Cir. 2002). Because "'[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions,'" a court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

1.  AKS Violations as the Basis for FCA Claims

The AKS prohibits a person from knowingly and willfully offering, paying, soliciting or receiving, any remuneration, in cash or in kind, to induce a referral to a federal healthcare program. 42 U.S.C. § 1320a-7b(b)(1)–(2). Dent and Johnson first argue[2] that they are entitled to judgment as a matter of law on the Government's FCA claims based on AKS violations because the Government did not offer evidence of "remuneration." To "remunerate" means "to pay an equivalent for service." *United States v. Greber*, 760 F.2d 68, 71 (3rd Cir. 1985). The AKS also covers "any kickback, bribe, or rebate," § 1320a-7b(b), that is, "situations where no service is performed." *Id.* "If the payments were intended to induce the physician . . . the statute was violated, even if the payments were also intended to compensate for professional services." *Greber*, 760 F.2d at 72. This Court defined "remuneration" in its jury instructions as "payment for services already paid by another or payment for more than fair market value." *See* 42 U.S.C. § 1320a-7a(i)(6) (remuneration is "transfers of items or services for free or for other than fair market value.").

---

[2] The bulk of Dent and Johnson's Rule 50(b) argument is that they could not have had the requisite scienter to violate the AKS because the AKS is void for vagueness. (Dkt. No. 880-1 at 7-10 ("the lawfulness of P&H fees was ambiguous as a matter of law" and "there is no evidence that BlueWave, Dent, Or Johnson's interpretation . . . was unreasonable").) Dent and Johnson then provide a summary of the evidence presented at trial (Dkt. No. 8801 at 10-11). The jury heard and weighed all of the evidence and found that the elements of an FCA violation were met. Defendants repeatedly insist that because no attorney explicitly told them that the payment of P&H fees was illegal, they cannot be liable. (Dkt. No. 880-1 at 14) ("The government introduced no statute, regulation, policy, or guidance that unequivocally outlawed P&H fees."). This argument is no more compelling now than it was several years ago when Defendants first raised it. The jury was not tasked with finding that the payment of P&H fees, writ large, is an illegal practice. The jury had only to weigh the evidence to determine whether Defendants were liable for violating the AKS and the FCA.

-6-

Dent and Johnson argue that the Government did not present evidence to show that the P&H fees were remuneration because (1) the Government agreed that Medicare does not reimburse for Code 99000; (2) the Government presented no evidence that the P&H fees were greater than fair market value; (3) although Government witnesses testified that Medicare and TRICARE reimburse physician practices for P&H services under the Current Procedural Terminology ("CPT") code for Evaluation and Management ("E&M"), no evidence was introduced that any physician practice that received P&H fees was also reimbursed under the E&M code; (4) doctors testified that receiving a P&H fee did not influence their decision to order tests; (5) the P&H agreements at issue stated that physicians could not receive both a P&H fee from the laboratories and reimbursement from other parties; and (6) Dent and Johnson had no knowledge of the physicians' billing practices. (Dkt. No. 880-1 at 4-7.)

First, the AKS does not require the United States to prove the lack of fair market value ("FMV"). *See United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 29–30 (1st Cir. 1989) (rejecting argument that government "had to prove that the payments received were not reasonable for the actual work done"); *accord United States ex rel. Health Dimensions Rehab., Inc. v. RehabCare Group, Inc.*, No. 4:12CV00848, 2013 WL 4666338, at *5 (E.D. Mo. 2013) ("Lack of fair market value, per se, is not an element the Government must provide.").

Second, a reasonable juror could conclude that P&H fees paid by HDL and Singulex were higher than fair market value to compensate the service provided. Dr. Michael Mayes testified that after receiving P&H fees, his practice subtracted the costs associated with the processing and handling of blood specimens and considered the "remaining amounts" to be "profit" which the practice distributed "back to the physicians who had ordered those tests based

upon the number they had ordered per month." (Dkt. No. 837 at 480:13–481:9.) Dr. Taqueer Alam testified that P&H fees offset his practice costs, including services unrelated to processing and handling. (Dkt. No. 858. at 2220:15–25, 2224:17–2225:12.) He admitted that he made a profit from P&H fees. (*Id.* at 2225:13–14.) Dr. Hollins testified that excess P&H fees left over after covering office expenses were distributed to the practice partners as a "bonus." (*Id.* at 2307:17–2308:19.)

A reasonable juror could also conclude from the evidence presented at trial that the Defendants used remuneration to induce referrals and that HDL and Singulex agreed to pay Dent and Johnson commissions on a percentage of collected revenue to sell lab tests to physicians. (GTX 2008 (Singulex/BlueWave Sales Agreement), 2009 (HDL/BlueWave Sales Agreement).) Before their scheme was implemented, defendants agreed that P&H fees would be offered to physicians because "P&H is a critical door opener." (GTX 1288.2.) BlueWave sales representative Boomer Cornwell testified that he was trained by Dent and Johnson to use P&H fees as a selling point when marketing HDL and Singulex tests (Dkt. No. 837 at 353:12–358:8), and admitted that he had touted P&H fees to physician clients as "tremendous" and "lucrative." (*Id.* at 458:13–17). Leonard Blasko referred to the P&H fees as an "economic thing." (*Id.* at 304:7–306:19.) Kyle Martel asserted the Fifth Amendment to refuse to answer questions about how he used P&H as a sales strategy. (Dkt. No. 853 at 1045:21–1052:4; GTX 1162 (email from Kyle Martel to potential client conveying the "business opportunity" of a $20 P&H fee that would be "paid directly to the practice on each panel sent" and would generate a revenue stream of $2000 per week).

A reasonable juror could also conclude that the defendants knew that the physicians receiving P&H fees were receiving a double payment because they were reimbursed for office

-8-

visits under the E&M code. Defendants used pro formas to induce physicians to order the tests by showing them the revenue stream they could create by ordering panels of tests and scheduling follow-up visits. (GTX 1035 (pro forma separately itemizing $145,000 per year in "Missed P&H Potential" and $546,000 per year in "Office Visits Missed Revenue"); 1099 (letter from BlueWave sales representative Burt Lively touting a "steady stream of follow up visits" generated by ordering 200 test specimens per week).

A reasonable juror could conclude that Defendants acted knowingly and willfully when they used remuneration to induce referrals. The record is rife with examples of Defendants being warned by many individuals that the P&H fees at issue constituted illegal kickbacks. On December 13, 2010, attorney Lester Perling told defendants that P&H was "as blatantly illegal as anything that I have ever seen in a long time. It would be a criminal violation of the federal and state kickback laws . . . and could form the basis for liability under the false claims act. It is absurd." (GTX 1266; *see also* GTX 1117.4-1117.6 (letter from potential client practice relaying the opinion from their attorney that "If the laboratory pays you for the Processing and Handling, but those functions are already paid for in the office visit payment, then the additional $17 that the laboratory is paying would be considered to be a kickback, paid to the medical practice to get the medical practice to use HDL rather than another lab."); 1122 (letter from compliance officer at Pathology labs alerting recipients to AKS implications of P&H payments). Finally, a reasonable juror could draw an adverse inference from evidence showing that Dent and Johnson tried to silence those who warned them about the illegality of their P&H fee practice. (*E.g.*, Dkt. No. 854 at 1339:5–19 (testimony that Dent and Johnson terminated Emily Barron after her attorney warned them that P&H fees violated AKS).

-9-

Defendants also continue to cite Gregory Root's December 27, 2007 memorandum to Berkeley Heartlab even though the P&H fees Defendant's arranged to be paid were twice as high as the fees at issue in Root's memorandum. It was undisputed that several of those attorneys did not specialize in health care law. Finally, although Dent and Johnson cite to statements from several Singulex and HDL attorneys to support their position, the jurors weighed all of the evidence at trial and reasonably found that defendants had acted knowingly and willfully.

Separately, Defendants argue that they cannot be held liable for the actions of BlueWave sales representatives because those representatives were independent contractors. (Dkt. No. 880-1 at 17-18). As this Court explained in its jury instructions, while defendants "are not automatically liable for the conduct of the BlueWave independent contractors." (Dkt. No. 861 at 2955:24–2956:1), if the jury finds the evidence sufficient to show that a conspiracy existed between a contractor and a defendant, the jury can impute the conduct of the contractor to any defendant who was part of the conspiracy. (*Id.* at 2956:2–11.)

Defendants also re-raise their argument that the AKS cannot outlaw the commission-based sales force model they used because the "commission structure did not increase costs or, more importantly, unduly influence the professional judgment of physicians" and that barring commission-based sales models violates the First Amendment. (Dkt. No. 880-1 at 19.) The AKS prohibits a person from knowingly and willfully offering or paying, or soliciting *or receiving*, any remuneration, in cash or in kind, to induce a referral to a federal healthcare program. 42 U.S.C. § 1320a-7b(b)(1)–(2) (emphasis added). A reasonable juror could conclude based on the evidence at trial (cited at length elsewhere in this order) that Defendants received remuneration in the form of commission-based payments for inducing physicians to order laboratory tests, many of which were medically unnecessary. Defendants' argument that anything about such an

interpretation violates the First Amendment is completely without merit, as addressed in this Court's prior order of October 23, 2017. (Dkt. No. 693 at 23-24.)

          2.      Medically Unnecessary Tests

Dent and Johnson argue that they are entitled to judgment as a matter of law on the Government's FCA claims based on the submission of claims for medically unnecessary tests because "the government introduced no evidence from treating physicians of any medically unnecessary tests; the government's medical expert did not even review a single patient file." (Dkt. No. 880-1 at 27.) Defendants also argue that they cannot be liable for the ordering of medically unnecessary tests because "the salesforce is in no position to second-guess a physician at the time of ordering the test or at the time of conducting the test" and laboratories are "permitted to rely on the ordering physician's determination that the laboratory tests billed to Medicare are medically necessary." (*Id.*)

A reasonable juror could conclude, based on the evidence of defendants' scheme and the lack of medical necessity of the tests, that defendants knowingly caused the submission to Medicare and TRICARE of claims for medically unnecessary services. Dr. Jeffrey Trost testified that, except for the standard lipid panel, none of the tests in HDL's baseline assessment and follow-up panels were medically necessary in routine clinical practice. (Dkt. No. 853 at 987:16–988:13.) Dr. Trost testified that several tests on HDL's panel (CYP3C19, Factor V Leiden, prothrombin mutation, NT Pro-BNP, and Galectin-3) were not medically necessary to make treatment decisions. (*Id.* at 989:11–997:10.) Dent and Johnson's own expert, Dr. Robert Fishberg, testified that CYP2C19 is only appropriate for patients who may need to be prescribed Plavix, not for every patient. (Dkt. No. 857 at 1965:22–1966:11.) Dr. Trost testified that Cardiac troponin-I, a test on the standard Singulex panel, is not useful as an outpatient screening test, and

that Interleukin-6 and Interleukin-17A, also on the Singulex panel, are completely devoid of any clinical utility. (Dkt. No. 853 at 998:1–999:24.) Dr. Fishberg stated that he ordered the Factor V Leiden and prothrombin mutation tests only for patients with certain family histories and that that subset of patients represented only about 5% of the population. (*Id.* at 1967:19–1968:14.)

Contrary to Defendants' representations, Dr. Trost did review the medical records of an actual patient. Dr. Trost testified that the charts showed the patient had received both HDL and Singulex baseline and follow-up panels at four to six-month intervals for six years. He further testified that none of that testing was necessary to identify that the patient was at a very high risk for having a heart attack. (Dkt. No. 853 at 1003:20–1008:1.)

The evidence presented at trial was sufficient for a reasonable juror to find that Dent and Johnson "engaged in a scheme to encourage non-cardiology physicians to order medically unnecessary tests through a false marketing campaign and pre-printed test requisition forms," which is sufficient to establish a knowing violation of the FCA. *United States ex rel. Groat v. Boston Heart Diagnostics Corp.*, Civ. A. No. 15-487, 2017 WL 6327540, at *8 (D.D.C. Dec. 11, 2017) (citing *United States ex rel. Lutz v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 499–500 (D.S.C. 2016)). A reasonable juror could conclude that the scheme induced physicians to order medically unnecessary tests from HDL and Singulex. For example, Dr. Mayes (who testified that he had frequent opportunities to review the test ordering decisions of the other physicians in his practice when he covered for them and that he handled the practice's finances) testified that the other physicians in his practice ordered more tests from HDL and Singulex when they received P&H fees and stopped ordering from HDL and Singulex when the P&H payments ceased. (Dkt. No. 837 at 482:1–7, 483:11–484:11, 501:15–21.)

### C.   Rule 59(a) – Motion for a New Trial

Under Rule 59(a), a district court may grant a new trial if the verdict (1) "is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Atlas Food Sys. & Servs., Inc. v. Crain Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996); *U.S. ex rel. Drakeford v. Tuomey*, 976 F. Supp. 2d 776, 789 (D.S.C. 2013). A new trial may also be appropriate to correct an inconsistent verdict. *Atlas Food*, 99 F.3d at 598. In determining whether to grant a new trial, the court may weigh the evidence and consider witness credibility. *See Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998); *King v. McMillan*, 594 F.3d 301, 314 (4th Cir. 2010).

Courts have "considerable discretion in choosing the specific wording of [jury] instructions." *Figg v. Schroeder*, 312 F.3d 625, 640 (4th Cir. 2002) (internal quotation marks omitted). A verdict may be reversed for failure to "give an instruction proposed by a party only when the requested instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired that party's ability to make its case." *Noel v. Artson*, 641 F.3d 580, 586-87 (4th Cir. 2011) (internal quotation marks omitted). "The test of adequacy of instructions . . . is not one of technical accuracy in every detail." *Spell v. McDaniel*, 824 F.2d 1380, 1395 (4th Cir. 1987). Rather, it is a practical examination of "whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Id.*

1.     Evidentiary Issues

An evidentiary error "warrants a new trial only if it results in 'a high probability that the error . . . affect[ed] the judgment.'" *Huskey*, 848 F.3d at 160 (quoting *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 375 (4th Cir. 2015)). That is, when "a new trial is sought based on purported evidentiary errors by the district court, a verdict may be set aside only if an error is so grievous as to have rendered the entire trial unfair." *EEOC v. Consol. Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2017).

Dent and Johnson object to the Government's discovery and use of uncommunicated work product. (Dkt. No. 880-1 at 41-43.) They argue that the Government inappropriately sought production of the uncommunicated work product directly from Dent, Johnson, and BlueWave, and not from the law firm that drafted the materials in question. However, this Court previously ordered Dent and Johnson to produce the responsive documents, including uncommunicated work product, "currently in the possession of their former counsel" because "[f]or discovery purposes, a party is generally considered to have possession and control over documents in the possession of its current or formal legal counsel." (Dkt. No. 410 at 4, at 9.) This Court discussed the legal precedent for allowing discovery of these materials at length in its prior order, finding that discovery was appropriate because Defendants asserted the advice of counsel defense. (Dkt. No. 410 at 5-9.)

Defendants specifically object to the introduction into evidence of a memorandum drafted by Linda Flippo summarizing a meeting of the defendants and several attorneys (GTX 1034), but provide no legal support for their argument. The memorandum was clearly relevant because it described communications from attorneys to each of the defendants about the risks associated with paying P&H and about what the United States had conveyed to defendants' counsel about P&H. (Dkt. No. 854 at 1219:11–1224:16.). The Court has already ruled that the

evidence was not hearsay because it was offered to show defendants' state of mind, not the truth of the matter asserted. (*Id.*)

Dent and Johnson also argue that the Court erroneously allowed the Government to introduce evidence about Defendants' alleged waiver of co-payments and deductibles. Defendants claim that this evidence was more prejudicial than probative because the Government abandoned its FCA claims based on the waiver of copayments and deductibles. (Dkt. No. 880-1 at 25-26.) As already ruled on by this Court, evidence about the waiver of co-payments and deductibles was integral to the Government's description of Defendants' marketing of laboratory tests, the incentives they offered to physicians, and their state of mind. (*See* Dkt. No. 855 at 1428:19–1429:1.)

2.  Alleged Discovery Abuses

Dent and Johnson claim that the Government engaged in discovery abuse when it delayed the production of documents and delayed production of a complete privilege log. (Dkt. No. 8801- at 44-47.) Those issues have been the subject of extensive motion practice by the parties and orders by this Court. Moreover, Defendants argue disingenuously that they were prejudiced by the Government's production of documents and privilege log updates close to the original trial date (set for August 2017) when those issues were all resolved long before the actual trial was held in January 2018. The Court will not revisit its rulings on these issues.

Dent and Johnson also ask this Court to revisit its ruling on their request for sanctions based on what they allege was the Government's improper actions in connection with the Dent and Johnson's efforts to secure Mr. Padget as a witness. (Dkt. No. 724.) Defendants have not identified any "intervening change in controlling law," "new evidence not available at trial," or

"clear error of law" or "manifest injustice" in the Court's ruling to cause the Court to revisit that decision. *See Hill v. Braxton*, 277 F.3d 701, 708 (4th Cir. 2002).

### 3. Inconsistent Verdict and Damages

Dent and Johnson argue that the verdict was inconsistent because the jury found BlueWave not liable. They claim that "Dent and Johnson were the owners, officers, and representatives of BlueWave, and all acts taken to sell tests for HDL and Singulex were done through BlueWave" so "[i]f BlueWave is not liable, there is no connection between Singulex or HDL and Dent and Johnson." (Dkt. No. 880-1 at 40-41.) Because BlueWave was not found liable, Dent and Johnson argue that the jury's verdict "cannot support damages against Dent and Johnson because there is no evidence in the record that identifies the number of claims or total amounts attributable to Dent and Johnson for their own acts" and they cannot be held liable for the acts of other BlueWave sales representatives when BlueWave itself was not found liable. (*Id.*)

For reasons discussed earlier in this order, the jury's verdict is not inconsistent because a reasonable juror could find Dent and Johnson liable for the actions of their co-conspirators. The Fourth Circuit has held that a reviewing court must sustain a jury verdict "on any reasonable theory" and "harmonize seemingly inconsistent verdicts if there is any reasonable way to do so." *Atlas Food Sys. & Servs., Inc. v. Crane Nat. Vendors, Inc., 99 F.3d 587, 599 (4th Cir. 1996).* Here, the jury was instructed[3] that, "a corporation is liable for a conspiracy committed by its officers, employees, or agents if the conspiracy is committed at least in part for the benefit of the corporation." (Dkt. No. 861 at 2960:14–17.) Applying that instruction, the jury may have found that Dent and Johnson acted solely for their own personal benefit and not for the benefit of

---

[3] No party objected to the Court's instruction on conspiracy.

BlueWave. A reasonable juror could also have concluded from the evidence presented at trial that Dent and Johnson trained and directed BlueWave contractors to offer remuneration to physicians to induce referrals and thus that they, as individuals, knowingly caused false claims to be presented to the United States. (Dkt. No. 861 at 2951:17–24; 2962:15–21.)

    4.    Jury Instructions

Dent and Johnson argue that the Court's jury instructions did not adequately inform the jury of the controlling law. The Court has already ruled on most of Dent and Johnson's arguments about the jury instructions (Dkt. No. 880-1 at 34-39), including their arguments that (1) the Court should have instructed the jury on materiality (*see* Dkt. No. 795 at 3-5); (2) the Court should have instructed the jury on the trebling of damages (*see* Dkt. No. 736 at 2-3); (3) the Court should not have instructed the jury that it could draw an adverse inference from a BlueWave sales representative's invocation of the Fifth Amendment (*see* Dkt. No. 736 at 16-22); and (4) the Court should have instructed the jury that the Government had a "clear and convincing" burden of proof for its FCA claims and a "beyond a reasonable doubt" burden of proof for its FCA claims based on AKS violations.

Three of Dent and Johnson's arguments about the jury instructions have not yet been addressed, and the Court has considered them here. Courts have "considerable discretion in choosing the specific wording of [jury] instructions." *Figg v. Schroeder*, 312 F.3d 625, 640 (4th Cir. 2002) (internal quotation marks omitted). A verdict may be reversed for failure to "give an instruction proposed by a party only when the requested instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired that party's ability to make its case." *Noel v. Artson*, 641 F.3d 580, 586-87 (4th Cir. 2011) (internal quotation marks

omitted). "The test of adequacy of instructions . . . is not one of technical accuracy in every detail." *Spell v. McDaniel*, 824 F.2d 1380, 1395 (4th Cir. 1987). Rather, it is a practical examination of "whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Id.*

First, Dent and Johnson argue that the instructions improperly combined the Government's two separate FCA claims, the presentment claim and the false statement claim, resulting in a lack of clarity about 'what conduct specifically constitutes a violation of the FCA under the false statement theory." (Dkt. No. 880-1 at 35.) The jury instructions were not unclear on this distinction. The Court instructed the jurors that they had to decide whether "defendants violated the False Claims Act by presenting or causing to be presented false or fraudulent claims or false records," making it clear that the FCA could be violated in either of these ways. The Court then instructed the jurors on the applicable legal standard for FCA violations, including falsity, knowledge, causation, conspiracy, and damages. (Dkt. No. 861 at 2946:11–15, 2953:4–2963:15.) The instructions explicitly referenced false records *and* statements (*id.*), consistent with 31 U.S.C. § 3729(a)(1)(B).

Second, Dent and Johnson argue that the Court properly instructed the jury that good faith is relevant to scienter under the AKS but failed to separately instruct the jury that good faith is relevant to state of mind under the FCA generally. Because good faith can negate willfulness, and willfulness is a requirement of AKS violations, it was appropriate to instruct the jury on good faith in connection with AKS violations. However, there is no "willfulness" requirement for FCA violations because only a showing of knowledge is required. 31 U.S.C. § 3729(a)(1)(A)–(C). Here, the Court correctly instructed on "knowledge" under the FCA,

including actual knowledge, deliberate ignorance, and reckless disregard. (Dkt. No. 861 at 2954:6–2955:21.) The instructions provided on good faith were in accordance with the law.

Third, Dent and Johnson argue that the Court should have instructed the jury that it could consider Dent and Johnson's reliance on counsel as a defense. The Court explained on the record why it determined that Dent and Johnson were not entitled to a full "advice of counsel" defense that could completely absolve them of all liability. (Dkt. No. 859 at 255-263.) However, the Court instructed the jury that, "[i]n determining whether a defendant acted in good faith," the jury "must consider" "all of the legal opinions and advice received by or known to the defendant, regardless of the source." (Dkt. No. 861 at 2951:12–16; *see also* Dkt. No. 859 at 2682:3-24.) Defendants were therefore allowed to argue that they acted in good faith when they relied on statements by attorneys.

## IV.    Conclusion[4]

Fort the reasons set forth above, Dent and Johnson's Motion for judgment as matter of law or, in the alternative, for a new trial (Dkt. Nos. 880, 880-1), is DENIED.

**AND IT IS SO ORDERED.**

_____
Richard Mark Gergel
United States District Court Judge

May ___/4/___, 2018
Charleston, South Carolina

---

[4] Dent and Johnson claim they are entitled to set-offs "from settling co-defendants and other parties that represent common damages," including "a set-off of $97,000,000 for HDL's settlement with the government," a set-off of $1.5 million from the Government's settlement with Singulex, and a set-off covering any amount the Government has recovered from physician practices that utilized HDL or Singulex tests. (Dkt. No. 880-1 at 4950.) The Court will address this argument in a separate, forthcoming order. The Court will also consider all Defendants' arguments about the sufficiency of evidence on damages in a forthcoming order.